MISIÓN INDUSTRIAL DE PUERTO RICO, INC. y OTROS, recurridos, *v.* JUNTA DE PLANIFICACIÓN DE PUERTO RICO y AUTORIDAD DE ACUEDUCTOS Y ALCANTARILLADOS, peticionarios.

*Números:* CC-97-114
CC-97-116 *Resueltos:* 21 de marzo de 1997

*Carlos Lugo Fiol, Procurador General,* abogado de la Junta de Planificación, parte recurrente; *Enrique Adames Soto, Viviana Rodríguez* y *John M. García,* de *García & Fernández,* abogados de la Autoridad de Acueductos y Alcantarillados, parte recurrente; *Pedro J. Saade Lloréns,* abogado de Misión Industrial de Puerto Rico y otros, parte recurrida.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

A través de los recursos de *certiorari,* que fueron presentados en los casos consolidados de epígrafe,(¹) se nos solicita que revisemos una resolución interlocutoria emitida por el Tribunal de Circuito de Apelaciones (en adelante el Tribunal de Circuito), mediante la cual expidió el auto de revisión solicitado por Misión Industrial de Puerto Rico, Inc. y otros (en adelante Misión Industrial), los aquí recurridos, y negó la emisión de una orden extraordinaria que relevara a las aquí peticionarias, Junta de Planificación de Puerto Rico (en adelante la Junta) y Autoridad de Acueductos y Alcantarillados (en adelante la Autoridad), de los efectos de paralización, concomitantes a la expedición del auto de revisión.

En el recurso de revisión ante el Tribunal de Circuito se impugnó una resolución de la Junta, que aprobaba la con-

---

(¹) El Caso Núm. CC-97-114, presentado por el Hon. Carlos Lugo Fiol, Procurador General de Puerto Rico, en representación de la Junta de Planificación de Puerto Rico (en adelante la Junta), fue consolidado con el Caso Núm. CC-97-116, presentado por la Autoridad de Acueductos y Alcantarillados mediante resolución que emitiéramos el 10 de marzo de 1997.

sulta peticionada por la Autoridad en torno a la ubicación de un sistema de acueductos conocido como el Superacueducto de la Costa Norte (en adelante S.A.N.). En sus respectivos escritos de *certiorari*, las peticionarias cuestionan, en esencia, la actuación del Tribunal de Circuito, que prestó un mayor énfasis a su determinación de sostener los efectos de la expedición del auto de revisión. Tratándose tanto la expedición del auto de revisión como la concesión del remedio interlocutorio extraordinario de actuaciones que caen bajo la sana discreción del Tribunal de Circuito, debemos determinar si éste abusó de su discreción al así actuar.

Con relación a la decisión en la que se sostuvo la paralización de los efectos de la resolución de la Junta, debemos analizar los hechos a la luz de los criterios que jurisprudencialmente se han desarrollado para determinar la procedencia de este tipo de remedio provisional extraordinario. Este remedio se rige por los principios de equidad. Es al amparo de esos criterios, y poniendo en su correcta perspectiva los planteamientos de las peticionarias, que debemos evaluar la corrección de la actuación del Tribunal de Circuito para resolver los recursos presentados. Debe quedar claro que siendo la medida que tratamos de carácter interlocutorio *provisional*, nada de lo que aquí expongamos debe entenderse como que prejuzga los méritos de la controversia, que aún se encuentra ante el Tribunal de Circuito. Sencillamente, ésta no está ante nuestra consideración.

En atención al análisis que expondremos a continuación, concluimos que el Tribunal de Circuito no abusó de su discreción al expedir el auto de revisión. En cuanto a la determinación de sostener los efectos de la expedición del recurso, en atención a las circunstancias particulares del caso de autos, dicho tribunal debió haber emitido una orden en la que relevara parcialmente a las aquí peticionarias de los efectos de paralización producidos por la expedición del auto de revisión.

# I

El S.A.N. es un ambicioso proyecto propulsado por la Autoridad como complemento a otras medidas que se propone implantar dicha agencia y tiene el propósito de asegurar el adecuado abastecimiento del servicio de agua a varios municipios de la costa norte de la Isla. El proyecto ha sido descrito de la forma siguiente:

> El proyecto está compuesto de siete elementos principales. Su primer componente es una laguna de retención de aguas crudas (sin tratar) cerca de la confluencia del Río Grande de Arecibo y del Río Tanamá. El segundo componente es una estación de bombeo de aguas crudas hacia la planta al este sureste de la mencionada laguna. El tercer elemento es la tubería de conducción de aguas crudas que va desde la estación de bombeo hasta la planta de filtración propuesta. El cuarto elemento es la Planta de Filtración en el Barrio Miraflores de Arecibo con una capacidad de producción inicial de 100 MGD. Como quinto elemento está la tubería de agua potable desde Arecibo hasta la zona este de Bayamón con un total de doce (12) puntos de conexión de servicio para los municipios a servirse ya mencionados. El lugar seleccionado para la planta es un punto alto que permite llevar las aguas por gravedad, sin bombeo, desde Arecibo hasta Bayamón. El sexto componente serán dos tanques de almacenaje de 10 MGD cada uno y serán instalados al oeste de la ciudad de Bayamón. Dos líneas de trasmición [sic] eléctricas serán el último componente del sistema. Una de las líneas va a suplir la estación de bombas cerca del Río Grande de Arecibo y la otra la Planta de Tratamiento a ubicarse en el Barrio Miraflores. Resolución de la Junta de 5 de julio de 1996, Apéndice Caso Núm. CC-97-114, pág. 41.

El 21 de junio de 1995 la Autoridad presentó a la Junta la consulta de ubicación en torno al S.A.N.[2] La aprobación de dicha consulta fue mantenida en suspenso por determinación de la Junta el 20 de julio de 1995, en lo que la Autoridad sometía varios documentos y acreditaba el cumplimiento de una serie de requerimientos. Entre éstos cabe destacar el relativo a una certificación de cumplimiento con el requisito establecido en el Art. 4(c) de la Ley sobre

---

[2] Consulta Núm. 95-06-0682-JGE.

Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970, según enmendada,[3] 12 L.P.R.A. sec. 1124(c), y los relativos a la notificación de los propietarios de los terrenos afectados por la ubicación del proyecto. Ante una solicitud de la Autoridad para que se le eximiera del requisito de notificar individualmente a cada propietario, la Junta autorizó la notificación mediante la publicación de anuncios en los periódicos, la radio y la televisión. Posteriormente la Junta celebró vistas públicas los días 18, 19, 22 y 26 de diciembre de 1995, en Bayamón, Utuado y Arecibo.

El 31 de enero de 1996, y antes de que la Junta emitiera su decisión en torno a la consulta de ubicación, la Autoridad suscribió un acuerdo para la construcción, la operación y el mantenimiento del S.A.N. con Thames-Dick Superaqueduct Partners, Inc. (en adelante Thames-Dick).[4] La Autoridad continuó con el trámite administrativo ante las agencias concernidas en relación con la obtención de los permisos correspondientes.

El 20 de mayo de 1996, habiendo la Junta celebrado las vistas públicas pero sin que hubiera resuelto la consulta de ubicación, la Junta de Calidad Ambiental (en adelante la J.C.A.) emitió una resolución y determinó que la declaración de impacto ambiental (en adelante D.I.A.) preparada por la Autoridad, cumplía con los requisitos establecidos por la Ley sobre Política Pública Ambiental. [5] De dicha

---

[3] Esta disposición de ley establece el requisito relativo a la presentación de una declaración que discuta el impacto ambiental que se espera tendrá el proyecto propuesto y las medidas que se tomarán para mitigar dicho impacto. Toda acción gubernamental que pueda afectar significativamente la calidad ambiental requiere la preparación de una declaración de impacto ambiental (en adelante D.I.A.). Sec. 5.2.1. del Reglamento sobre Declaraciones de Impacto Ambiental de Puerto Rico Núm. 3106 de 4 de junio de 1984, Junta de Calidad Ambiental, pág. 16.

[4] Véase Solicitud urgente de intervención de Thames-Dick Superaqueduct Partners, Inc. de 12 de marzo de 1997.

[5] En la parte final de la referida resolución se consignó específicamente que se daba por cumplido el trámite de consulta pública requerido por la Ley sobre Política Pública Ambiental. Sin embargo, se le requirió a la agencia proponente que considerara los comentarios de la ciudadanía, los incorporara mediante *addendum* a la declaración de impacto ambiental-final y los sometiera a la Junta de Calidad Ambiental (en adelante la J.C.A.) de conformidad con el reglamento aplicable. Véase la Resolución de la Junta de Calidad Ambiental de 20 de mayo de 1996, Apéndice Caso Núm. CC-97-116, págs. 345–369.

determinación, Misión Industrial y Servicios Científicos y Técnicos, a través del Sr. Neftalí García Martínez, solicitaron sendas reconsideraciones. Éstas fueron denegadas mediante la Resolución Núm. R-96-23-1 de 18 de junio de 1996, notificada el 25 de junio de 1996. No surge del expediente que de dicha determinación se haya solicitado una revisión.

El 18 de julio de 1996 la Junta aprobó la consulta de ubicación presentada por la Autoridad. Varios interventores solicitaron una reconsideración de la determinación de la Junta. Esta fue denegada mediante resolución notificada el 30 de agosto de 1996. Oportunamente, el 27 de septiembre de 1996, acudieron al Tribunal de Circuito, mediante un recurso de revisión. Tanto la Junta como la Autoridad se opusieron a que el tribunal expidiera el auto de revisión solicitado.

Cabe señalar que antes de que la Junta le impartiera su aprobación inicial a la consulta de ubicación de la Autoridad, Thames-Dick presentó al Departamento de Recursos Naturales y Ambientales (en adelante D.R.Na.) una solicitud para la concesión del permiso de construcción de una toma de agua y otra para una franquicia de utilización de la toma de agua, según lo requiere la legislación aplicable. Ambas solicitudes fueron presentadas conjuntamente el 16 de julio de 1996. Estas solicitudes fueron atendidas por el D.R.Na., a la misma vez que la Junta atendía las mociones de reconsideración de los objetores en aquel proceso. Dos (2) meses más tarde, el 18 de septiembre de 1996, el D.R.Na. emitió una resolución con relación a la Petición Núm. PTR-7-124-96, mediante la cual se concedió el permiso de construcción de la toma de agua. En los procesos ante el D.R.Na. también intervinieron los aquí recurridos y solicitaron reconsideración de la determinación para conceder el permiso de construcción de toma de agua. La finalidad de estos permisos también se encuentra aun bajo cuestionamiento, por motivo de la impugnación de que han sido objeto ante la agencia.

Para fines de la discusión que efectuaremos más ade-
lante, es menester puntualizar que el 6 de septiembre de
1996, luego que la Junta resolviera la reconsideración y
antes de que Misión Industrial presentara al Tribunal de
Circuito el recurso de revisión, Thames-Dick dió comienzo
a la construcción del proyecto instalando cierta tubería.
Para esa fecha el D.R.NA. todavía no había expedido el
permiso de construcción de la toma de agua impugnado
posteriormente.

Ya presentado el recurso y dentro del trámite judicial, el
20 de diciembre de 1996 Misión Industrial interpuso una
Moción Urgente Solicitando Auxilio de Jurisdicción. En
síntesis adujo que la Autoridad había comenzado la cons-
trucción del S.A.N. cuando aún estaba pendiente en el Tri-
bunal de Circuito la expedición de la petición de revisión.
Indicó que la Autoridad había comenzado la construcción
de la laguna de retención en el municipio de Arecibo y la
instalación de la tubería a lo largo de la ruta del S.A.N.
Añadió que la construcción efectuada por la Autoridad cau-
saba "serias consecuencias al medio ambiente al conllevar
el dragado y extracción de miles de metros cúbicos de te-
rreno precisamente en las áreas inundables y de gran valor
agrícola". Apéndice Caso Núm. CC-97-114, págs. 729–730.
Continuó señalando que la construcción se efectuaba sin
autorización alguna del D.R.NA., en contravención a la Ley
para la Conservación, el Desarrollo y Uso de los Recursos
de Agua de Puerto Rico, Ley Núm. 136 de 3 de junio de
1976 (en adelante la Ley de Aguas), 12 L.P.R.A. secs.
1501–1560, y al Reglamento para el Aprovechamiento,
Uso, Conservación y Administración de las Aguas de
Puerto Rico de 28 de enero de 1993, Departamento de Re-
cursos Naturales (en adelante el Reglamento de Aguas).[6]
Expresó, finalmente, que el ritmo de construcción amena-

---

[6] En su Solicitud de intervención de 12 de marzo de 1997, Thames-Dick Supe-
raqueduct Partners, Inc. nos informó que dicha firma había presentado las corres-
pondientes solicitudes de permiso de construcción de toma de agua y de franquicia al
Departamento de Recursos Naturales (en adelante D.R.NA).

zaba con convertir en académica la solicitud de revisión "debido a la gran inversión de fondos públicos que se realiza, pendiente el trámite del presente recurso". Apéndice Caso Núm. CC-97-114, pág. 731. A la luz de la moción presentada por Misión Industrial, el Tribunal de Circuito celebró una vista oral el 22 de enero de 1997. Luego de efectuada, tanto la Junta como la Autoridad se opusieron al Escrito en Respuesta a Oposición de Misión Industrial interpuesto un día antes de la vista. La Junta también sometió una copia certificada del expediente administrativo y copias de los permisos otorgados por varias agencias respecto a las distintas fases del proyecto.[7]

Así las cosas, el 28 de febrero de 1997 el Tribunal de Circuito emitió la resolución, cuya revisión ahora se nos solicita, para expedir el auto de revisión. En dicha resolución indicó que las agencias allí recurridas, la Junta y la Autoridad, no adujeron razones que justificaran alterar el curso ordinario de los efectos de la expedición. En otras palabras, concluyó que no tenía información suficiente para emitir una orden de remedio provisional extraordina-

---

[7] "ARPE:

"Exención de la presentación de planos de construcción y segregación de proyectos a tenor con la Resolución JTP-14 y sus posteriores extensiones, notificada originalmente el 3 de julio de 1995; permisos para demolición de edificios otorgados el 25 y 31 de octubre.

"DRNA:

"Exención del permiso de extracción de corteza terrestre otorgada el 26 de julio de 1996; permiso de construcción de toma de agua otorgado el 18 de septiembre de 1996; endoso de control de inundaciones; permisos de corte y poda de árboles otorgados entre octubre y diciembre de 1996; permiso para pozo de rastreo aprobado el 7 de agosto de 1996.

"DTOP:

"Acuerdo interagencial entre el DTOP y la Autoridad para el uso de determinada carretera.

"JCA:

"Permisos para emisión de polvo fugitivo otorgados del 28 de junio al 1ro. de julio de 1996; permiso de control de erosión y sedimentación de los terrenos de 20 de agosto de 1996.

"OTROS:

"Permiso del Cuerpo de Ingenieros de los Estados Unidos de 3 de septiembre de 1996; permiso de la Agencia de Protección Ambiental de los Estados Unidos (EPA) con relación a descarga de contaminantes durante la construcción otorgado el 6 de diciembre de 1996."

rio que evitase la paralización automática de la construcción del S.A.N.[8] Sin embargo, "consciente de lo que conlleva la detención temporera de las obras",[9] el Tribunal de Circuito desarrolló un itinerario acelerado para procurar la rápida resolución del recurso. A los efectos, ordenó la presentación de los autos certificados del proceso administrativo y de la transcripción de las vistas evidenciarias celebradas ante la Junta,[10] y que, una vez cumplidos los extremos anteriores, las partes tendrían diez (10) días para presentar los escritos adicionales que estimasen necesarios. El 3 de marzo de 1997 se archivó en los autos del Tribunal de Circuito copia de la notificación de dicha resolución.

El 7 de marzo de 1997, tanto la Junta como la Autoridad comparecieron ante nos mediante sendas peticiones de *certiorari*. En éstas señalaron que erró el Tribunal de Circuito al expedir el auto de revisión. En esencia, los planteamientos se contraen a cuestionar la expedición del recurso e impugnar la determinación de sostener el efecto de la expedición, en cuanto a la prohibición de continuar la construcción del proyecto.[11]

En atención al interés público que permea el proyecto

---

[8] Véanse: Reglas 66 y 79 del Reglamento del Tribunal de Circuito de Apelaciones de 1ro de mayo de 1996 (4 L.P.R.A. Ap. XXII-A).

[9] Resolución recurrida, pág. 20

[10] No surge del expediente que el Tribunal de Circuito haya solicitado a las partes que le señalaran las secciones pertinentes de las vistas para transcribir esas solamente. Entendemos que éste hubiese sido un mecanismo adecuado para ayudar a la pronta resolución del recurso.

Mediante Moción en Cumplimiento de Orden de 5 de marzo de 1997, la Junta informó al Tribunal de Circuito que la transcripción de las vistas tomaría al menos tres (3) semanas.

[11] La Junta planteó el error siguiente:

"Erró el Tribunal de Circuito de Apelaciones al expedir el auto de revisión solicitado por los recurrentes y paralizar las obras de construcción del Superacueducto de la Costa Norte, por ser tal medida improcedente en derecho, innecesaria y dañina para el interés público." Petición de *certiorari*, pág. 6.

La Autoridad, por su parte, planteó sus señalamientos de error de la forma siguiente:

"Erró el Tribunal de Circuito de Apelaciones al expedir auto de revisión en contravención de la Regla 66(B) y 66(C) del propio Reglamento del Tribunal de Circuito de Apelaciones." *Certiorari*, pág. 3.

impugnado, el 10 de marzo de 1997 emitimos una resolución para ordenar a las partes a expresarse en o antes del 12 de marzo de 1997 a las 5:00 de la tarde en torno de los errores planteados en las respectivas peticiones de *certiorari*; la aplicación al remedio provisional extraordinario de los criterios expuestos en *P.R. Telephone Co. v. Tribunal Superior*, 103 D.P.R. 200, 202 (1975); la posible concesión de remedios intermedios que no impliquen necesariamente la total paralización de la construcción del S.A.N., y cualquier otro criterio que estimasen pertinente para que este Tribunal pudiese llegar a una conclusión informada sobre los méritos de los recursos. Además, señalamos vista oral, la cual se efectuó el 14 de marzo de 1997. A ella comparecieron las partes y sus representantes legales.

## II

Ambas peticionarias señalan que erró el Tribunal de Circuito al expedir el auto de revisión. Indican que dicha actuación es improcedente a la luz de los criterios esbozados en la vigente Regla 66 del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A No les asiste la razón.

Los argumentos esbozados por las peticionarias suponen una interpretación excesivamente literal y rígida de la citada Regla 66 del Reglamento del Tribunal de Circuito de Apelaciones, que omite tanto la consideración de la importante función que ejerce el Tribunal de Circuito dentro de nuestro actual sistema de justicia, como el entendimiento de la distinción entre lo que supone la expedición de un auto de revisión y su adjudicación en los méritos. Una ponderada lectura de la resolución recurrida y un adecuado enfoque del alcance correcto de la referida Regla 66, impone la conclusión de que el Tribunal de Circuito ejerció adecuadamente su discreción al expedir el recurso de revisión.

Cabe señalar que la referida Regla 66 del Regla-

mento del Tribunal de Circuito de Apelaciones no establece una lista exhaustiva de los criterios que deberá aplicar el Tribunal de Circuito al decidir si expide o no un auto para revisar las actuaciones finales tomadas por los organismos administrativos.([12])

■ Ahora bien, el análisis de la facultad del Tribunal de Circuito al expedir recursos de revisión para examinar determinaciones administrativas no se da en el vacío. Esta facultad se ejerce tomando en consideración no sólo los propósitos del trámite administrativo, sino también la importante función revisora que tiene el Tribunal de Circuito dentro del esquema gubernamental que entrelaza las Ramas Judicial y Ejecutiva en esta área.

■ El Tribunal de Circuito, por su naturaleza y ubicación dentro de la actual estructura judicial, ejerce unas funciones de gran valía e importancia. Además de corregir los errores cometidos por los foros inferiores cuyas decisiones está llamado a revisar, juega un papel importante en la aplicación de la doctrina y de los cuerpos legales y reglamentarios, según interpretados por el Tribunal Supremo. Las funciones enumeradas se derivan lógicamente de la particular posición que este tribunal de apelaciones intermedio ocupa en nuestro Sistema Judicial. Las funciones antes mencionadas caracterizan su existencia y enmarcan la totalidad de la gestión que efectúa, independientemente de la competencia que específicamente le haya asignado la

---

([12]) Íntegramente, la Regla 66 del Reglamento del Tribunal de Circuito de Apelaciones dispone:

"Regla 66. *Criterios para la expedición del auto*:

"El Tribunal tomará en consideración los siguientes criterios al determinar si expide un auto de revisión o una orden de mostrar causa:

"(A) Si la regla o el reglamento, de su faz, incumplen las disposiciones de ley, o si se impugna el procedimiento seguido al adoptar dicha regla o reglamento.

"(B) Si el remedio y la disposición de la orden, resolución o decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho, o producto de una actuación arbitraria, ilegal o irrazonable.

"(C) Si la decisión recurrida no está apoyada por evidencia sustancial.

"(D) Si la expedición del auto o de la orden de mostrar causa evita el fracaso de la justicia." Reglamento del Tribunal de Circuito de Apelaciones, aprobado el 25 de abril de 1996, que entró en vigor el 1ro de mayo de 1996 (4 L.P.R.A. Ap. XXII-A)."

ley habilitadora. Se trata de elementos que trascienden un tribunal apelativo intermedio en particular y permean toda la gestión revisora apelativa.

Nada de lo antes expuesto significa que la actuación del Tribunal de Circuito al revisar las determinaciones de una agencia administrativa sea ilimitada e irrestricta. Reiteradamente hemos expuesto que ésta se circunscribe a una gestión relativamente limitada. A los efectos se señaló en los comentarios a la citada regla que:

> ...[N]ada de lo aquí dispuesto puede entenderse como variación a las normas del derecho administrativo en cuanto a la presunción de corrección, el principio de especialización, la no sustitución de criterios de ley y el respeto y consideración que dicho foro merece ante el foro judicial; las cuales sólo ceden ante una actuación arbitraria, ilegal o irrazonable o ante determinaciones huérfanas de prueba sustancial en la totalidad del récord pertinente. Véase, *Fuertes y otros v. A.R.Pe.*, 134 D.P.R. [947] (1993); *P.R.T.C. v. Unión Indep. Emp. Telefónicos.* 131 D.P.R. [171] (1992); *P.R. Tel. Co. v. Tribunal Superior*, 102 D.P.R. 231 (1974); *Rodrigo v. Tribunal Superior*, 101 D.P.R. 151 (1973); *A.P.I.A.V., Inc. v. Srio. de Hacienda*, 100 D.P.R. 173 (1971); *Román v. Superintendente de la Policía*, 93 D.P.R. 685 (1966); *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670 (1953). Comentario a la Regla 66 del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A.

Estas normas, de indiscutible sabiduría, responden al hecho de que es la agencia el ente que tiene la especialización necesaria para atender las situaciones particulares sobre las cuales su ley habilitadora le confiere jurisdicción. Es un derivado adicional de las consideraciones que en un principio dieron paso al auge de las agencias administrativas como vehículos necesarios para procurar el ordenado desarrollo del trabajo gubernamental. La complejidad que caracteriza esta labor emana no sólo de consideraciones cuantitativas, sino también de elementos cualitativos. Su grado de especialización justifica que se sostengan en principio sus determinaciones y que éstas no puedan ser variadas, sino cuando exista arbitrariedad, ilegalidad o irrazonabilidad por parte de la agencia o cuando la determinación no se sostenga a la luz de prueba sustan-

cial existente en la totalidad del expediente. Sin embargo, estos principios no precluyen la revisión judicial. Es decir, no otorgan grado alguno de inmunidad a la actividad administrativa.

■ Sin embargo, nada de lo anteriormente expresado debe interpretarse como que significa que los tribunales habrán de intervenir, juzgando la sabiduría de una determinación de política pública que le corresponde hacer a las Ramas Ejecutiva y Legislativa. El mecanismo adoptado por la Legislatura y el Ejecutivo para atender algún problema relacionado con intereses sociales o económicos no está sujeto a nuestra evaluación, a menos que contravenga alguna disposición de mayor jerarquía cuya aplicación estamos llamados a salvaguardar.

De los argumentos presentados por las peticionarias en sus respectivos escritos, y en la vista oral que celebráramos, se desprende que éstas tienen algún grado de confusión con respecto a los conceptos de expedición del auto de revisión y la adjudicación final que pueda efectuar el Tribunal de Circuito en relación con los méritos de éste. La expedición del auto de revisión no supone una adjudicación de los méritos de la controversia planteada al Tribunal. *Es simplemente una determinación enteramente discrecional que indica la existencia de alguna consideración que amerita una evaluación ulterior más detallada.* Ello no solamente porque el recurso presente alguna situación que potencialmente active los criterios enumerados en la Regla 66 sino porque pueden existir otras consideraciones que justifiquen las funciones antes señaladas del Tribunal de Circuito. Igualmente se sostiene la función revisora de los tribunales en situaciones de alto interés público, para irrogar certeza a las actuaciones y evitar la ocurrencia de posteriores pleitos. Todo lo que se requiere en la etapa de expedición es que exista en los autos del Tribunal de Circuito algún elemento que justifique su intervención como agente revisor.

■ Esto nos trae a otra fase del procedimiento apela-

tivo: la adjudicación final del recurso en los méritos. Es en relación con ésta que, aun frente a una expedición justificada, se imponen al resolver el caso las limitaciones de la consabida presunción de corrección, el principio de especialización y, por ende, la deferencia que merece la agencia en atención a dicha especialización. Al resolver el recurso también procede la aplicación de la norma de que las determinaciones del foro administrativo no serán variadas, salvo que se demuestre arbitrariedad, ilegalidad o irrazonabilidad por parte de la agencia o que la determinación no esté sostenida por la prueba. Esto es, sólo se podrá revocar o modificar la actuación administrativa cuando se pruebe que la actuación impugnada fue arbitraria, ilegal o irrazonable, o cuando no existe en la totalidad del expediente prueba sustancial que sostenga las determinaciones efectuadas por la agencia. En ausencia de estas consideraciones, la actuación administrativa impugnada deberá ser confirmada.

Ahora bien, es este esquema el que le impone a la Rama Judicial el deber de velar porque las demás ramas del Gobierno respeten los derechos ciudadanos y observen la ley al llevar a cabo las diversas gestiones que efectúan en el descargo de sus funciones. Debe tenerse muy presente que al evaluar los reclamos presentados en torno a los proyectos propulsados por el Gobierno "[n]o se pretende paralizar una obra, sino asegurar que se cumpla con los requisitos estatutarios de estirpe constitucional, garantizar la conservación del ambiente y la salud de los ciudadanos afectados". *García Oyola v. J.C.A.*, 142 D.P.R. 532, 539 (1997). El juicio final del foro judicial le impartirá certeza a la interpretación que la Junta haya dado a las leyes, evitando así la multiplicidad de pleitos que podría generar este cuestionamiento. Este hecho, por sí solo, hubiese justificado la expedición del auto de revisión. Nos parece que esta certeza es algo indispensable para que la Junta pueda implantar una política pública de forma eficaz y efectiva.

Reconociendo la normativa antes esbozada, resolvemos que la decisión del Tribunal de Circuito, al expedir el re-

curso de revisión en el caso de autos, estuvo plenamente justificada. Como expresáramos al comienzo de esta opinión, la consulta de ubicación impugnada se relaciona a un proyecto muy abarcador, atinente a un recurso básico de trascendental importancia para nuestra vida en sociedad. La determinación final en relación con el recurso de revisión supone el análisis de la resolución administrativa recurrida a la luz de un complicado armazón de leyes y reglamentos, de la transcripción de las vistas públicas celebradas ante la Junta y de los documentos presentados por las partes, unos para asegurar el cumplimiento con dichas leyes y reglamentos y otros para señalar todo lo contrario. Debe, además, analizarse la viabilidad jurídica, a la luz de nuestro actual ordenamiento legal, de la nueva metodología de implantación denominada por las peticionarias diseño-construcción, *fast-track* y proactiva, y la incidencia de dicha metodología sobre la legalidad de la resolución administrativa recurrida. Todo lo anterior fue expresamente reconocido por el Tribunal de Circuito en su resolución.[13]

## III

Por constituir la médula de esta controversia una polémica sobre la correcta interpretación de las leyes sobre protección ambiental, resulta importante en este punto exponer cuáles son los principios generales que rigen la implantación de la política pública en esta área. Las partes elaboran sus tesis interpretativas desde puntos de vista que en ocasiones podrían considerarse diametralmente opuestos. La Junta y la Autoridad adoptan un enfoque que enfatiza el progreso económico, mientras que Misión Industrial le da mayor énfasis a los aspectos ambientales.

Sabido es que la preservación de la calidad del ambiente y de sus recursos naturales es de rango cons-

---

[13] Resolución recurrida, págs. 15–18.

titucional y su importancia no puede ser menospreciada. *Paoli Méndez v. Rodríguez*, 138 D.P.R. 449 (1995); *Colón v. Méndez, Depto. Recursos Naturales,* 130 D.P.R. 433 (1992). Así, pues, nuestra Constitución expresamente dispone que "[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad". Art. VI, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 379. Consciente de este mandato, la Asamblea Legislativa aprobó la Ley sobre Política Pública Ambiental. Al promulgarse esta ley, se estableció como fin una política pública que fomentara la armonía entre el hombre y su medio ambiente; esto es, que promoviera los esfuerzos para aminorar los daños al ambiente y para estimular la salud y el bienestar de nuestra población. 12 L.P.R.A. sec. 1122. Con cabal conocimiento del impacto que tiene la actividad del hombre al interrelacionarse con el medio ambiente natural, específicamente como consecuencia del aumento poblacional, de la alta densidad urbanizacional, de la expansión industrial y de los adelantos tecnológicos, se creó la J.C.A., para promulgar todas aquellas normas de calidad y pureza del ambiente que garanticen la protección de nuestros sistemas ecológicos, manteniendo un balance entre las necesidades de la población y el uso de los recursos naturales. 12 L.P.R.A. sec. 1123.

En aras de lograr estos propósitos, la ley ordena a los departamentos, las agencias, las corporaciones públicas, los municipios y las instrumentalidades del Estado Libre Asociado y sus subdivisiones políticas que cumplan con una D.I.A. escrita y detallada, antes de efectuar cualquier acción o promulgar cualquier decisión gubernamental que afecte significativamente la calidad del medio ambiente. Los factores que deben considerarse en la preparación de ella están claramente dirigidos a minimizar los impactos ambientales adversos; es decir, minimizar los daños. 12 L.P.R.A. sec. 1124(c).

Para llevar a cabo esta política pública, la J.C.A. procurará ser custodio del medio ambiente para el beneficio de las futuras generaciones; asegurar paisajes seguros, saludables, productivos, estéticos y culturalmente placenteros; preservar los importantes aspectos históricos, culturales y naturales de nuestro patrimonio; lograr el más amplio disfrute del medio ambiente sin degradación; lograr un balance entre la población y el uso de los recursos que permita altos de niveles de vida; mejorar la calidad de los recursos renovables, y velar por el uso juicioso de aquellos recursos que sufran agotamiento. 12 L.P.R.A. sec. 1123(b). Todo lo cual obedece al interés de mantener el equilibrio entre nuestro ambiente y las necesidades de nuestra sociedad. Como bien dijera el profesor de Derecho Ambiental Schoenbaum:

> Law and policy respond by defining substantive standards, principles, and limits as well as a fair process of decisionmaking. Some of the standards are quite strict; more often they are very flexible. This is the very stuff of current environmental law. *The predominant goal is not to constrain economic development and progress, but to ameliorate some of its more undesirable effects.* (Énfasis suplido.) Schoenbaum, *Environmental Policy Law: Cases, Readings and Text*, 2da ed., Foundation Press, 1985, pág. 60.

También el D.R.Na. tiene la responsabilidad de implantar la política pública contenida en nuestra Constitución, Ley Orgánica del Departamento de Recursos Naturales, Ley Núm. 23 de 20 de junio de 1972 (3 L.P.R.A. sec. 151 *et seq.*). En este quehacer, y conforme a las normas que establezca la J.C.A., deberá tomar todas las medidas necesarias para la conservación y preservación de nuestros recursos naturales. *Colón v. Méndez, Depto. Recursos Naturales*, supra.

La escasez de agua provocada por el mal uso, el desperdicio, la degradación y la creciente demanda a raíz del consumo doméstico, el desarrollo económico y la recreación, justificó la adopción de la Ley de Aguas. El propósito principal de esta legislación es asegurar el abasto de aguas

que precisen nuestras generaciones presentes y futuras, mediante el establecimiento de áreas de reserva, con arreglo al interés público y a criterios de uso óptimo. También persigue el fin de lograr la distribución más equitativa y justa de las aguas. A ese efecto establece que las necesidades de agua adscritas al consumo doméstico, y particularmente al consumo humano, deberán ser satisfechas con prelación a cualesquiera otras. En la adjudicación del sobrante disponible, el interés público deberá prevalecer frente a todo interés o reclamo. Véanse: 12 L.P.R.A. sec. 1502; *Paoli Méndez v. Rodríguez*, supra, pág. 872. Es el D.R.Na. quien vendrá obligado a implantar lo antes dispuesto al ejercer la vigilancia y conservación de las aguas como también al otorgar franquicias, permisos y licencias de carácter público para su uso y aprovechamiento. 3 L.P.R.A. sec. 155(h).

Aclarados los principios generales de política pública que sirven de base a las disposiciones legales y reglamentarias que ambas partes reclaman en apoyo de sus actuaciones y planteamientos, pasemos a examinar la procedencia del remedio provisional solicitado.

## IV

El remedio provisional que es eje central de la controversia que tenemos ante nuestra consideración es uno que se emite en auxilio de la jurisdicción del tribunal y, por ende, está predicado en la facultad inherente que tiene todo tribunal para estructurar remedios que protejan su jurisdicción y eviten un fracaso de la justicia. Este es un remedio en equidad que goza de características afines a otros de similar naturaleza, como lo son el entredicho provisional y el *injunction* preliminar. Son, pues, los criterios aplicables a estos recursos los que, amoldados y adaptados para servir los propósitos de los remedios provisionales, guiarán la discreción judicial al emitir una orden de esta naturaleza. La Regla 79 del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A, dispone específicamente que

el Tribunal de Circuito podrá expedir cualquier orden provisional para hacer efectiva su jurisdicción y que dichas órdenes se regirán por las disposiciones pertinentes de las Reglas de Procedimiento Civil y el Código de Enjuiciamiento Civil en lo que no fuesen incompatibles.

Por disposición expresa de la Regla 61B(1) del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A, la expedición del auto de revisión suspende los efectos de la resolución o determinación administrativa que se está revisando. Generalmente, esta suspensión automática favorece a la parte recurrente.

A tenor de lo antes expresado, la parte recurrida que, desfavorecida preliminarmente por la suspensión, interese alterar el estado de derecho reconocido por reglamento, es a quien le corresponde solicitar y demostrar la procedencia del remedio provisional. Cuando el caso que origina la solicitud de remedio provisional entraña cuestiones de gran interés público y se interesa en que no surta efecto la suspensión de la determinación administrativa producto de la expedición del recurso de revisión, ésta participa de las características de un *injunction* preliminar. En estos casos, el ejercicio de la discreción del tribunal se guiará por los criterios de equidad que la jurisprudencia haya desarrollado para el recurso de *injunction* preliminar, en todo aquello en que éstos no fuesen incompatibles con el remedio provisional que se haya solicitado.

El caso normativo con relación a la expedición de *injunctions* preliminares es el de *P.R. Telephone Co. v. Tribunal Superior*, supra, pág. 202. Desde entonces nos hemos reiterado en la aplicación de los criterios allí elaborados al considerar solicitudes de *injunction* preliminar. *Mun. de Ponce v. Gobernador*, 136 D.P.R. 776 (1994); *García v. World Wide Entmt. Co.*, 132 D.P.R. 378 (1992); *Cobos Liccia v. DeJean Packing Co., Inc.*, 124 D.P.R. 896, 902 (1989); *Systema de P.R., Inc. v. Interface Int'l*, 123 D.P.R. 379 (1989); *A.P.P.R. v. Tribunal Superior*, 103 D.P.R. 903, 906 (1975). Así, pues, al evaluar la procedencia de un *in-*

*junction* preliminar examinaremos los criterios siguientes: (1) la naturaleza de los daños que pueden ocasionarse a las partes de concederse o denegarse el *injunction*; (2) la irreparabilidad del daño o la existencia de un remedio adecuado en ley; (3) la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo; (4) la probabilidad de que la causa se torne académica de no concederse el *injunction* y, sobre todo, (5) el posible impacto sobre el interés público del remedio que se solicita.

El peso de la prueba recaerá sobre el promovente del *injunction* preliminar o *pendente lite*. *P.R. Telephone Co. v. Tribunal Superior*, supra. Se fundamenta lo anterior en que "[l]a obligación de presentar evidencia primeramente recae sobre la parte que sostiene la afirmativa en la cuestión en controversia". Regla 10(B) de Evidencia, 32 L.P.R.A. Ap. IV. Véase, además, D. Rivé Rivera, *Recursos Extraordinarios*, 2da ed., San Juan, Ed. Facultad de Derecho U.I.A., 1996, pág. 38.

La concesión de un *injunction* preliminar descansa en el ejercicio de la sana discreción judicial, la que se desplegará ponderando las necesidades y los intereses de todas las partes involucradas en la controversia. *Mun. de Ponce v. Gobernador*, supra, págs. 790–791. Los tribunales no ejercen su discreción con automatismo judicial. Lo hacen luego de realizar un análisis integral de la prueba y un ponderado balance de equidades, sopesando los intereses de las partes. *Cobos Liccia v. DeJean Packing Co., Inc.*, supra, pág. 903; *Systema de P.R., Inc. v. Interface Int'l*, supra, pág. 387. Tras la rigurosa y cuidadosa ponderación de los intereses de todas las partes, el tribunal no vendrá obligado a emitir el *injunction* preliminar si a su juicio la balanza se inclina contra su expedición. *García v. World Wide Entmt. Co.*, supra. En síntesis, el concepto "balance de equidades" es de carácter abarcador. *Systema de P.R., Inc. v. Interface Int'l*, supra, pág. 388. Su amplitud requiere el análisis de todos los factores en juego, no tan

sólo de alguno o de algunos de éstos. *García v. World Wide Entmt. Co.*, supra, pág. 390. El peso que se le dará a cada uno dependerá de los hechos particulares del caso.

Es precisamente el balance de equidades que ha de realizarse el que atiende a la naturaleza de los daños que pueden ocasionarse a las partes de concederse o denegarse el recurso. Al analizar el aspecto de la naturaleza de los daños podría encontrarse que éstos son autoinfligidos. Una parte se autoinflige daños cuando, actuando con conocimiento, se coloca voluntariamente en una posición que le ocasiona perjuicio irrazonable. *Asoc. Res. Baldrich, Inc. v. J.P. de P.R.*, 118 D.P.R. 759, 772 (1987). Acorde con esto, hemos reconocido que la doctrina de la autoinflicción, como regla general, impide la concesión de una variación en materia de zonificación cuando el promovente de una solicitud de esta índole adquiere una propiedad con conocimiento de las limitaciones impuestas sobre ésta. *A.R.Pe. v. J.A.C.L.*, 124 D.P.R. 858, 865 (1989); *Asoc. Res. Baldrich, Inc. v. J.P. de P.R.*, supra; *Asoc., C.D. Octubre v. J.A.C.L.*, 116 D.P.R. 326, 334 (1985).

Por razón del origen del *injunction* en las Cortes de Equidad inglesas, el principio de equidad que gobierna su concesión o denegación exige que la parte promovente demuestre la ausencia de un remedio adecuado en ley. Se estiman como remedios legales adecuados aquellos que pueden otorgarse en una acción por daños y perjuicios, en una criminal o cualquiera otra disponible. Con relación a este remedio en equidad, constituye por lo tanto un daño irreparable aquél que no puede ser adecuadamente satisfecho mediante la utilización de los remedios legales disponibles. El daño irreparable es aquél que no puede ser apreciado con certeza ni debidamente compensado por cualquier indemnización que pudiera recobrarse en un pleito en ley. *Loíza Sugar Company v. Hernáiz y Albandoz*, 32 D.P.R. 903 (1924); *Alonso v. Madera et al.*, 32 D.P.R. 719 (1924), y *Martínez v. P.R. Ry. Light & Power Co.*, 18 D.P.R. 725 (1912). Sólo en raras ocasiones el daño am-

biental puede ser adecuadamente compensado mediante la indemnización a obtenerse como resultado de una acción por daños y perjuicios. El carácter permanente de este tipo de daño lo hace generalmente irreparable. *Amoco Production Co. v. Gambell*, 480 U.S. 531, 545 (1987). Por tales motivos, el incumplir con la declaración de impacto ambiental que requiere el *National Environmental Policy Act* (N.E.P.A.) es de por sí considerado un daño irreparable. *Puerto Rico Conservation Foundation v. Larson*, 797 F. Supp. 1066, 1072 (D. P.R.1992).

La parte promovente de un *injunction* preliminar deberá demostrar que de no concederse éste antes de adjudicarse el caso en sus méritos, sufriría un daño irreparable. 11A *Wright, Miller and Kane, Federal Practice and Procedure: Civil 2d* Sec. 2948.1 (1995). Véase, además, *Puerto Rico Conservation Foundation v. Larson*, supra, pág. 1071. En *Loíza Sugar Company v. Hernáiz y Albandoz*, supra, pág. 906, expusimos:

> 'La palabra "irreparable" ha adquirido en la ley sobre *injunction* una significación que tal vez no está en completa armonía con su etimología o su significado literal. Hay daños incapaces de ser reparados que una corte de equidad no considera como irreparables. Y por otra parte existen daños que pueden repararse, que se considerarán, sin embargo, como irreparables si la persona que los causa o amenaza causarlos es insolvente o no puede responder por daños y perjuicios. Según se usa generalmente la palabra significa aquello que no puede repararse, restablecerse o recompensarse de modo adecuado con dinero, o cuando la compensación no puede estimarse con seguridad.' 14 R.C.L. 346.

■ Una parte podría no satisfacer el criterio sobre la irreparabilidad del daño cuando éstos hayan sido autoinfligidos. *Wright, Miller and Kane*, supra. Véase, además, *Fiba Leasing Co., Inc. v. Airdyne Industries, Inc.*, 826 F. Supp. 38, 39 (D. Mass. 1993).

■ Quien solicita un *injunction* preliminar debe también demostrar que tiene probabilidades de prevalecer en los méritos. Después de todo, no se le va a conceder este

tipo de remedio extraordinario accesorio a una parte a quien claramente no le asiste la razón con relación a los méritos del recurso principal. Sin embargo, el hecho de que se expida un remedio de esta índole no significa que se esté adjudicando ni prejuzgando los méritos del recurso presentado. *Mun. de Ponce v. Gobernador*, 138 D.P.R. 431 (1995).

La razón de ser del cuarto criterio para otorgar el remedio surge del propósito fundamental del *injunction* preliminar. Este es, mantener el statu quo hasta que se celebre el juicio en sus méritos, para que así no se produzca una situación que convierta en académica la sentencia que finalmente se dicte, o se le ocasionen daños de mayor consideración al peticionario mientras perdura el litigio. *Cobos Liccia v. DeJean Packing Co., Inc.*, supra, pág. 902; *Sucn. Figueroa v. Hernández*, 72 D.P.R. 508, 513 (1951). "El criterio en torno a la academicidad de la causa está estrechamente relacionado con el de la irreparabilidad de los daños o la existencia de un remedio adecuado en ley." *Mun. de Ponce v. Gobernador*, 136 D.P.R. 776, 790 (1994).

Como último criterio es fundamental considerar el impacto que pueda tener la concesión de un *injunction* preliminar en el interés público. No se puede relegar a un segundo plano dicho interés. Este es primordial y supera al interés individual de las partes. *A.P.P.R. v. Tribunal Superior*, supra. Siempre se debe "ponderar la naturaleza de los derechos individuales afectados frente al valor y utilidad social de la obra pública en cuestión". *Ortega Cabrera v. Tribunal Superior*, 101 D.P.R. 612, 618 (1973). En síntesis, constituiría un error el obviar la consideración del perjuicio o beneficio que resultaría sobre el interés de la comunidad en general. *García v. World Wide Entmt. Co.*, supra.[14]

Finalmente, debemos tener presente que el *in-*

---

[14] Por no estar ante nuestra consideración, no estamos resolviendo cómo se aplicarían los criterios de *P.R. Telephone Co. v. Tribunal Superior*, 103 D.P.R. 200 (1975), a la concesión de remedios provisionales en casos puramente privados donde no están implicados los intereses públicos.

*junction* es "un remedio dinámico sobre el cual los tribunales siempre conservan jurisdicción para dejarlo sin efecto o modificarlo a favor o en contra del que resulta obligado". *Noriega v. Gobernador*, 122 D.P.R. 650, 688 (1988). Esta flexibilidad cumple con el propósito de que el *injunction* no se convierta en instrumento de injusticia, permitiéndole a los tribunales atender a cambios de relieve en la ley o en las circunstancias particulares de cada caso. *A.P.P.R. v. Tribunal Superior*, supra, pág. 909. Lo mismo ocurre con los remedios provisionales extraordinarios.

Con estos principios en mente, pasemos a evaluar la corrección de la actuación del Tribunal de Circuito al no conceder el remedio provisional y permitir que las obras de construcción continuasen a pesar de haberse expedido el auto de revisión.

## V

Por disposición reglamentaria expresa, una vez expedido el auto, la aprobación de la consulta de ubicación por parte de la Junta quedó en suspenso y, por lo tanto, las obras de construcción del S.A.N. quedaron automáticamente paralizadas. En consecuencia, eran los allí recurridos los que interesaban el remedio provisional extraordinario y a quienes les correspondía demostrar que, a tenor con los criterios jurisprudencialmente desarrollados para la concesión de este tipo de remedio provisional extraordinario, procedía que se dictase una orden que permitiese la continuación de las obras de construcción hasta tanto dicho tribunal resolviese en los méritos el recurso de revisión que acababa de expedir.

En su resolución, el Tribunal de Circuito expresó que las allí recurridas, la Autoridad y la Junta, no le habían convencido de que debería emitirse una orden que permita la continuación de las obras de construcción del S.A.N. mientras resolvía el recurso de revisión en los méritos. El Tribunal de Circuito dejó entrever que la parte allí peticionaria, Misión Industrial, podría prevalecer al indicar que

entendía como justificado no conceder el remedio provisional a las agencias allí recurridas ya que, aunque no contaba con información precisa sobre los costos de cancelación del proyecto, la pérdida en la que incurriría el Pueblo de Puerto Rico si continuaba la construcción y luego hubiese que detenerla o cancelarla sería mucho mayor que la que pudiese atribuirse a la suspensión temporera que la expedición del auto entrañaba.

De otra parte, tanto la Autoridad como la Junta entienden que Misión Industrial tiene muy poca probabilidad de prevalecer en los méritos en cuanto a la revisión solicitada al Tribunal de Circuito sobre la aprobación de la consulta de ubicación. De los escritos presentados por las partes y sus argumentaciones durante la vista oral ante nos surge, con meridiana claridad, que la diferencia en la evaluación legal que conduce a resultados tan diametralmente opuestos se debe a interpretaciones distintas sobre los requisitos de ley y la forma de implantar el complicado esquema gubernamental que hay que seguir para obtener la aprobación de proyectos de esta naturaleza. Estos proyectos tienen un gran potencial, tanto de afectar adversamente el medio ambiente y los recursos básicos de vital importancia como lo es el agua, como de beneficiar la calidad de vida del pueblo y resolver problemas de gran envergadura.

El esquema diseñado por la Legislatura requiere la intervención tanto de las agencias cuya función es viabilizar este tipo de proyecto como de las agencias cuya función es fiscalizadora. El propósito de las agencias viabilizadoras es facilitar que a la brevedad posible se lleve a cabo la obra pública de que se trate. De otra parte, el deber de las agencias fiscalizadoras es evitar que en la consecución de estos propósitos se vayan a afectar indebidamente la ecología, el medio ambiente o los recursos naturales cuya conservación resulta ser de vital importancia, causando daños que si se hubiesen tomado medidas adecuadas a tiempo se hubiesen podido evitar o por lo menos mitigar.

El análisis que hemos hecho de los escritos presentados y sus apéndices y de la argumentación oral nos ha llevado a concluir que existe una gran probabilidad de que las peticionarias, la Autoridad y la Junta, no hayan cumplido con todo el trámite administrativo y que carezcan de algunos de los permisos que la ley les requiere que obtengan para llevar a cabo el proyecto del S.A.N. Es probable también que no se hayan hecho, de la forma requerida por la ley y los reglamentos, algunos de los estudios y las evaluaciones que constituyen requisitos indispensables para la realización de un proyecto de esta envergadura.

Tanto el Tribunal de Circuito en su resolución como las peticionarias hacen especial hincapié en los daños económicos que la total paralización de las obras de construcción les está causando. Un análisis de los flujogramas revisados que nos sometiera la Junta como parte del apéndice de su escrito en cumplimiento de orden refleja, con meridiana claridad, que tanto la Junta como la Autoridad estaban conscientes, desde la conceptualización inicial del proyecto, del riesgo que se corrían si comenzaban la construcción de las obras del S.A.N. antes de que finalizara el proceso de revisión judicial o de que se obtuviese alguna orden del Tribunal de Circuito que les permitiera comenzar a construir. Aun así, decidieron correrse ese riesgo. Francamente, ahora no pueden alegar que las consecuencias económicas de esa mala decisión es el daño a que se refieren los principios de equidad que rigen la concesión de los remedios provisionales de la naturaleza del que solicitan.(15)

 Nos preocupa la posición de las peticionarias con respecto a la finalidad de las determinaciones administrativas y la poca importancia y atención que parecen prestarle a la revisión judicial. En el flujograma se indica espe-

---

(15) Es menester puntualizar que en la vista oral celebrada el 14 de marzo de 1997, los representantes legales de la Autoridad de Acueductos y Alcantarillados indicaron que en el contrato con Thames-Dick Superaqueduct Partners, Inc., se tomaron medidas cautelares para minimizar los daños que pudieran surgir de ocurrir una paralización del proyecto. Lo que demuestra que estaban conscientes de que esto era una posibilidad.

cíficamente que el tiempo que tomaron los trámites en la Junta y la J.C.A. "no toman en consideración el proceso de Reconsideración y tribunales [sic] que tienen derecho cualquier partes [sic] que no estén de acuerdo con sus decisiones". La función revisora que ejercen los tribunales con relación a las actuaciones administrativas es de suma importancia. Es el mecanismo que tiene toda parte afectada para asegurarse de que las agencias administrativas cumplan con el mandato de ley y no se violen los derechos de los individuos. La decisión judicial es también la que le imparte certeza a las interpretaciones estatutarias, brindándole confiabilidad a las actuaciones administrativas.

En el caso de autos era enteramente previsible que las actuaciones gubernamentales fuesen cuestionadas. Los recurridos presentaron sus objeciones a lo largo del proceso administrativo. Esto debió haber alertado a las diferentes agencias de gobierno que formaron parte de la conceptualización del proyecto que el flujograma debía ser revisado para incluir como parte del tiempo a computarse para el comienzo de las obras, el tiempo que tomaría la reconsideración en el foro administrativo y la subsiguiente revisión judicial.

Sin embargo, a pesar de lo antes señalado, tenemos que tomar en consideración al evaluar la procedencia del remedio extraordinario que representa una orden que permite la continuación de las obras de construcción, el hecho de que Misión Industrial no ha podido demostrar que exista un daño ambiental o ecológico *inminente* que amerite sostener la drástica consecuencia de una *total* paralización de una obra de gobierno de gran envergadura. Después de todo, el S.A.N. persigue resolver el serio problema de la escasez de agua en el área norte de la isla y poder realizar una serie de proyectos encaminados a fortalecer la economía, proveyendo empleos y fuentes de ingreso. De otra parte, según expresáramos anteriormente, hay que cobrar consciencia de que la determinación de si la construcción del S.A.N. es la mejor solución, si resolverá o no el problema de la escasez de agua, o si el dinero que entraña este

proyecto podría ser mejor utilizado, son consideraciones de política pública propias de las Ramas Ejecutiva y Legislativa y no forman parte de los criterios que hemos tomado en cuenta al resolver los recursos.

A la luz de todo lo antes expuesto, se puede colegir que un adecuado balance de todos los intereses involucrados refleja que mejor se sirve a los fines de la justicia si permitimos la continuación parcial de las obras de construcción del S.A.N., mientras el Tribunal de Circuito resuelve el recurso de revisión en los méritos. La paralización de las obras en las áreas vulnerables queda plenamente justificada, ya que existe un "asomo" de irregularidad en el trámite seguido en la obtención de los permisos. La continuación parcial que se permitirá obedece a la naturaleza del proyecto, ya que los daños ambientales alegados por Misión Industrial pueden ser evitados con una detención de las obras en las áreas consideradas ambientalmente sensitivas. Fortalece aún más esta determinación el hecho de que una orden que permita la continuación parcial de las obras, por su propia naturaleza dinámica, no tendría un efecto permanente ya que ésta no impide que cualesquiera de las partes pueda, en cualquier momento en que cambiasen las circunstancias, solicitarle al Tribunal de Circuito que varíe las limitaciones impuestas. Esta flexibilidad resulta indispensable para poder manejar adecuadamente un proyecto de la complejidad y magnitud del S.A.N. También avala esta posición pragmática el hecho de que el remedio le es aceptable a las peticionarias,[16] mientras provee a los recurridos alternativas para la protección de sus intereses.

Tomando todo lo anterior en consideración, con relación al caso de autos, la Autoridad podrá continuar la construcción del sistema de tuberías, pero suspendiendo sus obras en los lechos de los ríos, en las charcas y en los demás cuerpos de agua que se encuentren en la trayectoria. Los

---

[16] Los representantes de la Junta y de la Autoridad de Acueductos y Alcantarillados así lo manifestaron en la vista oral celebrada el 14 de marzo de 1997.

demás elementos del proyecto no podrán continuarse hasta que el Tribunal de Circuito resuelva el caso en los méritos y otra cosa disponga.

La política ambiental no es un obstáculo al progreso, ni mucho menos una molestia que se pueda soslayar. Es una garantía para el futuro; es una visión a largo plazo de la calidad de vida que venimos obligados a garantizarle a las futuras generaciones. Los tribunales tenemos el deber de hacer cumplir las leyes y de asegurarnos de que en la consecución del progreso no queden maltrechos otros valores que resultan ser de igual jerarquía e importancia.

En atención a todo lo antes expuesto, *se expedirán los recursos consolidados y se dictará sentencia que confirme la Resolución del Tribunal de Circuito de Apelaciones de 28 de febrero de 1997, en cuanto a la expedición del recurso de revisión. Además se dictará una orden de remedio provisional para disponer que la Autoridad podrá continuar la construcción parcial de las obras del S.A.N. Esto es, podrá continuar instalando el sistema de tuberías, pero deberá suspender sus obras en los lechos de los ríos, las charcas y demás cuerpos de agua que se encuentren en la trayectoria. Los demás elementos del proyecto no podrán continuarse hasta que el Tribunal de Circuito resuelva el caso en los méritos y otra cosa disponga.*

*Con el propósito de aligerar los procedimientos, se acorta a cinco (5) días el término concedido a las partes para presentar escritos adicionales ante el Tribunal de Circuito. Dicho tribunal tendrá un término de quince (15) días para resolver el recurso de revisión en los méritos, contado desde que éste quede finalmente sometido. Cualquier moción de reconsideración que se le presente, la resolverá dentro del término de cinco (5) días de haberse presentado.*

El Juez Asociado Señor Hernández Denton emitió una opinión de conformidad. Los Jueces Asociados Señores Negrón García y Rebollo López emitieron unas opiniones concurrentes y disidentes. El Juez Asociado Señor Corrada Del Río emitió una opinión disidente.

— O —

Opinión de conformidad emitida por el Juez Asociado Señor Hernández Denton.

La protección del medio ambiente y de nuestros recursos naturales exige la evaluación cautelosa de los procedimientos seguidos por las agencias administrativas en la aprobación de proyectos de la envergadura del que hoy tenemos ante nuestra consideración. Exige de los tribunales, además, que se aseguren de que el Estado cumpla estrictamente con las leyes y los reglamentos que se han promulgado para asegurar la conservación más eficaz de los recursos naturales. En ocasiones, nuestra función revisora requiere que hagamos un cuidadoso balance entre el impacto ambiental generado por tales proyectos y las necesidades genuinas de los puertorriqueños. Ese es, una vez más, el dilema que tenemos ante nuestra consideración. Por estimar que los intereses en pugna en la controversia específica que tenemos ante nos no son irreconciliables en esta etapa procesal del caso y que la opinión del Tribunal refleja un adecuado balance entre éstos, estamos conformes.

I

El 21 de junio de 1995 la Autoridad de Acueductos y Alcantarillados (en adelante la A.A.A.) presentó ante la Junta de Planificación de Puerto Rico (en adelante la Junta de Planificación) una solicitud de consulta de ubicación[1] para la eventual construcción del proyecto llamado

---

[1] El Reglamento para Procedimientos Adjudicativos de la Junta de Planificación (revisado) Núm. 5244 de 21 de marzo de 1995, Oficina del Gobernador, define una consulta de ubicación de la forma siguiente:

"Trámite mediante el cual la Junta de Planificación evalúa y decide según estime pertinente, sobre propuestos usos de terrenos que no son permitidos ministerialmente por la reglamentación aplicable en áreas zonificadas pero que las disposiciones reglamentarias proveen para que se consideren. Sec. 2.00(6) del Reglamento para Procedimientos Adjudicativos, *supra*, pág. 2.3.

Superacueducto de la Costa Norte (en adelante S.A.N.). El S.A.N. constituye un complejo proyecto promovido por la A.A.A. como respuesta al problema de abastos de agua que desde hace años ha padecido el área metropolitana. Su construcción, a un costo aproximado de trescientos cinco (305) millones de dólares, requiere, entre otras cosas, la excavación en los terrenos de ocho (8) municipios de la costa norte[2] para la instalación del sistema de tuberías que transportará el agua a diversos municipios del área, así como la construcción de una laguna de retención de agua en el pueblo de Arecibo.

Como parte del proceso de evaluación de la consulta de ubicación, la Junta de Planificación consultó a los Departamentos de la Vivienda, de Recreación y Deportes, de Transportación y Obras Públicas y de Agricultura, así como al Instituto de Cultura Puertorriqueña, la Autoridad de Energía Eléctrica y la Junta de Calidad Ambiental. También celebró audiencias públicas los días 18, 19, 22 y 26 de diciembre de 1995. Concluido este proceso, la Junta de Planificación notificó la resolución en la que aprobó la consulta de ubicación el 18 de julio de 1996.[3]

---

[2] Los municipios cuyos terrenos serían usados para la construcción del proyecto son Arecibo, Barceloneta, Manatí, Vega Baja, Toa Alta, Dorado, Bayamón y San Juan.

[3] Según la resolución de la Junta de Planificación de Puerto Rico (en adelante Junta de Planificación), el proyectado Superacueducto de la Costa Norte (en adelante S.A.N.) consta de siete (7) elementos, mediante los cuales serán integradas las tres (3) cuencas hidrográficas más grandes con que cuenta la isla y en donde existe mayor precipitación pluvial durante el año. Estos siete (7) elementos son:

1. Una laguna de retención de aguas crudas (sin tratar) cerca de la confluencia del Río Grande de Arecibo y del río Tanamá.

2. Una estación de bombeo de aguas crudas hacia la planta que será ubicada en las cercanías de la laguna de retención.

3. La tubería de conducción de aguas que va desde la estación de bombeo hasta la planta de filtración propuesta.

4. Una planta de filtración en Arecibo.

5. Una tubería de agua potable que va desde Arecibo hasta Bayamón con un total de doce (12) puntos de conexión para los municipios que serán servidos.

6. Dos (2) tanques de almacenaje que serán ubicados en Bayamón.

7. Dos (2) líneas de transmisión eléctrica para suplir de energía a las dos (2) estaciones de bombas propuestas.

Esta construcción abarcará un área total de quinientas cuarenta y cinco (545) cuerdas.

Inconformes con esta decisión, Misión Industrial de Puerto Rico, Inc., varias entidades cívicas y varias personas en su carácter individual (en adelante nos referiremos a todos ellos como Misión Industrial) presentaron solicitudes de reconsideración los días 5 y 7 de agosto de 1996 ante la propia agencia. El 30 de agosto de 1996 la Junta de Planificación notificó su negativa a la reconsideración presentada por dichos grupos.

En vista de esta decisión, Misión Industrial acudió el 27 de septiembre de 1996 al Tribunal de Circuito de Apelaciones para solicitar la revisión de la consulta de ubicación. En su escrito planteó cinco (5) errores, los que, en síntesis, cuestionan la legalidad de la acción de la Junta de Planificación a la luz de las disposiciones de la Ley para la Conservación, el Desarrollo y Uso de los Recursos de Agua de Puerto Rico, Ley Núm. 136 de 3 de junio de 1976 (12 L.P.R.A. sec. 1501 *et seq.*) (en adelante Ley de Aguas) y la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970 (12 L.P.R.A. sec. 1121 *et seq.*).[4]

Estando pendiente ante el Tribunal de Circuito de Apelaciones la consideración de este recurso, Misión Industrial presentó una moción en auxilio de jurisdicción en la que solicitó a ese foro que paralizara la construcción del S.A.N. En dicha solicitud alegó que la A.A.A. había intensificado la construcción del proyecto "mediante la instalación de la tubería del mismo y el inicio de la construcción de una laguna de retención" en el pueblo de Arecibo. Caso Núm.

---

[4] Los señalamientos de error planteados por Misión Industrial de Puerto Rico, Inc. (en adelante Misión Industrial) son los siguientes:

"(A) Erró la Junta Recurrida al impartir su aprobación a la solicitud de consulta en contravención a la Ley para la conservación, el desarrollo y uso de los recursos de aguas de Puerto Rico.

"(B) Erró la Junta recurrida al impartir su aprobación a la consulta a·pesar de los impactos ambientales de su resolución en contravención a sus reglamentos y la ley sobre política pública ambiental.

"(C) Erró la Junta recurrida al autorizar obras en contravención a su reglamento de zonas inundables.

"(D) Erró la Junta recurrida al autorizar la consulta en contravención a las políticas públicas vigentes de protección de zonas agrícolas.

"(E) Erró la Junta recurrida al autorizar la consulta en contravención a la ley sobre política pública ambiental." Petición de 27 de septiembre de 1996, pág. 5.

CC-97-116, Apéndice de la Petición de *certiorari*, pág. 569. De igual forma expuso que la instalación acelerada de la tubería del S.A.N. "acontece *sin autorización* alguna del Departamento de Recursos Naturales y Ambientales ... en abierta violación a la Ley Para la Conservación, el Desarrollo y Uso de los Recursos de Aguas de Puerto Rico, ... y el Reglamento para el Aprovechamiento, Uso, Conservación y Administración de las Aguas de Puerto Rico". (Énfasis en el original.) Íd., pág. 570. Además, alegó que "las obras de construcción del S.A.N. se llevan a cabo en forma ilegal, no sólo porque se fundamentan en una decisión de la Junta recurrida que es ilegal, sino porque se llevan a cabo sin que hayan sido previamente autorizadas por el [Departamento de Recursos Naturales]". Íd., pág. 571. Añadió también que

> [l]a autorización que sí otorgó ... [el] Departamento [de Recursos Naturales] en cuanto [a] la "toma de agua", *no* incluye el extenso sistema de tubería de unas 50 millas que se extendería desde Arecibo hasta las cercanías del Area Metropolitana y, además, dicha autorización tampoco incluyó la evaluación de los factores que, con respecto a una franquicia, exige la Ley de Aguas. (Escolios omitidos.) Caso Núm. CC-97-116, Apéndice de la Petición de *certiorari*, pág. 571.

Para evaluar la solicitud de la paralización de la construcción del S.A.N., el Tribunal de Circuito de Apelaciones realizó una vista oral el 22 de enero de 1997. Posteriormente, Misión Industrial presentó un escrito de réplica a la oposición a la expedición del auto de revisión que la A.A.A. había sometido. En éste reafirmó su posición de que la decisión de la Junta de Planificación era ilegal.[5]

---

[5] Específicamente señaló que:

"La Junta autorizó una mejora pública de inmensas consecuencias respecto [a] los recursos de agua, sin que se hayan acatado los procedimientos y los criterios de la Ley de Aguas y el Reglamento de Agua; en específico, sin que se hubiese adjudicado la procedencia o no en los méritos de una franquicia para el SAN por parte del DRNA o condicionado dicha mejora a los criterios y normas que rigen el otorgamiento de la misma. ...

"La resolución de la Junta recurrida tampoco condicionó su aprobación a la concesión de la franquicia, ni consultó al DRNA. En vez, la Junta se lanzó en realidad a juzgar la disponibilidad del recurso con todas sus implicaciones. Apéndice de la Petición de *certiorari*, pág. 738.

:

Oportunamente, el Tribunal de Circuito de Apelaciones accedió a expedir el auto de revisión mediante Resolución de 28 de febrero de 1997. A juicio de dicho foro, para adjudicar los méritos de los planteamientos de las partes era necesario "examinar con detenimiento el proceso seguido por la Autoridad para obtener la aprobación de las agencias pertinentes". Resolución del Tribunal de Circuito de Apelaciones, pág. 13. Además, catalogó ese proceso como un proceso fragmentado que

> ... ha permitido ... que se dispense a la Autoridad de la aprobación de planos de construcción y adquisiciones de terrenos, así como de los permisos de remoción y extracción de corteza terrestre, para las diferentes etapas de la construcción. El resultado es que se ha comenzado a construir el Superacueducto, sin que se haya aprobado el proyecto en su totalidad, excepto como un "concepto", que según expuso la propia Junta en la vista oral, es el único alcance de la consulta de ubicación. Resolución del Tribunal de Circuito de Apelaciones, pág. 14.

A tenor del Reglamento del Tribunal de Circuito de Apelaciones, esta expedición tuvo el efecto de detener automáticamente la construcción del S.A.N. Véase Regla 61(B) del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A. No obstante, al así obrar, y con plena conciencia de las implicaciones que tendría la paralización de la construcción del proyecto como consecuencia de la expedición del auto de revisión, el foro apelativo fijó un itinerario que viabilizara la solución rápida del recurso que estaba ante su consideración.[6]

De la determinación de expedir el auto y la consiguiente paralización de la construcción del S.A.N., la A.A.A. y la Junta de Planificación acudieron por separado el 7 de marzo de 1996 ante este Tribunal mediante recursos de *certiorari*, los cuales vinieron acompañados de las corres-

---

[6] Al respecto ordenó la elevación de los autos certificados del proceso seguido ante la agencia administrativa, que se presentara la transcripción de las vistas evidenciarias realizadas ante la Junta de Planificación, y que cualquier escrito adicional que las partes entendieran necesarios para la correcta adjudicación de la controversia debía ser presentado dentro de un término de diez (10) días, luego de haberse dado cumplimiento a lo anterior.

pondientes mociones en solicitud de auxilio de jurisdicción. Mediante Resolución de 10 de marzo de 1997 consolidamos ambos recursos. Además, requerimos a las partes que expresaran sus respectivas posiciones por escrito y que comparecieran ante este Tribunal el viernes 14 de marzo de 1997 para una vista oral.

La vista oral fue celebrada de conformidad con nuestra orden. En ella las partes tuvieron amplia oportunidad de expresar sus respectivas posiciones sobre la determinación del Tribunal de Circuito de Apelaciones. Luego de ponderar lo argumentado por las partes, así como el contenido de los alegatos de las partes, una mayoría de este Tribunal ha decidido confirmar al Tribunal de Circuito de Apelaciones en cuanto estimó apropiado expedir el auto de revisión y, además, emitir un remedio provisional extraordinario con el objetivo de permitir parcialmente la continuación de la construcción del S.A.N., a su vez que se mantiene en vigor la paralización de ellas en aquellas áreas particularmente sensitivas, según las identificó Misión Industrial. Coincidimos en que este curso de acción es adecuado en esta etapa procesal del caso.

## II

Antes de entrar propiamente en la discusión del señalamiento de error planteado por las recurrentes, es preciso advertir que nuestra función revisora se limita a evaluar la corrección de la resolución de naturaleza interlocutoria que emitió el Tribunal de Circuito de Apelaciones. Nada de lo expresado en la opinión del Tribunal, o en esta opinión de conformidad, prejuzga los méritos de la revisión administrativa instada por Misión Industrial, asunto que aún resta por ser evaluado por el foro apelativo. Aclarado lo anterior, examinemos la controversia específica que tenemos ante nos.

Como es sabido, una parte agraviada por una determinación de una agencia administrativa, en procesos de naturaleza adjudicativa, puede acudir a los tribunales para

solicitar la revisión de la corrección de esa determinación. La Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico así lo dispone expresamente. Véase la Sec. 4.1 de la Ley Núm. 170 de 12 de agosto de 1988 (3 L.P.R.A. sec. 2171). De conformidad con ese derecho que nuestro ordenamiento le confiere a la ciudadanía, Misión Industrial acudió ante el Tribunal de Circuito de Apelaciones para revisar la resolución de la Junta de Planificación, mediante la cual aprobó la consulta de ubicación del S.A.N.

Adquirida la jurisdicción sobre el recurso, dicho foro apelativo inició el trámite para su adecuado perfeccionamiento y eventual adjudicación de la controversia. En ese proceso, el Tribunal de Circuito de Apelaciones posee una amplia discreción para tramitar el recurso de forma rápida, económica y eficiente en atención al objetivo básico de hacer cumplida justicia. Véase Regla 1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Las múltiples situaciones que surgen en ese proceso requieren del foro apelativo remedios rápidos y creativos.

La determinación de expedir un auto o una orden de mostrar causa es una prerrogativa judicial que, si bien debe estar enmarcada dentro de los parámetros reglamentarios pertinentes, en todo caso, es un ejercicio discrecional del foro al que se acude. Esa discreción, sin embargo, no es absoluta. Debe ser ejercida de forma razonable en atención a las normas reglamentarias pertinentes y al postulado básico de hacer justicia.

De ordinario, al expedir un auto el Tribunal de Circuito de Apelaciones no está obligado a explicar o fundamentar su decisión. Esta es una acción judicial que guarda una presunción de validez y corrección que, como regla general, no debe ser revisada por este Tribunal. De lo contrario, cada vez que el Tribunal de Circuito de Apelaciones expide un auto de *certiorari*, la parte perjudicada por la decisión recurriría ante esta Curia. Esto aumentaría los recursos ante nuestra consideración y atrasaría de forma considera-

ble la adjudicación de las controversias por parte del Tribunal de Circuito de Apelaciones.

En este extremo, coincidimos plenamente con la opinión del Tribunal cuando afirma que la facultad del Tribunal de Circuito de Apelaciones de expedir un auto de revisión para revisar una determinación administrativa debe ser ejercida tomando en consideración "la importante función revisora que tiene el Tribunal de Circuito dentro del esquema gubernamental que entrelaza las Ramas Judicial y Ejecutiva...". Opinión mayoritaria, pág. 671. Igualmente nos hacemos eco de lo expresado en la opinión del Tribunal en términos de que al evaluar y corregir los errores cometidos por tribunales inferiores así como por las agencias administrativas, dicho foro, "juega un papel importante en la aplicación de la doctrina de los cuerpos legales y reglamentarios, según interpretados por el Tribunal Supremo". Íd., págs. 671–672.

En este contexto, la Regla 66 del Reglamento del Tribunal de Circuito de Apelaciones de 1ro de mayo de 1996 (4 L.P.R.A. Ap. XXII-A), señala varios criterios que deben ser considerados al evaluar si se expide o no un auto de revisión:

(A) Si la regla o el reglamento, de su faz, incumplen las disposiciones de ley, o si se impugna el procedimiento seguido al adoptar dicha regla o reglamento.

(B) Si el remedio y la disposición de la orden, resolución o decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho, o producto de una actuación arbitraria, ilegal o irrazonable.

(C) Si la decisión recurrida no está apoyada por evidencia sustancial.

(D) Si la expedición del auto o de la orden de mostrar causa evita el fracaso de la justicia.

Esta enumeración no es taxativa. Constituye meramente una guía para que el Tribunal de Circuito de Apelaciones evalúe la procedencia de la expedición del auto.

Por otro lado, a tenor de la Regla 61(B) del Reglamento del Tribunal de Circuito de Apelaciones, *supra*, la expedición de un auto, como el que nos ocupa, tiene como conse-

cuencia inmediata la suspensión de los efectos de la regla, resolución u orden recurrida. Debido a que la mera expedición del auto tiene dicho efecto, se necesita una orden del Tribunal de Circuito de Apelaciones para evitar tal suspensión o paralización automática.

Esta orden, la cual suspende el efecto inmediato de paralizar la resolución recurrida, a su vez, tiene un efecto similar al que tiene la expedición de un interdicto preliminar por un tribunal. En todo caso constituye un remedio provisional extraordinario, cuya procedencia debe ser demostrada por la parte que lo solicita, en este caso la Junta de Planificación y la A.A.A. Véase Regla 10(B) de Evidencia, 32 L.P.R.A. Ap. IV. De este modo, los requisitos que la jurisprudencia ha establecido para la determinación de si se expide o no un interdicto preliminar sirven para complementar el análisis del foro apelativo cuando una de las partes le solicita que deje sin efecto la paralización automática provista por el ordenamiento. Por ello, al hacer esta evaluación un tribunal puede examinar: (1) el grado de amenaza de daño irreparable al promovente de no dejar sin efecto la paralización; (2) el balance comparativo entre dicho daño y el que se le causará a la otra parte de dejar sin efecto la paralización; (3) la probabilidad de que el actor prevalezca en los méritos, y (4) el posible impacto sobre el interés público. *P.R. Telephone Co. v. Tribunal Superior*, 103 D.P.R. 200 (1975). Véanse, además: *Mun. de Ponce v. Gobernador*, 136 D.P.R. 776 (1994); *Systema de P.R., Inc. v. Interface Int'l*, 123 D.P.R. 379 (1989); *A.P.P.R. v. Tribunal Superior*, 103 D.P.R. 903 (1975).

Un análisis de estos criterios advierte que lo que en última instancia pretende la orden, que deja sin efecto la paralización automática, es evitar daños irreparables que puedan frustrar los fines de la justicia. No obstante, en todo caso, la expedición de esta orden descansa en la sana discreción del tribunal apelativo y tal determinación no debe ser revocada en apelación a menos que se demuestre que dicho foro abusó de su facultad. *Cf. Delgado v. Cruz*, 27 D.P.R. 877 (1919).

## III

En el caso de autos, el Tribunal de Circuito de Apelaciones estimó que la A.A.A. y la Junta de Planificación no lo convencieron de que debía alterar el curso ordinario de la expedición del auto de revisión administrativa y suspender los efectos de la decisión recurrida. Por ello, y por "la pérdida en la que incurriría el Pueblo de Puerto Rico si continúa la construcción del S.A.N. y hubiese que detener o cancelar posteriormente el proyecto", dicho foro expidió el auto. Resolución del Tribunal de Circuito de Apelaciones, pág. 20.

Ante nos, la A.A.A. y la Junta de Planificación resaltan el alto costo que la paralización de la construcción representa para el erario como fundamento para revocar la paralización de la construcción.[7] Señalan, además, que la consulta de ubicación recurrida es enteramente válida, ya que se obtuvieron todos los permisos requeridos o las exenciones pertinentes, a excepción de la franquicia de la toma de agua; la cual, expresan que no puede ser obtenida sino hasta que finalice la construcción y se presente ante el Departamento de Recursos Naturales el correspondiente informe de finalización de las obras.

Un análisis de la resolución del Tribunal de Circuito de Apelaciones advierte que la expedición del auto de revisión se basó en dos (2) fundamentos: (a) la complejidad de los procesos de obtención de los permisos correspondientes en virtud del método *fast track* seguido, el cual, entiende, amerita un mayor análisis para la correcta solución del recurso, y (b) que en la eventualidad de que sea decretada la ilegalidad de la aprobación de la consulta de ubicación, ya el Estado habrá invertido una cuantiosa suma de dinero que sería considerablemente mayor a las pérdidas que representaría la paralización inmediata de la obra. Además, por la rapidez con que se está construyendo el proyecto y la

---

[7] La Autoridad de Acueductos y Alcantarillados estima el monto de las pérdidas en las que incurriría en alrededor de ciento diez mil (110,000) dólares diarios.

inversión millonaria de fondos públicos que ésta conlleva, la paralización de la obra evitaría que el recurso se torne académico.

Sobre el primer aspecto, el Tribunal de Circuito de Apelaciones expresa que la A.A.A. inició la construcción del S.A.N. antes de que el Departamento de Recursos Naturales tuviera "la oportunidad de expresarse en cuanto a la factibilidad de la extracción de agua propuesta". Resolución del Tribunal de Circuito de Apelaciones, pág. 14. En efecto, mediante este proceso fragmentado se dispensó

> ...a la Autoridad de la aprobación de planos de construcción y de adquisiciones de terrenos, así como de los permisos de remoción y extracción de corteza terrestre, para las diferentes etapas de la construcción. El resultado es que se ha comenzado a construir el Superacueducto, sin que se haya aprobado el proyecto en su totalidad. Resolución del Tribunal de Ciruito de Apelaciónes, pág. 14.

Además, como bien señala el foro apelativo:

> ...[A]unque la Junta describe la consulta de ubicación como la fase conceptual del proyecto y argumenta que es sólo en la fase operacional o de construcción que se requerirán los diferentes permisos de construcción, incluyendo el de toma de agua y la franquicia de uso o aprovechamiento del recurso, *la realidad es que a la fecha en que la Autoridad presenta ante el [Departamento de Recursos Naturales] la solicitud de franquicia y la solicitud de permiso de construcción de toma de agua, la fase de construcción del proyecto alcanzaba aproximadamente un siete por ciento (7%) o diecinueve (19) millones de dólares de erogación.* (Escolio omitido y énfasis suplido.) Resolución del Tribunal de Circuito de Apelacions, págs. 14–15.

Para examinar la corrección de la interpretación del Tribunal de Circuito de Apelaciones, revisemos los deberes de la Junta de Planificación según están plasmados en su ley orgánica.

A. La Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley Núm. 75 de 24 de junio de 1975, según enmendada, 23 L.P.R.A. sec. 62 *et seq.*, y la Sec. 7.01 del Reglamento para Procedimientos Adjudicativos de la Junta de Planificación (revisado) Núm. 5244 de 21 de

marzo de 1995, Oficina del Gobernador, imponen a este organismo la obligación de cumplir con diversos estatutos y reglamentos que complementan su función evaluativa de las diversas consultas de ubicación que le son presentadas. Al respecto, debe considerar, entre otras cosas, el Plan de Desarrollo Integral, los Planes de Usos de Terreno, la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991, los Mapas de Zonificación y los Planes Regionales adoptados por la Junta de Planificación. Asimismo, la Junta de Planificación debe evaluar la infraestructura física y social así como la situación ambiental en el área afectada por la consulta de ubicación.

La Junta de Planificación, como organismo especializado en la planificación urbana y el desarrollo del país, debe cumplir con la política pública ambiental, así como con aquellas leyes que protegen los recursos naturales del país. De este modo, las disposiciones de la Ley de Aguas complementan el análisis que debe hacer la Junta de Planificación, particularmente en un caso como el de autos en donde el proyecto propuesto compromete el uso de grandes cantidades del recurso agua.

La Junta de Planificación y la A.A.A. argumentan que el Tribunal de Circuito de Apelaciones erró al estimar que era necesario que el Departamento de Recursos Naturales pasara juicio sobre la solicitud de franquicia de agua antes de que la Junta de Planificación evaluara la consulta de ubicación. Aducen que el Reglamento para el Aprovechamiento, Uso, Conservación y Administración de las Aguas de Puerto Rico de 28 de enero de 1993, Departamento de Recursos Naturales, establece un procedimiento específico para obtener tal franquicia, según el cual, ésta sólo puede ser obtenida cuando finalice la construcción del S.A.N.

No albergamos duda de que el reglamento aludido, en efecto, condiciona la concesión de la franquicia de agua a la presentación de un informe de terminación de la obra en cuestión. Sin embargo, la resolución del foro de apelaciones no está amparada en una interpretación errónea de este trámite. Su posición se fundamenta en el aparente choque

de varias disposiciones legales que, a la luz del trámite tipo *fast track* seguido por la A.A.A., aparentan estar en conflicto. De este modo, el foro apelativo resalta que la aprobación de la consulta de ubicación, por parte de la Junta de Planificación, de un proyecto de la naturaleza y complejidad del S.A.N., cuya razón de ser es exclusivamente el uso del recurso agua, no contó con una rigurosa evaluación de la disponibilidad de ese recurso por parte de la agencia especializada, en este caso, el Departamento de Recursos Naturales.

A la luz de estos señalamientos, evaluemos el trámite seguido en la obtención de los permisos requeridos para la construcción del S.A.N.

B. De entrada, coincidimos con el Tribunal de Circuito de Apelaciones en que el proceso acelerado y fragmentado de autorización que se ha seguido en este caso debe ser examinado con mucho cuidado por los tribunales. Se trata de un proyecto de considerable envergadura que requerirá trabajos de construcción en al menos ocho (8) municipios del área norte del país y que, además, compromete el uso de grandes cantidades de agua.

Al evaluar el trámite seguido por la A.A.A. en la elaboración de este proyecto hemos examinado los flujogramas que ha provisto la Junta de Planificación en los escritos que ha sometido ante nos. En éstos, la A.A.A. detalla el itinerario inicialmente considerado para el proceso de desarrollo y obtención de permisos gubernamentales en relación con el S.A.N. En el primero de éstos se establecía el 6 de septiembre de 1995 como la fecha cuando estaría preparada la declaración final de impacto ambiental. Para el 12 de agosto de 1995 se visualizaba la finalización del proceso ante la Junta de Planificación relativo a la consulta de ubicación. Para el 19 de diciembre de 1995, por su parte, se consideraba que se obtendría el permiso de construcción de la toma de agua por parte del Departamento de Recursos Naturales. Finalmente, la A.A.A. señala en dicho flujograma que para el 2 de enero de 1996 iniciaría el proceso de diseño y construcción del proyecto del S.A.N., el cual

estaría precedido por el proceso de negociación con el contratista que comenzaría en septiembre de 1995 y finalizaría en diciembre de 1995. Como puede apreciarse, la A.A.A. disponía que los permisos requeridos serían obtenidos antes de todo el proceso de diseño y construcción del proyecto.

Contrario a lo previsto, el contrato de construcción del S.A.N. con el consorcio Thames-Dick Superaqueduct Partners, Inc. fue formalizado el 31 de enero de 1996. En esa fecha aún no se había aprobado la consulta de ubicación por parte de la Junta de Planificación, no existía una declaración final de impacto ambiental, no se había tan siquiera presentado la solicitud de permiso de construcción de la toma de agua ante el Departamento de Recursos Naturales, por lo que no se tenía el permiso de construcción correspondiente, y tampoco se había solicitado la franquicia de agua.

Por otro lado, según surge de los autos del caso, la Consulta de Ubicación fue aprobada por la Junta de Planificación antes de que el Departamento de Recursos Naturales concediera el Permiso de Construcción de la Toma de Agua. En este sentido, la resolución recurrida fue notificada el 18 de julio de 1996, mientras que el Permiso de Construcción de la Toma de Agua fue otorgado el 18 de septiembre del mismo año, dos (2) meses después de la notificación de la resolución recurrida. De igual modo, salió a relucir durante la vista oral realizada en este Tribunal que la A.A.A. inició la construcción del S.A.N. el 6 de septiembre de 1996, esto es, antes de obtener el Permiso de Construcción de la Toma de Agua por parte del Departamento de Recursos Naturales y mientras se estaba impugnando en lo tribunales la consulta de ubicación.

Es sorprendente, además, que en la resolución en la cual se aprueba la consulta de ubicación, la Junta de Planificación ni siquiera le impuso a la A.A.A. la condición específica de obtener del Departamento de Recursos Naturales la franquicia de agua y el permiso de construcción requerido por la Ley de Aguas. De ordinario, la consulta de ubicación está condicionada a que se obtengan unos permi-

sos descritos en la propia resolución. En este caso, la Junta de Planificación no detalló los permisos requeridos y meramente ordenó que se cumpliera con la reglamentación aplicable.

En cuanto a las agencias consultadas, nos llama la atención que tampoco se menciona al Departamento de Recursos Naturales. De hecho, de la resolución recurrida se desprende que se consultó al Instituto de Cultura Puertorriqueña y al Departamento de Recreación y Deportes, *pero no a la agencia con la responsabilidad de planificar y controlar el uso de los cuerpos de agua en Puerto Rico.*

Por otro lado, tanto de la vista oral celebrada por este Tribunal como de los autos se desprende que no existe evidencia de que el Departamento de Recursos Naturales cumpliera con su obligación de evaluar cuidadosamente el permiso de construcción y de franquicia solicitado por la A.A.A. La Ley de Aguas ordena que en los casos de solicitudes que impliquen un caudal de agua en exceso de un límite previamente fijado, el Secretario de Recursos Naturales no podrá emitir un permiso "sin antes haber precisado el impacto que el aprovechamiento propuesto tendría sobre los existentes". 12 L.P.R.A. sec. 1509(c).

Además, el citado Art. 9 de dicha ley requiere que en la evaluación del interés público adscrito a un uso o aprovechamiento, el Secretario tome en consideración su impacto sobre otros recursos naturales y "sobre la integridad de los sistemas naturales y, en general, sobre el ecosistema". 12 L.P.R.A. sec. 1509. En las vistas orales, ni los representantes de la A.A.A. ni el Procurador General pudieron demostrar que durante el trámite seguido en la consideración de los permisos de franquicia y de agua se hubiese cumplido estrictamente con estos requisitos estatutarios. De hecho, los permisos obtenidos del Departamento de Recursos Naturales en la actualidad están siendo impugnados en el foro administrativo y estos todavía no son finales.(8)

_____

(8) Tomamos conocimiento judicial de que en el Departamento de Recursos Naturales está pendiente, además, la impugnación de la concesión del Permiso de Cons-

Asimismo, de la vista oral también se desprende que el trámite *fast track* seguido en el desarrollo y la construcción del proyecto aquí impugnado no está amparado en ley, reglamento u orden ejecutiva alguna. La parte peticionaria nos incorpora como apéndice de su escrito la Orden Ejecutiva Núm. OE-1992-10 de 24 de febrero de 1992 promulgada por el entonces Gobernador Rafael Hernández Colón; la cual, en efecto, refrenda el rápido trámite de proyectos de construcción, a la vez que crea una oficina para la expeditación de proyectos de construcción. Sin embargo, la vigencia de esa orden ejecutiva expiró el 2 de enero de 1993. Ni el Procurador General ni la representación de la A.A.A. pudieron demostrar en la vista oral que existiera una orden ejecutiva que sustituyera la anterior y que permitiera el proceso de aprobación de permisos que se utilizó en este caso. De este modo, no existe disposición jurídica alguna vigente en la que pueda ampararse el trámite seguido en el desarrollo y la construcción del S.A.N.

De igual modo, Misión Industrial señala varias omisiones contenidas en la resolución de la Junta de Planificación. En específico, aduce que los terrenos en donde será ubicada la laguna de retención son de alto valor agrícola, por lo que su construcción allí podría ser contraria a la Sec. 9.01 del Plan de Usos de Terrenos. Sobre este extremo, además, Misión Industrial indica que en la Resolución de la Junta de Planificación no se formuló determinación de hecho alguno en términos de que no existe alternativa al uso de los terrenos identificados para la construcción de la laguna de retención.

Todo lo anterior claramente arroja dudas legítimas sobre la validez de la consulta de ubicación. Por ende, el Tribunal de Circuito de Apelaciones actuó con corrección al expedir el auto de revisión administrativa. Considerando

---

trucción de la Toma de Agua que esa agencia otorgó a la Autoridad de Acueductos y Alcantarillados para el S.A.N. Asimismo, en el Tribunal de Circuito de Apelaciones está pendiente un recurso de *certiorari* que es producto de incidentes surgidos en la tramitación de esa impugnación. Véase *Misión Industrial, y otros v. Departamento de Recursos Naturales y Ambientales*, Caso Núm. KLRA 97-00107.

que desde 1966 se ha eximido a la A.A.A. de presentar planos de construcción de los proyectos de acueductos rurales (véase la Resolución Núm. JPE-14 emitida por la Administración de Reglamentos y Permisos (A.R.Pe.) el 28 de octubre de 1966), y que la consulta de ubicación constituyó el único instrumento efectivo que tiene la Junta de Planificación para asegurar que se cumpla con las leyes ambientales y de zonificación vigentes, el Tribunal de Circuito de Apelaciones entendió que el recurso presentado por Misión Industrial cumplía con los criterios de la Regla 66 del Reglamento del Tribunal de Circuito de Apelaciones, *supra*, para expedir el auto de revisión. Por estimar que el recurso estuvo bien expedido, coincido con la opinión del Tribunal que confirma este aspecto de la decisión recurrida. Variar esta determinación implicaría claudicar la función revisora de los tribunales ante elementos ajenos al quehacer judicial.

Por otro lado, el mero hecho de que la A.A.A. haya decidido continuar con la construcción del proyecto no puede servir como fundamento para que el foro de apelaciones actuara de otro modo. En los flujogramas sometidos ante nuestra consideración, la A.A.A. advierte, además, que los términos considerados no tomaban en consideración el período de reconsideración y de revisión judicial al cual pudieran estar sujetas las resoluciones emitidas por las diversas agencias administrativas en cuanto al proyecto. Esta aclaración a todas luces revela que tanto la Junta de Planificación como la A.A.A. tenían plena consciencia de que sus determinaciones podrían ser objeto de impugnación, lo que le restaba finalidad y firmeza a éstas. Más aún, estaban plenamente conscientes de que cualquier determinación judicial que les fuera adversa tendría serias implicaciones económicas que evidentemente debieron haber previsto al momento de iniciar las obras de construcción. En este caso, la A.A.A. bien pudo postergar el inicio de la construcción del S.A.N. hasta la dilucidación de la impugnación instada. No lo hizo. En cambio, decidió asumir ese riesgo. En este sentido, el daño que pudo haber sufrido por

la determinación del Tribunal de Circuito de Apelaciones es autoinfligido.

Cabe destacar que una vez se expidió el auto de revisión, la implantación de la consulta de ubicación quedó en suspenso. En esas circunstancias, dicha consulta no tiene la finalidad y firmeza necesarias para permitir la continuación de la obra. Ahora bien, la A.A.A. aduce que la paralización de la construcción del S.A.N. le produce cuantiosas pérdidas.

No parece haber duda de que la paralización del S.A.N. tiene un efecto inmediato sobre las arcas de la A.A.A. Como resultado de esta paralización, cada día que pasa la A.A.A. pierde una cuantiosa cantidad de dinero. Esta pérdida tiene un impacto inmediato sobre el costo de la construcción del S.A.N. y, eventualmente, sobre sus proyecciones y perspectivas de crecimiento futuro. Este es un daño palpable.

Frente a este daño económico que sufre la A.A.A., se encuentra el daño ambiental que Misión Industrial alega que ocasionará la continuación de las obras. Al respecto, la representación de Misión Industrial expresó, durante la vista oral realizada en este Tribunal, que los daños ambientales inmediatos que ocasionaría la continuación de la construcción del S.A.N. serían producto fundamentalmente de la remoción de tierras en el área que en la eventualidad sería la laguna de retención y de las excavaciones que se harían en áreas cercanas a ríos y quebradas. Asimismo, ante preguntas de este Tribunal, Misión Industrial afirmó que estima que no existe alternativa alguna a la paralización decretada que pueda atender de forma adecuada las preocupaciones expresadas por ambas partes. Discrepamos.

Una evaluación de la naturaleza del proyecto revela que estos dos (2) intereses, aparentemente en pugna, no son del todo excluyentes, al menos en esta etapa procesal del caso. La estructura del S.A.N. permite que, en este momento, se *continúe parcialmente* con su construcción al mismo tiempo que se minimizan los efectos ambientales

inmediatos identificados por Misión Industrial como resultantes de la continuación de las obras. En este sentido, estamos conformes con la opinión del Tribunal que mantiene en vigor la paralización de las obras en las áreas ambientalmente sensitivas. De este modo, la A.A.A. podrá continuar *sólo* con la instalación del sistema de tuberías del proyecto en aquellas áreas que no sean ambientalmente vulnerables, pero mantendrá suspendidos los trabajos de construcción en aquellos lugares cercanos a cuerpos de agua. Esta alternativa es en su totalidad consecuente con los intereses que el Tribunal de Circuito de Apelaciones pretendió proteger al expedir el auto de revisión sin expresamente suspender sus efectos sobre la resolución recurrida.

## IV

Por último, debemos destacar que nuestra posición no está amparada en una evaluación sobre la necesidad o conveniencia del proyecto propuesto por la A.A.A. Esa evaluación le corresponde hacerla a las agencias pertinentes. Nuestra determinación está amparada exclusivamente en los principios jurídicos de nuestro ordenamiento ambiental, los cuales tienen trascendencia constitucional por estar plasmados en nuestra Ley Suprema al ésta disponer que "[s]erá política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad". Art. VI, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 379.

Hoy actuamos de forma consecuente con ese postulado, a la vez que reafirmamos nuestras recientes expresiones en ocasión de la consideración de un caso de similar trascendencia al de autos, cuando señalamos que: *"[t]enemos que tener siempre presente que el desarrollo económico de este país esta subordinado al uso eficiente de los recursos limitados que posee y que las decisiones que hoy tomamos sobre el uso que le daremos a esos recursos limitados deter-*

*minarán nuestras posibilidades futuras de desarrollo eco-*
*nómico y la calidad del ambiente en los años venideros".*
(Énfasis suplido.) *García Oyola v. J.C.A.*, 142 D.P.R. 532,
554, opinión disidente. Véanse: *Paoli Méndez v. Rodríguez,*
138 D.P.R. 449 (1995); *Colón v. Méndez, Depto. Recursos*
*Naturales,* 130 D.P.R. 433 (1992).

Unas últimas notas son pertinentes aquí. Reciente-
mente un conocido científico-ecólogo puertorriqueño pre-
guntó públicamente:

> ¿Qué está en juego entonces cuando pedimos más infraes-
> tructura y más carreteras? [...] ¿Qué valores naturales se ponen
> en juego cuando tratamos de maximizar la infraestructura sólo
> para beneficio económico? La contestación es sencilla: tendre-
> mos menos tierra para almacenar agua, para la flora y la
> fauna, para la recreación, para los espacios abiertos o para
> amortiguar catástrofes naturales, en fin, para vivir. Además,
> tendremos más necesidades de importaciones y de manteni-
> miento a la infraestructura y seremos más vulnerables a sor-
> presas como las inundaciones o sequías en las zonas urbanas y
> al colapso de infraestructura, como ocurrió en Río Piedras. [...]
> A Puerto Rico sólo le queda el 5 por ciento de su terreno, unas
> escasas 110,000 cuerdas en áreas naturales críticas. El tamaño
> promedio de las reservas naturales de Puerto Rico es de 60
> cuerdas (el equivalente al tamaño de un gran centro comercial).
> ¿Hacia dónde nos dirigimos con este estilo de crecimiento? ¿Qué
> visión del futuro tenemos para este país? Sobre estos asuntos es
> que tenemos que dialogar pues las consecuencias de seguir la
> dirección que llevamos atentan contra la vida misma. A.E.
> Lugo, ¿Hacia dónde vamos?, *Diálogo* de marzo de 1997, pág. 13.

Estas preguntas imponen a los tribunales la obligación
ineludible de evaluar con cautela el trámite seguido por las
agencias administrativas en el desarrollo y en la construc-
ción de proyectos de la envergadura del S.A.N., para deter-
minar si el Gobierno ha cumplido de forma estricta con el
trámite reglamentario prescrito por nuestro ordenamiento
y con las leyes ambientales aplicables.

Impulsar soluciones rápidas no es necesariamente im-
pulsar soluciones eficaces. Examinar con cautela el proceso
seguido en el desarrollo y en la construcción de proyectos
como éste no entorpece el desarrollo económico del país.
Por el contrario, responde al deber de velar por el adecuado

uso y aprovechamiento de nuestros recursos naturales, según lo exige nuestro ordenamiento jurídico, y al interés de evitar que el uso inapropiado de estos recursos estanque nuestro desarrollo presente y futuro. Por ello, estimamos adecuado y sensato el balance que este Tribunal ha realizado entre los intereses en pugna.

— O —

Opinión concurrente y disidente del Juez Asociado Señor Negrón García.

La calidad de vida se relaciona en gran medida con la existencia y preservación de un medio ambiente apropiado; *pero la vida humana misma, depende del agua.*[1]

*Con todo respeto, si se nos permite la analogía, la orden de paralización parcial mayoritaria del Superacueducto de la Costa Norte* (en adelante el Superacueducto), *equivale a una operación quirúrgica del sistema cardiovascular humano. El cirujano atiende y reconstruye las arterias necesarias (tubería), pero en su intervención —sin adoptar las medidas cautelares— olvida algunos de sus elementos restantes: lo deja sin sangre (agua y laguna de retención), detiene su corazón (estación de bombeo) e interrumpe sus riñones (planta de filtración). Como resultado, pone al paciente (Autoridad de Acueductos y Alcantarillados) y a sus familiares (ciudadanía) ante el riesgo inminente de muerte, o de padecer traumas dolorosos e innecesarios que atrasan su pronta recuperación y aumentan sustancialmente sus gastos.*

---

[1] "...el único elemento que no puede ser reproducido por métodos científicos es, el agua. El agua es vida, pero de lo que muchos seres humanos no tienen conciencia es, que fuera de nuestro planeta no existe agua. Que aún tan cerca como en la estratosfera, no hay agua. Pienso la maravilla que es el hecho de que la misma agua que existía en el Paleolítico sea la misma agua que vemos y tomamos ahora, cargada de tiempo y de historia, la misma siempre, pero otra." (Enfasis suplido.) I. Ochart, *El Libro del Agua*, (Mensaje de la autora), 1996, pág. 17.

## I

De entrada pongamos en perspectiva la opinión mayoritaria y su remedio. Ésta expone y reitera los principios pertinentes en materia de derecho administrativo y revisión judicial. En síntesis, reconoce la sabiduría de las normas de deferencia judicial hacia las decisiones administrativas, la presunción de corrección que les cobija y, más aún, el principio de especialidad de sus determinaciones (justificado por el alto nivel de destreza y conocimiento que les caracteriza). Fundamentan el remedio de paralización parcial, esencialmente en la conclusión de que: (1) a la Autoridad de Acueductos y Alcantarillados (en adelante la Autoridad) le faltan unos permisos, unos estudios y unas evaluaciones (Opinión del Tribunal, pág. 685–686), *sin especificar cuáles*; (2) en la *preocupación respecto a la finalidad de las determinaciones administrativas*, y (3) en la poca importancia y atención que la Junta de Planificación y la Autoridad parecen haberle prestado a la revisión judicial (Opinión del Tribunal, págs. 686–687). Aún cuando es un "hecho" que Misión Industrial de Puerto Rico, Inc. *et al.* (en adelante Misión Industrial) *no han podido demostrar la existencia de un daño ambiental y ecológico inminente de gran envergadura* (Opinión del Tribunal, pág. 687), caracterizan la paralización *parcial*, como alternativa y posición "pragmática", supuestamente aceptable a la Junta de Planificación y a la Autoridad (Opinión del Tribunal, pág. 688).

Como veremos, se trata de una *solución salomónica.*(²) *Paradójicamente se relegan a un plano secundario los principios invocados de derecho administrativo y la abundante prueba en autos; sobre todo, se ignora la integridad del proyecto según lo define la consulta de ubicación*

---

(²) Desde el punto de vista práctico, la decisión mayoritaria que autoriza la construcción de la instalación de la extensa tubería a través de los distintos municipios —elemento integral de sus componentes, cuyo costo asciende a varios *millones* de dólares— equivale, de facto, a un endoso de que el Superacueducto de la Costa Norte (en adelante el Superacueducto) se podrá construir.

*impugnada.* Su infraestructura se compone de *siete (7) elementos* que no deben ni pueden ser fraccionados por este Tribunal. La posición, durante la vista oral, de la Junta de Planificación y de la Autoridad, en cuanto a este extremo, no avala ese curso decisorio. Dichas agencias sólo aceptan la posibilidad de detener la colocación de la tubería en los lechos de los ríos y las quebradas; no la suspensión de la obra sobre los otros seis (6) elementos; a saber: la laguna de retención; su estación de bombeo; la tubería de conducción de aguas crudas hacia la planta de filtración; la planta de filtración; los dos (2) tanques de almacenaje en Bayamón, y las dos (2) líneas de transmisión eléctrica.

Aunque esta decisión mayoritaria trata de balancear los intereses de las partes, *expongamos las razones jurídicas por la cual es contraria a derecho.*

Durante 1994 y 1995 experimentamos una dramática escasez del agua apta para el consumo humano, doméstico e industrial en todo el país. La ciudadanía, en general, pudo constatar los devastadores efectos de la escasez debido a una prolongada sequía y a las limitaciones de almacenamiento en los embalses de Carraízo, La Plata y Cidra, cuyas capacidades naturales se redujeron significativamente por la acumulación de residuos y sedimentos durante décadas de desatención. La ciudadanía clamó por una acción gubernamental. Como respuesta, ésta revivió la idea del *Superacueducto.*

Es una realidad innegable que el desarrollo industrial, la actividad económica y el desmedido consumismo de la humanidad en épocas pasadas causaron graves daños ecológicos a la naturaleza inmediata, así como al planeta en general. Recientemente, la humanidad ha comenzado a tomar conciencia de la magnitud de estos daños y se ha propuesto adoptar medidas efectivas que, aunque no reparen los daños causados, cuando menos, éstos no continúen o eviten exponernos a riesgos mayores.

En diferentes países, grupos cívicos, sociales o políticos de vanguardia —preocupados por el desarrollo desordenado de la humanidad— dieron la voz de alerta sobre los

futuros efectos nocivos en el ambiente y, en particular, en la calidad de vida, si no adoptábamos oportunamente medidas preventivas y correctivas.

En esa cruzada ambientalista mundial, afortunadamente Puerto Rico no ha sido la excepción. Cada vez con más frecuencia, grupos cívicos o comunitarios promueven la defensa del ambiente como reflejo de esa conciencia ecológica. Ello contribuye significativamente a la discusión pública de aquellas propuestas de obras públicas y privadas que, de una forma u otra, impactan la naturaleza. En este contexto, los intereses de Misión Industrial son legítimos y están predicados en una respetable visión protectora de la naturaleza que nos rodea, ante posibles actuaciones estatales que puedan tener un impacto perjudicial sobre sus componentes.

En una sociedad pluralista, proyectos de la envergadura del *Superacueducto* inevitablemente generan posiciones *legítimas*, en favor y en contra. Distintos sectores de nuestra ciudadanía, políticos, ambientalistas y otros, debatieron (y continúan cuestionando) su costo, funcionalidad, efectos positivos y negativos, alternativas y, a la luz de aquellos valores o intereses que estiman que deben proteger y adelantar, tienen sus propias ideas y soluciones. Se trata de un asunto sobre el cual —*al igual que en muchas áreas del quehacer público*— *personas razonables pueden razonablemente discrepar.*

Aún así, existe consenso en la necesidad de la presente y las futuras generaciones de asegurar, aprovechar y usar al máximo el abasto de agua y su prelación para el consumo humano y doméstico, con el menor impacto ambiental.

En lo que concierne a los tribunales, no nos corresponde pasar juicio sobre la *sabiduría* de construir el *Superacueducto*; si su costo original presupuestado, o el final, *es excesivo o una mala inversión de fondos públicos.* Tampoco es una *asignatura judicial* la revisión de si éste suplirá determinada cantidad estimada de millones (100, 80 o menos) de galones diarios del preciado líquido, o si —efectivamente— solucionará o aliviará su escasez en épocas normales o

de sequía a las demandas de una población en continuo crecimiento en toda el área norte. El enjuiciamiento final de estos y otros factores pertenece *al pueblo: verdadero juez supremo de las decisiones y los actos —correctos o equivocados— de los Poderes Ejecutivo, Legislativo y Administrativo.*

No contamos con la experiencia, el conocimiento especializado y los recursos técnicos para dilucidar juiciosamente, y en todas sus dimensiones y extensión, un asunto tan complejo de la cosa pública, el cual compete a las ramas políticas y administrativas y que, más bien, dispone sobre el adecuado uso de los recursos naturales y el abasto doméstico e industrial de agua potable.

Si nos apropiamos de esa prerrogativa y nos involucráramos en la *intríngulis decisoria* con respecto a las diversas opciones para suplir la deficiencia de abasto de agua, y escogemos una solución, *este Tribunal tendría también que aceptar la delicada y seria responsabilidad de proveer, de alguna forma alterna, una seguridad y garantía al Gobierno y a la ciudadanía de que su juicio y solución son los correctos; papel para el cual no se diseñó el esquema de revisión judicial.*

Como *único* poder constitucional llamado a enjuiciar la legalidad de las decisiones y los actos del Gobierno, el ámbito de nuestra función judicial revisora se circunscribe al examen *jurídico* de los planteamientos de Misión Industrial, en abono de su tesis central de que la Junta de Planificación no observó ciertas disposiciones legales y reglamentarias al aprobarlo y la Autoridad no ha obtenido unos permisos ni ha realizado ciertos estudios.

Con deferencia a distintos criterios, en *recta juridicidad*, estamos convencidos que la decisión mayoritaria del reputado Tribunal de Circuito de Apelaciones (Hons. Jueces Liana Fiol Matta, Dolores Rodríguez de Oronoz y Gilberto Gierbolini; éste último disidente) *es errónea y no procedía la paralización de la obra de construcción.*

En su sustrato, la causa judicial que evaluamos, a la luz

de los argumentos esgrimidos por Misión Industrial, parte de la premisa de que la Junta de Planificación y la Autoridad incumplieron varias leyes y reglamentos por haber rubricado los métodos de diseño y construcción (*fasttrack*)(³) y proactivo,(⁴) dirigidos a acelerar los trámites de obtención de permisos. Al respecto tenemos la impresión de que la razón de decidir (*ratio decidendi*) mayoritaria del reputado Tribunal de Circuito de Apelaciones al decidir la paralización estuvo fundamentada en esa mera sospecha, apuntalada en que carecía de todos los elementos de juicio para concluir que no se había incurrido en esas violaciones.

No podemos presumir que las ramas hermanas de gobierno, corporaciones y agencias públicas concernidas, en la ejecución de la cosa pública, insisten en violentar la ley; *los métodos de diseño y construcción (fast-track) y proactivo no pueden presumirse como ilegales.*(⁵)

---

(³) La metodología diseño-construcción tiene el efecto de que el dueño de la obra contrata de forma simultánea el diseño y la construcción de la obra para crear una economía de tiempo y costo, contrario al método tradicional que consiste en contratar el diseño y ejecutarlo antes de contratar la construcción. Se le requirió, además, a la Autoridad de Acueductos y Alcantarillados (en adelante Autoridad) que considerara los comentarios de la ciudadanía y los incorporara mediante un *addendum* a la Declaración Final de Impacto Ambiental, según requiere la Sec. 5.5.6.1 del Reglamento sobre Declaraciones de Impacto Ambiental Núm. 3106 de 4 de junio de 1984, Junta de Calidad Ambiental, pág. 27.

(⁴) El método "proactivo" consiste en anticipar problemas o requisitos futuros, en vez de reaccionar a ellos una vez se manifiestan. O sea, se preparan todos los estudios antes de que le sean solicitados.

(⁵) Una de las características en la burocracia gubernamental de la obra pública —invariable a lo largo de muchísimos años— ha sido el desfase entre la etapa de planificación y su realización. Esta demora provoca la prolongación de las necesidades que se pretenden atender o que las obras se tornen obsoletas cuando van a utilizarse.

Los métodos *diseño-construcción (fast-track) y proactivo* intentan superar estos escollos inherentes de los métodos tradicionales de implementación de obras públicas. Se originaron en la Orden Ejecutiva Núm. OE-1992-10 de 24 de febrero de 1992, del entonces Gobernador Hon. Rafael Hernández Colón. Ésta enfatizó la necesidad de acelerar la construcción y el desarrollo de la obra pública y estableció mecanismos para expeditar los proyectos de construcción. Sus propósitos de entonces son los mismos que entraña hoy el método *fast-track*; a saber: acelerar el proceso de construcción a través de la coordinación de esfuerzos de las distintas agencias mediante la creación de la Oficina de Expeditación de Proyectos de Construcción, un Consejo Interagencial de Expedición de Proyectos de Construcción y un Comité de Alta Gerencia Técnica para Expeditar los Proyectos de Construcción.

## II

El 21 de junio de 1995 la Autoridad presentó ante la Junta de Planificación, una solicitud de Consulta de Ubicación del proyecto conocido como *Superacueducto*.([6]) Su propósito es resolver el problema de los abastos de agua de quince (15) municipios de la costa norte, incluyendo el Área Metropolitana de San Juan.

El proyecto está compuesto de siete elementos principales.

Esta oficina, entonces creada, recomendó: (*a*) dividir los proyectos por fases (método que implica adelantar la consideración de aquellas fases del proyecto que no confrontan problemas con la obtención de permisos o endosos u otras restricciones significativas); (*b*) adoptar el método de *fast-tracking* para aquellos proyectos cuya naturaleza lo permita, y (*c*) acelerar el proceso de substracción que se sigue en el desarrollo de la obra pública, consistente con las leyes y con los reglamentos aplicables.

Si bien la Orden Ejecutiva Núm.1992-10 expiró por sus propios términos el 2 de enero de 1993, la administración siguiente adoptó la misma filosofía y su metodología. *Ejemplo: el manejo interagencial del Superacueducto.* Para el proceso de su evaluación se coordinó en el *Sub-Comité de Privatización del Gobierno el calendario a seguirse por las diferentes agencias implicadas* A estos efectos, se prepararon varios flujogramas y las agencias encargadas de evaluar el proyecto establecieron las fechas cuando terminarían su función y se coordinaron las fechas de presentación de solicitudes conforme a los requisitos legales. Así, la preparación de la Declaración Preliminar de Impacto Ambiental (en adelante DIA-P) precedía su presentación, que a su vez precedía su evaluación por parte de las agencias y la celebración de vistas públicas. La evaluación de la DIA por parte de la Junta de Calidad Ambiental se hizo antes de la evaluación de la Consulta de Ubicación, como lo dispone el reglamento aplicable. Este calendario podía variar de acuerdo con lo que aconteciera durante el proceso.

Este método —lo mismo que el *proactivo*— aunque conlleva riesgos inherentes en cuanto a costos y potencial, *por sí no es ilegal. No existe fundamento jurídico para descartarlo, ni debemos entorpecer su uso.*

([6]) Adelantamos que, antes de aprobar la Consulta de Ubicación, la Autoridad preparó y presentó una DIA-P ante la Junta de Calidad Ambiental con relación al Superacueducto. La DIA-P fue circulada entre numerosas agencias gubernamentales concernidas y, entre ellas, el Departamento de Recursos Naturales intervino activamente en el procedimiento y formuló detalladamente sus observaciones, señalamientos y críticas a los borradores de la DIA-P, (Apéndice, pág. 326). La DIA-P fue puesta a disposición del público y se ordenó la celebración de vistas públicas el 22 y 25 de marzo de 1996. Durante las vistas declararon el Ing. Félix Aponte Ortiz, Dr. Neftalí García Martínez, Jorge Fernández Porto a nombre de Misión Industrial; José Rivera Santana, a nombre de *Ciudadanos en Defensa del Agua, Aire y Tierra*, entre otros. Estos deponentes se expresaron en contra de la construcción del Superacueducto y la esencia de sus comentarios fueron recogidos en la DIA. El 20 de mayo la Junta de Calidad Ambiental emitió una resolución para certificar que la DIA preparada por la Autoridad cumplía con los requisitos establecidos por la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970, según enmendada, 12 L.P.R.A. sec. 1121 *et seq.*

Su *primer* componente es una laguna de retención de aguas crudas (sin tratar) cerca de la confluencia del Río Grande de Arecibo y del Río Tanamá. El *segundo* componente es una estación de bombeo de aguas crudas hacia la planta al este sureste de la mencionada laguna. El *tercer* elemento es la tubería de conducción de aguas crudas que va desde la estación de bombeo hasta la planta de filtración propuesta. El *cuarto* elemento es la planta de filtración en el Barrio Miraflores de Arecibo con una capacidad de producción inicial de 100 millones de galones de agua diarios (MGD). Como *quinto* elemento está la tubería de agua potable desde Arecibo hasta la zona este de Bayamón con un total de quince (15) puntos de conexión de servicio para los municipios a servirse ya mencionados. El lugar seleccionado para la planta es un punto alto que permite llevar las aguas por gravedad, sin bombeo, desde Arecibo hasta Bayamón. El *sexto* componente serán dos tanques de almacenaje de 10 MGD cada uno y serán instalados al oeste de la ciudad de Bayamón. Dos líneas de transmisión eléctricas serán el *último* componente del sistema. Una de las líneas va a suplir la estación de bombas cerca del Río Grande de Arecibo y la otra la Planta de Tratamiento a ubicarse en el Barrio Miraflores. (Énfasis suplido.) Oposición a que se expida auto de revisión, pág. 6.

La solicitud de ubicación generó numerosos estudios, consultas, instancias procesales(7) y la celebración de vistas públicas. Con ese insumo, aproximadamente *un (1) año después*, la Junta de Planificación aprobó la Consulta el 18 de julio de 1996. Misión Industrial y los demás interventores en ese procedimiento pidieron sin éxito reconsideración.

Oportunamente, el 27 de septiembre, Misión Industrial presentó una solicitud de revisión al Tribunal de Circuito de Apelaciones en la que suplicó la revocación de la Con-

(7) Los días 18, 19, 22 y 26 de diciembre de 1995 se celebraron vistas públicas ante la Junta de Planificación. El 5 de julio de 1996 se aprobó la Consulta de Ubicación; sin embargo, se presentó una reconsideración por parte de Productores de Agregados, Inc. el 23 de julio. A su vez, la Autoridad solicitó que se corrigiera la Determinación de Hecho Núm. 36 de la Junta de Planificación en cuanto al ancho de quince (15) metros de la servidumbre en el corredor de cincuenta (50) metros en que se instalará la tubería. El 7 de agosto la Junta se reafirmó en su aprobación de la Consulta de Ubicación y corrigió su Determinación de Hecho Núm. 36, según solicitado. El 6 y 7 de agosto se presentaron mociones de reconsideración por Misión Industrial y el Ing. Elías Rodríguez, respectivamente. El 12 de agosto el Comité Defensores de la Salud de la Comunidad de Río Arriba y residentes formularon su oposición a la Consulta. La Junta de Planificación denegó estas solicitudes de reconsideración.

sulta de Ubicación. La Junta de Planificación y la Autoridad se opusieron. Subsiguientemente, Misión Industrial, previa vista, logró que dicho foro (Hons. Jueces Fiol Matta, Rodríguez de Oronoz y Gierbolini) expidiera el auto, y que por votación mayoritaria (Juez Gierbolini disintió), en auxilio de jurisdicción, se paralizara la continuación de las obras. En esencia, la mayoría concluyó que el uso por la Autoridad del concepto "eficiencia", conocido como *método de diseño-construcción (fast-track)* y el método *proactivo* —dirigidos a acelerar los trámites en la obtención de permisos— *tuvieron el efecto de que la Consulta de Ubicación aprobada se entendiera suficiente para comenzar la construcción,* antes de que el Departamento de Recursos Naturales tuviera la oportunidad de expresarse *en cuanto la viabilidad de la extracción de agua propuesta.* La mayoría del reputado tribunal entendió que esta visión fragmentada del proceso de autorización gubernamental *eximió a la Autoridad de obtener la aprobación de planos de construcción, las adquisiciones de terrenos y los permisos de remoción y la extracción de corteza terrestre.* Estimó que esa metodología provocó que se iniciara la construcción del Superacueducto *sin haberse aprobado su totalidad y sin que el Departamento de Recursos Naturales hubiese concedido la franquicia de agua necesaria para operarlo o, ante la posibilidad de que limitase la cantidad de extracción de agua, derrotando de esta forma la viabilidad del proyecto.* Por último, dicho foro reconoció que no poseía la información precisa necesaria para hacer una determinación razonable sobre los costos de cancelación del proyecto. Sin embargo, después de analizar de forma comparativa los costos de la paralización temporera, ciento diez mil dólares ($110,000) diarios, con la pérdida que incurriría el erario de permitirse su continuación —y luego pararlo— entendió que era menos costoso detenerlo en esa etapa. Además, razonó que existía la posibilidad de que su continuación convirtiese en académico el recurso y el ejercicio de su jurisdicción apelativa. Ordenó a la Junta de Planificación

elevar el expediente administrativo y que se transcribieran las vistas públicas.([8])

Inconformes, acudieron ante nos la Junta de Planificación y la Autoridad, mediante recursos de *certiorari* separados. Ambos presentaron mociones en auxilio de jurisdicción. *Cuestionan la expedición del recurso de revisión por el Tribunal de Circuito de Apelaciones y, en la alternativa, solicitan que autoricemos la continuación de la construcción mientras dicho foro resuelve sus méritos.* El 10 de marzo consolidamos y concedimos a las partes términos simultáneos para orientarnos sobre varios extremos. Celebramos una vista oral el viernes 14 de marzo.

### III

Respecto al primer señalamiento, a saber, *que no debió el Tribunal de Circuito de Apelaciones expedir el recurso*, se imponen unas observaciones.

Por interacción de la Sec. 4.2 de la Ley de Procedimientos Administrativos Uniforme del Estado Libre Asociado de Puerto Rico (en adelante L.P.A.U.), 3 L.P.R.A. sec. 2172, y el Art. 4.002(g) de la Ley de la Judicatura de Puerto Rico de 1994, según enmendada, 4 L.P.R.A. sec. 22k(g), se reconoce el derecho a revisión judicial contra una orden o resolución *final*, dentro de treinta (30) días a partir del archivo en autos de copia de la notificación de dicha orden o resolución, ante el *Tribunal de Circuito de Apelaciones.*

*El recurso de revisión no es una apelación, sino de naturaleza discrecional.* La Regla 61(B)(1) del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A, establece que su *sola presentación no paraliza* la resolución de la agencia. Ahora bien, como regla general, su ex-

---

([8]) El 5 de marzo de 1997 la Junta de Planificación informó al tribunal que esa transcripción tardaría, *como mínimo, de tres (3) a cuatro (4) semanas.* Indicó, además, que elevaría el expediente original del caso en el término de una semana.

pedición *automáticamente* paraliza ésta, *salvo orden contraria de dicho tribunal en casos apropiados.*

Dentro del actual diseño estatutario *definitorio* de nuestra competencia apelativa, la expedición del auto de revisión por el Tribunal de Circuito —distinto a cuando lo deniega— no constituye una resolución *final* que podamos examinar vía *certiorari.* Sin embargo, una resolución del Tribunal de Circuito de Apelaciones que se niegue a paralizar, en la medida en que resuelve y adjudica con carácter *final* ese importante extremo, constituye un dictamen susceptible de ser revisable discrecionalmente por *este foro* a través del *certiorari.*

De *primera impresión*, esa es la situación en estos recursos ante nos. Significaría que en esta etapa no corresponde pasar juicio sobre el *primer* señalamiento de error y resolver en sus *méritos* la revisión expedida y pendiente en el Tribunal de Circuito de Apelaciones. Sin embargo, más que un refinamiento conceptual, *debido a la peculiar dinámica y postura de las partes ante el Tribunal de Circuito* de Apelaciones, es innegable que adjudicar el segundo señalamiento de error —improcedencia de la paralización— conlleva inexorablemente examinar los distintos planteamientos de éstas en abono de sus respectivas posiciones en dicho foro. *Nos explicamos.*

La Moción Urgente en Auxilio de Jurisdicción presentada por Misión Industrial en el Tribunal de Circuito de Apelaciones estuvo fundamentada en que la Autoridad, aun conociendo que estaba pendiente la solicitud de revisión, inició e intensificó la construcción del Superacueducto instalando tuberías y la construcción en Arecibo de la laguna de retención, cuya construcción *alegadamente* estaba causando serias consecuencias al medio ambiente por el dragado y extracción de miles de metros cúbicos de terrenos en áreas inundables y de gran valor agrícola, que es el "objeto de la solicitud de revisión". En ese escrito, Misión Industrial expuso que esa instalación era construida sin la autorización legal del Departamento de Recursos Naturales, en violación de la Ley y el Reglamento de Aguas. Fun-

daron su contención en una interpretación de unas disposiciones del Reglamento del referido Departamento de Recursos Naturales. Además, señalaron que la gran inversión de fondos públicos, estando pendiente de trámite su solicitud de revisión, podría tornarlo académico; finalmente, reiteraron la ilegalidad de la decisión de la Junta de Planificación.

El Tribunal de Circuito de Apelaciones fijó una vista para discutir no sólo el auxilio de jurisdicción, sino "los méritos del recurso presentado". Como parte de ese trámite *combinado*, Misión Industrial presentó un extenso Escrito en Oposición "en apoyo de sus contenciones en este caso, tanto en términos de los méritos de la *Petición* [de Paralización] como de su *Solicitud*". (Énfasis en el original.) Un análisis acucioso de ese escrito revela que discutieron detalladamente sus argumentos contra la Junta de Planificación y la Autoridad y reprodujeron la tesis de que de facto la resolución de la Junta de Planificación se convirtió en un permiso de construcción. Además, no existía una franquicia concedida por el Departamento de Recursos Naturales y tenían allí pendiente una reconsideración en torno a la autorización de construcción de la toma en la laguna de retención en Arecibo. Reiteraron sus argumentos de que la tubería estaba siendo instalada ilegalmente. Además, se reafirmaron sobre la ausencia de otros trámites, reparos a la preparación de la Declaración de Impacto Ambiental y su insuficiencia en cuanto al impacto ambiental. Repitieron su contención de que las obras autorizadas contravenían el Reglamento de Zonas Inundables y la política pública de protección de zonas agrícolas. Oportunamente la Junta de Planificación replicó y expuso sus argumentos en contra del recurso de revisión y la paralización.

Esa dinámica procesal *dual expositiva*, que entremezcló los argumentos en abono de los señalamientos de error del recurso de revisión *con* el auxilio de jurisdicción, nos imposibilita, en esta etapa, deslindarlos con la nitidez deseada. *Como están inextricablemente unidos, es un imperativo de-*

*cisorio penetrar y analizar los señalamientos de error* formulados por Misión Industrial en su recurso de revisión; de lo contrario, con toda honestidad intelectual, no podríamos resolver jurídicamente si procedía paralizar. Incluso, la mayoría, al usar la normativa que regula la expedición del *injunction* preliminar para evaluar la paralización, aplica el criterio de *probabilidades de que la parte promovente prevalezca eventualmente.* Opinión del Tribunal, pág. 685. En otras palabras, más allá de sutilezas legales, el proceso discursivo mayoritario también representa indefectiblemente un prejuzgamiento inicial de los extremos básicos en que se apuntalan los méritos de la revisión interpuesta. El carácter interlocutorio no desvirtúa esta realidad conocida en la intimidad por todo jurista y abogado familiarizado con la psicodinámica decisoria. En este sentido, los pronunciamientos y fundamentos aquí vertidos deben estimarse así condicionados; esto es, al decir mayoritario, en términos de *probabilidades.*

## IV

El Reglamento para Procedimientos Adjudicativos de la Junta de Planificación dispone que toda mejora pública requiere una *consulta de ubicación,* a través de la cual evalúa y decide sobre el uso potencial de terrenos. La consulta exige que la agencia proponente exprese los fundamentos en que apoya su solicitud, presente evidencia de que es titular del predio, o que notificó a su titular, y acompañe plano del lugar. *Además, debe certificar que cumplió con la Ley sobre Política Pública Ambiental.* Sec. 4.03 del Reglamento para Procedimientos Adjudicativos de la Junta de Planificación (revisado) Núm. 5244 de 21 de marzo de 1995, Oficina del Gobernador, pág. 4.5.[9]

---

[9] Al respecto, la Junta de Planificación inició el proceso de vistas públicas (18, 19, 22 y 26 de diciembre de 1995) con *anterioridad* a que se aprobara la DIA por la Junta de Calidad Ambiental (20 de mayo de 1996). Sin embargo, debemos despejar toda confusión. Es un dato no contradicho que la Junta de Planificación evaluó la

Cumplidos estos requisitos y presentada la consulta, si en el ejercicio de su *discreción* lo estima necesario, la Junta de Planificación solicita a los organismos administrativos pertinentes sus comentarios. Sec. 7.01 del Reglamento para Procedimientos Adjudicativos, *supra,* pág. 7.1.

La consulta de ubicación, en sentido estricto, *no constituye un permiso incondicional de uso de terreno,* sino una autorización de proyecto propuesto. Una vez la aprueba, de ordinario, y adviene final y firme, el proponente tiene que tramitar ante la Administración de Reglamentos y Permisos (en adelante A.R.Pe.) el permiso de construcción y de uso. En lo que respecta a la Autoridad, no se discute que existe una dispensa de la Junta de Planificación que le exime de obtener permiso previo en A.R.Pe. basado en los planos de construcción.([10])

Aun así, Misión Industrial adujo que la Junta de Planificación incidió al aprobar la *Consulta de Ubicación* en contravención a la Ley de Aguas.([11]) Sostienen que no limitó o

---

DIA presentada por la Autoridad haciéndola formar parte integral de su resolución sobre la Consulta de Ubicación. Como demostraremos más adelante, la Junta de Planificación realizó un concienzudo análisis del impacto ambiental del Superacueducto, a base de los comentarios y recomendaciones recogidos en la DIA. Por otro lado, la Autoridad cumplió con la Sec. 4.03 del Reglamento para Procedimientos Adjudicativos de la Junta de Planificación (revisado) Núm. 5244 de 21 de marzo de 1995, Oficina del Gobernador, pág. 4.5, en evidenciar, mediante certificación, que se había realizado una DIA del proyecto propuesto. Es menester aclarar que la DIA por la Junta de Calidad Ambiental, aunque puede ser tramitada a la vez con la Consulta de Ubicación, *su aprobación deberá anteceder la autorización de la Consulta por la Junta de Planificación.*

([10]) La Sec. 10.00 del Reglamento de Procesos Adjudicativos, *supra,* pág. 10.1, establece que el proponente de la consulta autorizada, final y firme, deberá presentar ante la Administración de Reglamentos y Permisos (en adelante A.R.Pe.) la próxima etapa correspondiente, es decir, la solicitud del permiso de construcción. Este requisito es comprensible y responde a un enfoque práctico y de economía en los recursos oficinescos. Evita que A.R.Pe. invierta y use sus recursos, evaluando un permiso para una obra cuya autorización inicial está en suspenso. No podemos olvidar que *A.R.Pe. es una de las agencias con mayor volumen de trabajo debido a su injerencia en la concesión de permisos e investigaciones administrativas relacionadas con la industria de la construcción.* Como la Autoridad fue dispensada de la presentación de planos y obtención de permisos de construcción para acueductos ante A.R.Pe., ese trámite reglamentario resulta inaplicable.

([11]) Ley Núm. 136 de 3 de junio de 1976, según enmendada, 12 L.P.R.A. sec. 1501 *et seq.*, denominada Ley para la Conservación, el Desarrollo y Uso de los Recursos de Agua de Puerto Rico.

condicionó dicha consulta a la *obtención previa* de un *Permiso de Construcción de Toma de Agua* y, posteriormente, la *Franquicia de Aprovechamiento de Aguas* ante el Departamento de Recursos Naturales.

La Junta de Planificación *condicionó* su aprobación a que la Autoridad obtuviera dicho permiso y franquicia. En lo pertinente, dictaminó:

> ... (3) 'se cumplirá con todos los requerimientos de la Junta de Calidad Ambiental; (4) Deberá cumplir con todas las obras de mitigación y/o recomendaciones impuestas en la Declaración de Impacto Ambiental Final; (5) *Se cumplirá con todas las recomendaciones y requerimientos de las Agencias Estatales y Federales con ingerencia en este tipo de proyecto.* (Énfasis en el original suprimido y énfasis suplido.) Oposición a que se expida auto de revisión, pág. 17.

Esas condiciones, fijadas por la Junta de Planificación y aceptadas por la Autoridad, constituyeron un ejercicio válido de sus poderes. *No hemos encontrado disposición alguna en las leyes y en los reglamentos aplicables que requiera, antes de la aprobación de una consulta, la concesión del Permiso de Construcción de Toma de Agua y Franquicia del Departamento de Recursos Naturales.* Los procedimientos y *los* campos de acción de ambos organismos, aunque coordinables, son separables e independientes. Veamos.

El Reglamento para el Aprovechamiento, Uso, Conservación y Administración de las Aguas de Puerto Rico de 28 de enero de 1993, Departamento de Recursos Naturales (en adelante Reglamento de Aguas)([12]) controla el procedimiento para lograr el permiso aludido de construcción y de franquicia. A su amparo, corresponde a la agencia proponente presentar la solicitud (Art. 7.4 del Reglamento de Aguas, *supra*, pág. 23), y al Departamento de Recursos Naturales evaluarlo *preliminarmente*, a tono con los criterios del Art. 5 de su propio Reglamento (Art. 8.7 del Reglamento de Aguas, *supra*, pág. 29). El objetivo de esta *eva-*

---

([12]) Aprobado el 30 de diciembre de 1992.

*luación preliminar* es detectar la existencia de factores que de su faz impidan, de manera absoluta, la concesión de la franquicia *antes* de que se comience la construcción de la toma de agua. La regla expresamente establece que una evaluación preliminar favorable no le obliga a aprobar finalmente la franquicia *si, con posterioridad a la construcción*, surge información que justifique negarlo. Art. 8.7 del Reglamento de Aguas, *supra*. Ahora bien, de ser favorable esa evaluación preliminar, examinará el permiso de construcción de la toma. Art. 7.10 del Reglamento de Aguas, *supra*, pág. 25. Si es concedido, el proponente construirá la obra y, *una vez terminada*, rendirá un Informe de Terminación de Obras. Art. 7.12 del Reglamento de Aguas, *supra*. Aceptado éste último informe, se evaluará la solicitud de franquicia a base de los criterios de los Arts. 8.8 y 8.9 del Reglamento de Aguas, *supra*, págs. 29–30, y podrá concederla, denegarla o modificarla.

Es evidente que el Departamento de Recursos Naturales no puede hacer una evaluación *final* de la franquicia hasta que no se haya aprobado la Consulta de Ubicación; ésta es requisito *previo e indispensable* para poder iniciar la construcción de cualquier obra. Sec. 3.03(1) del Reglamento para Procedimientos Adjudicativos, *supra*, pág. 3.2. De la misma forma, por disposición reglamentaria, la evaluación *final* de la Franquicia será efectuada *después* de la construcción de la obra y luego de entregado el *informe de terminación* al Departamento de Recursos Naturales.

En el caso de autos, la Autoridad presentó su solicitud de Franquicia y de Permiso de Construcción de Toma al Departamento de Recursos Naturales el 16 de julio de 1996[13] y previo trámites, dos (2) meses después, le fue concedido el 18 de septiembre. Por su importancia, transcribimos íntegramente la Resolución del Departamento de Recursos Naturales:

---

[13] En estricta cronología, dos (2) días antes de la Junta de Planificación aprobar la Consulta de Ubicación, lo cual responde al método *proactivo*.

El solicitante en el epígrafe radicó en este Departamento una solicitud de *permiso para construir una toma de agua* en el Río Grande de Arecibo, aguas arriba de la confluencia entre el Río Grande de Arecibo y el Río Tanamá, en el Municipio de Arecibo, Barrio Domingo Ruiz, en un Sector paralelo a las carreteras PR-22 y PR-2. Esta toma forma parte del *Proyecto del Superacueducto de la Costa Norte.*

El agua extraída será utilizada para *USO DOMÉSTICO.*

El Departamento de Recursos Naturales y Ambientales en virtud de los poderes que nos confieren la Ley Núm. 23 del 20 de junio de 1972 y la Ley Núm. 136 del 3 de junio de 1976, según enmendadas, *CONCEDE* este permiso al Solicitante (en adelante Concesionario) para *construir una toma en el lugar arriba indicado* para los fines y propósitos antes mencionados y conforme a las siguientes condiciones:

## *CONDICIONES GENERALES*

1. El aprovechamiento de las aguas extraídas del río mediante la toma se limitará únicamente al uso del agua necesaria para *desarrollar el proyecto y determinar su calidad hasta tanto el Concesionario obtenga una Franquicia* o autorización de este Departamento que le permita extraer las aguas para determinada actividad.

2. El Concesionario permitirá al personal del Departamento la inspección de la toma aquí autorizada y someterá la información que se le solicite con·relación a la misma.

3. Este permiso estará disponible para ser inspeccionado en el lugar de la construcción durante todo el tiempo en que se realice la obra.

4. Dentro de un período no mayor de treinta (30) días de finalizada la construcción de la toma, el Concesionario someterá a este Departamento un *Informe de Terminación de Obras.* Este informe será firmado y certificado correcto por el ingeniero a cargo de las obras.

5. El Concesionario informará por escrito al Departamento sobre cualquier suceso que pueda *afectar adversamente los recursos·de agua o la salud y seguridad pública* y que surja como resultado de la construcción, rehabilitación, inspección, operación o mantenimiento de la *toma.*

6. Este permiso estará *sujeto a enmienda, suspensión o revocación* por este Departamento conforme al Reglamento para el Aprovechamiento, Uso, Conservación y Administración de las Aguas de Puerto Rico. No se entenderá que impone obligación alguna al Estado Libre Asociado de Puerto Rico o sus funcionarios a indemnizar al Concesionario por los daños que pueda sufrir como consecuencia de enmienda, suspensión o revocación.

7. El Concesionario vendrá obligado a responder por los daños que pueda irrogarle a terceras personas o a la propiedad pública o privada en el proceso de construcción y/o utilización de las obras autorizadas.

8. Este permiso no podrá ser transferido sin la autorización previa del Departamento de Recursos Naturales y Ambientales.

## CONDICIONES ESPECIALES

1. La construcción de la toma se hará conforme a los *planos revisados por este Departamento* (12 hojas con fecha del 12 de septiembre de 1996, revisión B-1) incorporado lo establecido en la condición especial 3, *los cuales obran en el expediente de esta Agencia y forman parte de este permiso.*

2. Este Permiso se concede por un término de tres (3) años el cual comenzará a partir de su fecha de aprobación.

3. La elevación del tope del vertedero de la toma deberá tener una altura no menor de 18.5 pies con relación al nivel promedio del mar y su largo no podrá exceder los 300 pies. El vertedero de salida localizado aguas abajo de la confluencia del Río Grande de Arecibo con el Río Tanamá deberá ser con salida con nivel fijo ("fixed weir") sin compuertas. No se permitirá extracción de agua en este punto.

4. El Concesionario *establecerá* una estación para *medir flujo* de forma continua en el Río Grande de Arecibo aguas abajo de su confluencia con el Río Tanamá en la Central Cambalache con el *propósito de verificar que se cumple con los requisitos de flujo mínimo que se establezcan.* Esta estación deberá calibrarse durante un período de seis meses mediante un *programa de rastreo* para detectar cualquier influencia mareal que pueda llegar hasta ese punto en el río. El Concesionario realizará medidas de flujo semanalmente para calibrar y validar la estación para flujos bajos durante los primeros seis meses de operación de la misma. Posteriormente se realizarán medidas mensuales, preferiblemente en los momentos de flujo bajo. Se someterán informes al DRNA de los datos obtenidos, mensualmente.

5. Las condiciones *especiales* 7, 9 y 10 del permiso No. 199507489 (IP-EM) otorgado por el Cuerpo de Ingenieros del Departamento del Ejército de los EE.UU. se *hacen formar parte de este permiso.* El Concesionario *coordinará* con el Departamento la ejecución de las Condiciones Especiales 9 y 10 de dicho permiso.

6. El Concesionario instalará, en un lugar accesible y antes de cualquier desviación del agua extraída de la *toma,* metros de flujo instantáneo y de caudal acumulativo o un metro que sea combinación de ambos. A estos metros se les dará un manteni-

miento adecuado, según las recomendaciones del manufacturero. Cualquier rotura, falla y/o cese de funcionamiento de estos metros se anotarán en los protocolos requeridos. Se someterá un informe escrito al Secretario, dentro de un término no mayor de 15 días contados a partir del cese de funcionamiento de estos metros, en el cual se detallarán las fallas ocurridas y las acciones remediativas tomadas.

7. *El Concesionario obtendrá todos los debidos permisos requeridos por el Gobierno Estatal y Federal para la extracción de material de la corteza terrestre o en el cauce del río y para poder desviar* las aguas del río *si fuera el caso.*

8. El Concesionario notificará a la Oficina Regional de Arecibo de este Departamento al teléfono 878–7279 la fecha de comienzo de las obras autorizada en este permiso.

9. El Informe de Terminación de Obras (ITO) que se solicita en el Inciso Núm. 4 de las Condiciones Generales de este permiso deberá incluir *los planos de la obra según fue construida detallando* la estructura de entrada, la estructura de salida, la charca, y la estación de bombas, el metro, *las profundidades de las tuberías bajo el lecho del río* y cualquier estructura construida *con propósitos de atrapar o extraer aguas dentro y a orillas del río.* Estos planos deberán estar sellados y firmados por el ingeniero a cargo de la obra. El ITO incluirá, además, la Certificación de Instalación de Metro.

El Concesionario tendrá derecho a solicitar una vista administrativa de acuerdo con las disposiciones del Artículo 10 del Reglamento para el Aprovechamiento, Uso, Conservación y Administración de las Aguas de Puerto Rico, de no estar de acuerdo con algunas de las Condiciones de la presente Resolución. La solicitud deberá ser radicada por escrito dentro de un término de treinta (30) días a partir de la fecha de aprobación de esta Resolución en la Oficina de Secretaría del Departamento.

CUALQUIER VIOLACION A LA LEY NUM. 23 DEL 20 DE JUNIO DE 1972, A LA LEY NUM. 136 DEL 3 DE JUNIO DE 1976, A LA LEY NUM. 9 DEL 18 DE JUNIO DE 1970, SEGUN ENMENDADAS, O EL INCUMPLIMIENTO DE CUALESQUIERA DE LAS CONDICIONES EN LA PRESENTE RESOLUCION PODRA CONLLEVAR LA REVOCACION DE ESTE PERMISO. (Énfasis suplido.)

No obstante los términos *claros, precisos y cualificados* de esta resolución, Misión Industrial alega que la Autoridad inició la instalación de la *tubería* del Superacueducto el 6 de septiembre de 1996, sin haber obtenido permiso *alguno* del Departamento de Recursos Naturales, en viola-

ción de la Ley y el Reglamento de Aguas. Aducen que el ámbito regulador de dicho departamento se extiende a la evaluación y consideración de la eficiencia *de toda la tubería*, por lo que la Autoridad debió esperar hasta obtener el Permiso de Construcción de Toma de Agua para comenzar la construcción *de cualquier parte* del Superacueducto, *incluyendo toda la tubería*. Según lo indicado, la resolución que concedió el permiso para la construcción de la toma fue emitida el 18 de septiembre de 1996.

Ese mismo día, Misión Industrial pidió intervención y vista para oponerse a la concesión del Permiso de construcción de la toma en Arecibo. *Ese trámite en nada afectó el derecho de la Autoridad a iniciar la construcción de la toma en el área de Arecibo.*

La Sec. 1.3(f) de la L.P.A.U. define *orden o resolución* como "cualquier decisión o acción agencial de aplicación particular que *adjudique derechos* u obligaciones de una o más personas específicas, o que imponga penalidades o sanciones administrativas excluyendo órdenes ejecutivas emitidas por el gobernador". (Énfasis suplido.) 3 L.P.R.A. sec. 2102(f). Contrasta con el término *orden o resolución parcial* concebido como "[l]a acción agencial que adjudi[ca] algún derecho u obligación *que no pon[e] fin*, a la controversia total sino a un aspecto específico de la misma". 3 L.P.R.A. sec. 2102(g).

De ambas definiciones se colige que la diferencia entre una *orden o resolución* y una *orden o resolución parcial* es, precisamente, que la primera *pone fin* a la controversia *total*, mientras que la segunda, sólo a algún aspecto específico de ella. De ahí que la Sec. 3.14 de la L.P.A.U., 3 L.P.R.A. sec. 2164, al fijar el trámite que se habría de seguir, luego de emitida una orden o resolución *final* de una agencia, no contiene expresamente ninguna disposición que sujete su ejecución y eficacia al agotamiento de una reconsideración disponible o hasta que haya transcurrido el término para acudir en revisión judicial al Tribunal de Circuito de Apelaciones. No obstante, debe exigirse que al

notificarse se advierta del derecho a reconsideración o revisión judicial.

Es forzoso concluir que las resoluciones y órdenes finales de las agencias, *salvo que por sus propios términos expresamente dispongan lo contrario*, una vez emitidas, gozan de una eficacia dimanante de su cualidad *final* inicial; *producen un estado de derecho provisional*. La parte favorecida puede actuar conforme a ella, a menos que durante el trámite de una reconsideración la Agencia suspenda *expresamente* los efectos de su resolución. Aunque ciertamente la parte favorecida puede actuar al tenor de ésta, ello es *a riesgo de que como resultado de la reconsideración* la Agencia, eventualmente, modifique sustancialmente o se revoque a sí misma.

En resumen, no hay disposición en la L.P.A.U. que *automáticamente* supedite la finalidad de las decisiones administrativas y, por ende, su *inmediatez* a los trámites de evaluación de una reconsideración. Su firmeza dependerá del transcurso del término para solicitar una revisión judicial e intervención de los tribunales al resolver el recurso. El reconocimiento de ese *estado de derecho provisional*, según antes indicado, está implícitamente consagrado en la Regla 61(B) del Reglamento del Tribunal de Circuito de Apelaciones, *supra*: la expedición de un auto de revisión *suspenderá la implantación de una regla o un reglamento, orden, resolución o determinación de una agencia o un funcionario, salvo orden en contrario del tribunal.*

Ahora bien, esa expedición no destruye ni resta eficacia jurídica-adjudicativa a la *presunción de corrección de las determinaciones administrativas*, piedra angular en la revisión judicial. Como consecuencia, al evaluarse si deben suspenderse los efectos de una resolución —aquí la consulta— ni en el Tribunal de Circuito de Apelaciones como tampoco en este Foro podemos ignorar o debilitar esa presunción. *Otra interpretación atentaría contra el diseño básico que nutre todo el andamiaje del derecho administrativo. Afectaría su seriedad y prestigio y pondría*

*en jaque el principio cardinal de presunción de corrección que les ampara.* Demás está decir, las demoras, las incertidumbres y el caos que ello produciría, si una resolución final de una agencia y organismo administrativo no gozara en sus inicios de esa eficacia.

Por su parte, la Autoridad acepta haber comenzado la instalación de la tubería en el Municipio de Dorado días antes de obtener el mencionado permiso. No obstante, entiende que el Departamento de Recursos Naturales no tenía ingerencia sobre este aspecto particular, el cual correspondía a A.R.Pe. Señala, además, que el permiso de construcción de la toma es necesario sólo para construir la toma de agua en Arecibo y no la tubería en toda su extensión. Analicemos.

El Art. 1.41 del Reglamento de Aguas, pág. 5, define *toma de agua* como "cualquier *sistema* para extraer, aprovechar o usar aguas superficiales de su cauce natural". (Énfasis suplido.) Precisamente la tesis de Misión Industrial descansa en esta definición. *Argumentan que la palabra "sistema" abarca la totalidad del proyecto, incluyendo la tubería.* En el contexto visualizado del reglamento no cabe esa interpretación. Veamos.

El Art. 7.5d del Reglamento de Aguas, págs. 23–24, exige que el solicitante de un permiso de toma de agua someta, entre otra información:

> Un croquis o dibujo de la propiedad con una descripción completa del sistema de extracción o uso propuesto y *mostrando la localización* del sistema de aprovechamiento, edificios, caminos, cuerpos de agua *cercanos* y cualquier otra actividad de extracción o aprovechamiento de agua *en un radio de mil (1,000) pies alrededor del punto de la obra propuesta.* (Énfasis suplido.)

El inciso (e) del mismo artículo exige que el solicitante del permiso de toma incluya un "diseño preliminar de la estructura y *su relación a[sic] la topografía del predio,* localización y el *tamaño de los tubos o canales propuestos,* la localización, tipo y capacidad del equipo de bombeo, la lo-

calización y el tipo de medidor de flujo y las medidas contempladas para proteger el medio ambiente". (Énfasis suplido.) Reglamento de Aguas, pág. 24.

De la información requerida por el Departamento de Recursos Naturales para la concesión del permiso de construcción de toma se desprende que, en esta etapa, la agencia se limita a evaluar la adecuacidad de un *sistema específico y sus elementos circundantes —el de toma de agua— para la extracción de agua* que incluye la estructura, los *tubos* o canales, el equipo de bombeo y el medidor de flujo; *todo esto en un radio de mil (1,000) pies alrededor del punto de la obra propuesta.* Ciertamente el ámbito regulatorio del Departamento de Recursos Naturales *se circunscribe a la instalación de la tubería que está relacionada directamente con la toma de agua; esto es, el sistema estructural, los tubos, los canales, el equipo de bombeo y el medidor de flujo necesarios para la extracción del cuerpo de agua.*

En el caso de autos, la Autoridad comenzó la instalación de tubos en Dorado. Esa actividad —uno de sus elementos— nada tenía que ver con el ámbito, el diseño estructural-operacional y la construcción del sistema de tomas de extracción de agua localizada en las riberas del Río Grande de Arecibo.

A.R.Pe. es la agencia llamada a conceder el permiso de instalación de la mencionada tubería de suministro, no el Departamento de Recursos Naturales. Como explicáramos, la Autoridad fue eximida de la obtención de ese tipo de permiso, por lo que *no actuó ilegalmente* al comenzar la instalación de la tubería en Dorado, sin haber obtenido el permiso de construcción de toma de agua para ese distante sistema de extracción en Arecibo.

Señala, también, Misión Industrial que el Departamento de Recursos Naturales violó su propio Reglamento de Aguas al conceder el permiso de construcción de toma sin haber realizado precisamente una evaluación preliminar de la solicitud de franquicia de agua.

El Reglamento de Aguas ordena al Secretario del Departamento de Recursos Naturales hacer una evaluación *preliminar* de la solicitud de franquicia, la cual antecederá la concesión del permiso de construcción. Art. 8.7. Misión Industrial argumenta que debido a que el Permiso de Construcción de toma concedido a la Autoridad no hace alusión alguna sobre la referida evaluación preliminar, el Tribunal debe concluir que ésta no se realizó, por lo que el permiso no es válido.

El Art. 8.7 del Reglamento de Aguas, *supra*, dispone que la franquicia de agua será evaluada preliminarmente utilizando los criterios de *uso beneficioso y razonable* del Art. 5 del Reglamento de Aguas, *supra*, págs. 17–18, resumibles así: (*a*) es beneficiosa y razonable *toda extracción y uso dirigido a necesidades domésticas*, agrícolas, comerciales, industriales y recreativas; (*b*) se considerará un *caudal mínimo* para mantener la integridad de los sistemas naturales y que el uso o aprovechamiento esté en armonía con la Ley sobre Política Pública Ambiental; (*c*) el uso no puede conllevar el desperdicio del recurso de agua, sino que debe ser *eficiente y en armonía con las circunstancias y condiciones hidrológicas y económicas de cada región*; (*d*) la cantidad *no excederá el uso presente o propuesto*; (*e*) *no es beneficioso el uso de aguas marinas o subterráneas* en sistemas de enfriamiento cuando no se provea para el reuso del agua o su inyección a un acuífero; (*f*) *la construcción de sistemas de extracción de aguas públicas y su aprovechamiento* con el propósito de satisfacer las necesidades domésticas, comerciales, industriales o recreativas en *áreas que cuentan con un servicio satisfactorio de abasto de agua provisto por la Autoridad, no cumplen con los requisitos de uso beneficioso y razonable de las aguas públicas de Puerto Rico.*

El Art. 5.4 del Reglamento de Aguas, pág. 18, también dispone que en la evaluación se consideren los "Criterios de Uso Optimo" allí dispuestos. El citado Art. 5.4 dispone:

En la determinación de lo que representa el interés público y beneficio social en la evaluación del uso óptimo, el Secretario deberá considerar los siguientes factores:

a. La cantidad de agua a utilizarse, el uso que se le daría y la compatibilidad de ese uso con los recursos disponibles en la región y con otros usos proyectados o reservados en el Plan de Agua;

b. El posible menoscabo de derechos adquiridos y franquicias existentes;

c. El efecto sobre la salud y la seguridad pública;

d. El efecto sobre la integridad del medio ambiente;

e. El efecto socio-económico, determinado mediante un análisis de costos y beneficios sociales;

f. La posibilidad de satisfacer propósitos múltiples que responden a objetivos de desarrollo económico, calidad ambiental o bienestar social.

A la luz de todos los criterios antes descritos, podemos lógicamente concluir que el Departamento de Recursos Naturales, en *efecto*, realizó una evaluación preliminar de la franquicia de agua *antes* de conceder el permiso de construcción de toma. Surge de la transcrita resolución que el Departamento de Recursos Naturales *limitó* el uso del agua extraída al *uso doméstico,* lo cual cumple con el primero de los criterios de uso beneficioso y razonable. También *condicionó* el aprovechamiento del agua a la cantidad necesaria para desarrollar el proyecto y establecer su calidad (Condición General Núm. 1). Además, la Autoridad deberá conducir estudios que le permitan determinar el *flujo mínimo requerido para mantener el sistema del estuario del río* (Condición Especial Núms. 4 y 6). Estas condiciones cumplen con los criterios (*b*), (*c*) y (*d*) de uso beneficioso y razonable, ya que garantizan que la toma no afectará negativamente el flujo del río, que no se desperdicie el recurso de agua y que no se exceda de la cantidad de agua propuesta. Por otro lado, es evidente que el criterio (*e*) de uso beneficioso y razonable no aplica al proyecto propuesto por la Autoridad.

La Resolución del Departamento de Recursos Naturales analizó, además, los criterios de *uso óptimo.* Dicho Depar-

tamento evaluó la cantidad de agua que habría de utilizarse, su uso de acuerdo con los recursos de agua disponibles (Condición General Núm. 1; Condición Especial Núms. 4 y 6). Evaluó su efecto en la salud y seguridad pública y las medidas que se habrán de tomar en caso de que se ocasionen daños (Condición General Núms. 5 y 7). De la totalidad de la resolución se desprende que *se hizo una evaluación de los efectos socioeconómicos, ambientales y sociales, en la cual se dispuso que el uso de los recursos de agua fuera el mínimo, condicionando una extracción total a la concesión de la franquicia de agua.*

No hemos encontrado disposición alguna en el Reglamento de Aguas que requiera al Departamento de Recursos Naturales *preparar en documento separado el informe en cuanto a la evaluación preliminar de la franquicia de agua.* Tampoco Misión Industrial nos ha ilustrado sobre si esa es la práctica seguida. Evaluado el planteamiento a la luz de la Resolución del Departamento de Recursos Naturales sobre la concesión del permiso de construcción de toma y demás constancias en autos, todos los indicadores en esta etapa judicial apuntan a que, en efecto, se realizó una evaluación preliminar de franquicia a base de los criterios descritos en el Art. 5 del Reglamento de Aguas, *supra.*

Refuerza esta apreciación otras condiciones del permiso de construcción de toma. El Departamento de Recursos Naturales exigió que la Autoridad cumpliera con las condiciones especiales 7, 9 y 10 del Permiso Núm. 199507489 (IP-EM), otorgado por el Cuerpo de Ingenieros del Departamento del Ejército de los Estados Unidos.

La Condición Especial Núm. 7 del Cuerpo de Ingenieros dispone que la Autoridad deberá realizar un estudio para determinar los cambios potenciales en la *calidad del agua del estuario* y determinar *el flujo mínimo de agua.* Allí se explica la metodología para hacer dichos estudios.

La Condición Especial Núm. 9 le impone la obligación a la Autoridad de que los materiales que vayan a ser excava-

dos para construir la laguna de retención, los cuales serán usados para rellenar las áreas circundantes a una colina adyacente, *no excedan de los cuarenta (40) metros del nivel del mar.* También le obliga *a reforestar con especies de vegetación típicos de colinas de piedra caliza.* Estas actividades tendrán que ser coordinadas con el *Servicio de Pesca y Vida Silvestre de los Estados Unidos (U.S. Fish and Wildlife Service).*

Por último, la Condición Especial Núm. 10 requiere que la Autoridad realice inspecciones del área donde se depositará el terreno que sea producto de las excavaciones para identificar la serpiente conocida como *boa puertorriqueña.* Estas inspecciones serán realizadas por un biólogo de campo entre 5:00 A.M. y 7:30 A.M., el día que el equipo pesado vaya a entrar en el área. La inspección será enfocada en grietas en el suelo y en las rocas y los árboles que puedan ser usados por la especie. Si la serpiente es observada en el lugar de trabajo, cualquier actividad en un radio de cincuenta (50) pies de ésta cesará. Una persona autorizada capturará la serpiente y la liberará en un lugar previamente designado.

La Autoridad preparará un *protocolo* para las inspecciones, la captura de la serpiente, así como el lugar que será seleccionado para la liberación. Este protocolo deberá estar listo treinta (30) días antes de la iniciación del proceso de disposición de la tierra. La Autoridad coordinará esta actividad con el Servicio Federal de Pesca y Vida Silvestre de los Estados Unidos (en adelante el U.S.F.W.S.). La Autoridad preparará un informe en el que resumirá las observaciones de las inspecciones, actividades de captura y relocalización de la boa. Este informe deberá ser entregado al Cuerpo de Ingenieros y al U.S.F.W.S. a los sesenta (60) días de haberse completado la inspección.

## V

Aún así, Misión Industrial sostiene que la resolución de la Junta de Planificación es ilegal, en virtud de la tesis de

que pretende adjudicar lo relativo al uso y aprovecha-
miento del agua, facultad exclusiva del Departamento de
Recursos Naturales.

Hemos visto que la *Consulta de Ubicación no fue un
permiso incondicional ni directo para el uso de los recursos
de aguas.* Como explicáramos, es el Departamento de Re-
cursos Naturales quien, en la instancia administrativa,
concede el permiso de construcción y de franquicia para
utilizar el indispensable líquido. Por otro lado, la encar-
gada de la fase operacional de otorgar permisos para la
construcción y/o uso del terreno —para lo cual la Autoridad
está exenta— es A.R.Pe. La Junta de Planificación, al apro-
bar la consulta de ubicación, sólo avala la mejora pública
propuesta *con múltiples condiciones,* en el ejercicio del po-
der delegado a ella por la Asamblea Legislativa de acuerdo
con el concepto de desarrollo integral de Puerto Rico, dis-
puesto en el Art. 4 de la Ley Orgánica de la Junta de Pla-
nificación de Puerto Rico, 23 L.P.R.A. sec. 62c.[14]

Misión Industrial entiende que el procedimiento de
aprobación de la Consulta de Ubicación se violó porque el
Departamento de Recursos Naturales no sometió sus co-
mentarios durante dicho proceso. La Sec. 7.01 del Regla-
mento para Procedimientos Adjudicativos, *supra,* pág. 7.2,
dispone, en lo pertinente, que en la tramitación, evaluación
y disposición de la consulta, la Junta de Planificación con-
sultará *"cuando lo estime necesario"* (énfasis suplido) a
cualesquiera organismos gubernamentales que, de alguna
manera, tengan relación con los proyectos bajo estudio. No
existe disposición legal o reglamentaria que así lo requi-
riera; no era *compulsoria* dicha consulta para validar la
Consulta de Ubicación. *Advertimos, sin embargo, que el
Departamento de Recursos Naturales participó activa-
mente con relación a la DIA y recibió copia de la resolución
para que la comentara, si así lo estimaba pertinente. Ade-
más, según indicado, la resolución transcrita refleja un ex-*

---

[14] Véase, además, 23 L.P.R.A. sec. 62b(t), donde el concepto "terreno" incluye
tanto tierra como agua.

*pediente acumulativo de las condiciones de las agencias fe-
derales y estatales.*

Misión Industrial plantea que era el Departamento de
Recursos Naturales, no la Autoridad, el llamado a presen-
tar la DIA ante la Junta de Calidad Ambiental. Según el
Art. 4(c) de la Ley sobre Política Pública Ambiental, *la obli-
gación de prepararlo es de la agencia o entidad guberna-
mental que se propone tomar la acción.* 12 L.P.R.A. sec.
1124(c). Véase *García Oyola v. J.C.A.,* 142 D.P.R. 536
(1997). Así lo reafirma, en lo pertinente, el Reglamento so-
bre Declaraciones de Impacto Ambiental Núm. 3106 de 4
de junio de 1984, Junta de Calidad Ambiental:

> La agencia proponente de un proyecto o acción, será respon-
> sable por la preparación de la DIA correspondiente, conforme a
> las Guías para la preparación de DIA. Sec. 5.1.1(a) del Regla-
> mento sobre Declaraciones de Impacto Ambiental, *supra,* pág.
> 16.

Además, la Sec. 5.1 de dicho Reglamento, *supra,* per-
mite, cuando varias agencias participan y están interrela-
cionadas en su dependencia funcional, seleccionar una de
ellas como *agencia principal.* Aquí, el Departamento de Re-
cursos Naturales no está realizando ninguna acción: *ésta
es tramitada en su totalidad por la Autoridad, quien, como
agencia proponente del proyecto, está encargada de la pla-
nificación, la construcción, el financiamiento, el uso, la ope-
ración y el mantenimiento del Superacueducto.*

## VI

Alega Misión Industrial que la Junta de Planificación,
al aprobar la consulta de ubicación, no consideró ciertos
"aspectos críticos" relativos al uso del agua y su impacto en
el medio ambiente.[15] Aduce que sólo consideró *liviana-*

---

[15] Específicamente argumentan que la Junta de Planificación no tomó en con-
sideración sus efectos sobre el estuario del Río Grande de Arecibo, el impacto de la
toma de agua en los niveles de la represa Dos Bocas y Caonillas, el impacto sobre los
mogotes, las especies en peligro de extinción y el impacto de la excavación de tierra
para hacer la laguna de retención.

*mente* los impactos ambientales del Superacueducto, y sus determinaciones al respecto no encuentran apoyo en el expediente.

Un análisis de las documentadas ponencias presentadas por los ambientalistas y la ciudadanía —opositores al Superacueducto durante el trámite administrativo— refleja, en esencia, *una legítima inconformidad común*, no sólo en el posible daño ecológico que su construcción pueda causar, sino una objeción a su conceptualización, como opción al problema de abastos de agua en la zona metropolitana. Constantemente, propusieron alternativas que, a su juicio, resolverían el problema que se intenta corregir, *sin la necesidad de una obra de la magnitud y el costo del Superacueducto*, tales como mayores controles en la producción y conservación del agua, excavación de pozos subterráneos, dragado de sedimentos en embalses, reutilización de agua y educación y fomento en la conciencia ciudadana. También hicieron señalamientos técnicos en cuanto a diversos extremos pendientes.

En cuanto a datos específicos, durante la vista oral celebrada ante este Tribunal, los representantes de Misión Industrial no pudieron explicar satisfactoriamente, a preguntas del Juez Asociado Señor Rebollo López, la realidad de los daños ambientales o ecológicos causados por la obra hasta el presente.

La Sec. 7.01 del Reglamento para Procedimientos Adjudicativos de la Junta de Planificación, *supra*, le impone el deber de considerar los impactos ambientales de un proyecto *como uno de los criterios* para aprobar o no la consulta de ubicación. A su vez, la Ley sobre Política Pública Ambiental obliga a las agencias gubernamentales a examinar los efectos ambientales y ecológicos en sus procesos decisionales, de conformidad con la política pública ambiental esbozada en dicha ley. 12 L.P.R.A. sec. 1124. Su citado Art. 4(c) ordena a todas las agencias, antes de efectuar cualquier acción o promulgar cualquier decisión que afecte significativamente la calidad del ambiente, a some-

ter ante la Junta de Calidad Ambiental una DIA-P.(¹⁶) 12 L.P.R.A. sec. 1124(c). Véanse: *García Oyola v. J.C.A.*, supra; *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716, 720 (1974).

En acatamiento de lo anterior, la Autoridad presentó ante la Junta de Calidad Ambiental una DIA-P. La DIA-P fue circulada entre muchísimas agencias concernidas, estatales y federales —*incluso el Departmento de Recursos Naturales*— y se solicitó y obtuvo sus comentarios, los cuales *fueron incorporados* en la Determinación *Final* de Impacto Ambiental (en adelante DIA-F). Un examen de la DIA revela que la Autoridad consideró los efectos del proyecto sobre el ambiente; las alternativas para cumplir con las demandas de abastos de agua; las medidas de mitigación de impacto ambiental; el resumen de los comentarios de los deponentes en las vistas públicas y los comentarios de las agencias gubernamentales, las conclusiones y la determinación de cumplimiento con la política pública ambiental.(¹⁷) El 20 de mayo de 1996 la Junta de Calidad Ambiental *resolvió que la DIA presentada por la Autoridad*

---

(¹⁶) La DIA-P incluirá una evaluación de los efectos primarios y secundarios, positivos o negativos, del proyecto propuesto, sobre aspectos ambientales: el bienestar y salud humana, el uso de terrenos, la infraestructura, la calidad del aire y agua, los minerales económicos, la flora, la fauna, los suelos, las áreas inundables, las especies amenazadas o en peligro de extinción, los niveles de sonido, las áreas de valor histórico, arqueológico o estético. Sec. 5.3.6(a) del Reglamento sobre Declaraciones de Impacto Ambiental Núm. 3106 de 4 de junio de 1984, Junta de Calidad Ambiental, pág. 20.

(¹⁷) Exponemos los comentarios más sobresalientes de las agencias en cuanto al ámbito ambiental:

*U.S. Environmental Protection Agency (EPA)*

Concluye que se impactarán aproximadamente 3.73 acres de humedales, la mayoría en veintiséis (26) humedales a través de los segmentos localizados en el *corredor* de tuberías. La EPA sostiene que la construcción de la tubería *no afectará significativamente la hidrología de las áreas de humedales ya que la Autoridad restaurará la elevación original de estas áreas una vez completada la construcción.* El único impacto permanente a los humedales será de 0.4 acres debido a la construcción de la toma de agua y la laguna de retención.

Sobre el Río Grande de Arecibo, concluye que habrá un impacto secundario sustancial corriente abajo (*down stream*) del estuario ocasionado por la laguna de retención y la toma de agua. Entiende que la extracción de agua resultará en una alteración sustancial en la calidad del recurso de agua. Recomienda que el Cuerpo de Ingenieros del Ejército de los Estados Unidos condicione su permiso a que la Autoridad prepare un estudio detallado del efecto de la extracción en la calidad de agua.

*cumplía con las disposiciones de la Ley sobre Política Pública Ambiental.* Esta resolución advino *final y firme* sin que se presentara recurso de revisión judicial alguno. La DIA final y firme formó parte de los numerosos documentos que examinó la Junta de Planificación para evaluar los efectos ambientales del Superacueducto.

Para superar esta realidad, en su recurso ante el Tribunal de Circuito de Apelaciones, Misión Industrial ataca *co-*

Refleja una preocupación sobre el hecho de que el corredor de las líneas de transmisión de agua pasarán por el *Vega Alta Public Supply Wells Superfund Site* y podría provocar una interferencia con sus actividades. Se le solicita a la Autoridad mantener informado a la EPA sobre la construcción del Superacueducto en Vega Alta para evitar cualquier interferencia con las actividades de limpieza del Superfund en ese lugar.

*Servicio Federal de Pesca y Vida Silvestre (U.S.F.W.S.):*

Los comentarios del U.S.F.W.S. van dirigidos a su interés primordial en cuanto al impacto del Superacueducto en el estuario del Río Grande de Arecibo y sobre los animales en peligro de extinción a lo largo de la ruta donde será colocada la tubería.

En específico entiende que los estudios realizados por la Autoridad no sostienen la propuesta de un flujo mínimo necesario en el río de 10 MGD para sostener el estuario. Tampoco se garantiza cómo se podrá mantener este flujo mínimo. Por otro lado, existe preocupación con la posible sedimentación de las reservas de Dos Bocas y Caonillas.

Recomienda que se le realice el monitoreo continuo del flujo; que se flexibilice la cantidad que vaya a ser extraída del río en épocas de bajo flujo, siendo esta flexibilidad posible puesto que el Superacueducto será integrado con recursos de otras fuentes como lo son Carraízo y La Plata.

En cuanto a las especies amenazadas o en peligro, señala que afectará la boa puertorriqueña (*Epicrates inornatus*), y del reino vegetal, las plantas siguientes: palo de Ramón (*Banara vanderbiltii, Buxus vahlii, Daphnopsis helleriana*); palma de manaca (*Calyptronoma rivalis, Chamaecrista glandulosa, var. mirabilis*); palo de nigua (*Cornutia obovata, Myrcia paganii*); palo de rosa (*Ottoschulzia rhodoxylon, Schoepfia arenaria*), y erubia (*Solanum drymophilum, Tectaria estremerana*).

Sostiene, además, que la Autoridad no ha brindado información específica sobre las especies que serán adversamente afectadas. Recomienda la realización de censos para identificar las especies amenazadas, el impacto a su hábitat y para desarrollar medidas para reducir dicho impacto. *Reconoce, sin embargo, que dichos censos están siendo llevados a cabo.*

Sobre la pesca deportiva, concluye la agencia que es posible que la extracción de agua afecte ciertas especies marinas utilizadas para la pesca deportiva. Recomienda que se consulte a la División Marina (DIVER) para determinar el impacto en las reservas de Dos Bocas y Caonillas de las reglas operacionales en dichos cuerpos de agua ocasionados por el Superacueducto.

*Carta de 3 de julio de 1995 de Ramón A. Maíz, Administrador de A.R.Pe., dirigida a Emilio Colón*

A.R.Pe. establece que no comentaron sobre la DIA-P por ser una agencia reguladora que adjudica proyectos. Sin embargo, le informa a la Autoridad que para la etapa de los planos de construcción a ser sometidos a dicha agencia, el proyecto debe cumplir con la Ley sobre Política Pública Ambiental y que cuente con una Consulta de Ubicación de la Junta de Planificación.

*lateralmente* la DIA de la Autoridad y su aprobación por la Junta de Calidad Ambiental. Sin embargo, una vez advino *firme* esa resolución, no hay jurisdicción judicial para revisar la juridicidad y adecuacidad del proceso de aprobación y contenido de la DIA.

Misión Industrial se queja de que la determinación de la Junta de Planificación con respecto al impacto ambiental del Superacueducto no está apoyada por evidencia sustancial.

La revisión judicial de determinaciones administrativas

---

Aclaró que la Autoridad está exenta de someter para su aprobación planos de construcción y proyectos de transacción y de segregación de terrenos ante A.R.Pe., según la Resolución JPE-14 de 30 de agosto de 1973 y 2 de marzo de 1983. Sin embargo, deberá entregar a A.R.Pe. copia de los planos de construcción, copia de estimados de construcción, de estudios técnicos realizados y copia de la solicitud de permiso de construcción.

Recomendó, además, que en los terrenos clasificados como inundables se constituyan servidumbres de paso sin tener que adquirir los terrenos. En cambio, deberá cumplir con las Secs. 6.03 y 11.02 del Reglamento de Planificación Núm. 13, *supra.*

Por último, endosó totalmente el Superacueducto.

*Carta de 31 de julio de 1996 de la Autoridad al U.S.F.W.S.*

Se refiere al *acuerdo* entre la Autoridad y el U.S.F.W.S. respecto a la disposición final del material extraído durante la construcción de la laguna de retención. El *acuerdo* dispone que dicho material será usado para rellenar el área circundante de una colina adyacente. El material a ser depositado no excederá los cuarenta (40) metros sobre el nivel del mar. Además, el área que sea rellenada será reforestada con plantas y árboles típicos del área de los "mogotes". Los árboles a ser plantados serán escogidos de una lista recomendada por el U.S.F.W.S.

*Acuerdo pragmático entre el Cuerpo de Ingenieros del Ejército, el Consejo Asesor sobre Preservación Histórica, Oficina de Preservación Histórica de P.R. y el Instituto de Cultura de P.R.*

Se acordó que la Autoridad proveerá al Cuerpo de Ingenieros del Ejército de los Estados Unidos, Oficina de Preservación Histórica de Puerto Rico e Instituto de Cultura Puertorriqueña, copias de la ruta y área de impacto del Superacueducto; la Autoridad notificará treinta (30) días antes a estas agencias sobre cambios en el plan de diseño; se fijaron las áreas de posible efecto sobre recursos culturales; *se establecieron planes de mitigación de efectos sobre los recursos culturales y yacimientos arqueológicos, y el procedimiento de recuperación de restos humanos.*

*Carta de la Junta de Calidad Ambiental referente a la Certificación de Calidad de Agua de 13 de agosto de 1996*

Se evalúan los efectos sobre humedales, cauces de ríos y corrientes de agua. *Se le requiere a la Autoridad restaurar a su estado natural todos los humedales impactados y los cauces de ríos y corrientes.* La tubería será instalada a una profundidad de 4–1/2 pies. La construcción de la toma resultará en el relleno de 0.8 acres de agua equivalente a 3,100 metros cúbicos de relleno, consistente en concreto y piedra. Se certifica que existe una seguridad razonable de que el proyecto no causará violaciones a los estándares de calidad de agua aplicables si se cumple con lo siguiente:

se rige por el principio de la *evidencia sustancial*; a saber, aquella "evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". *Hilton Hotels v. Junta Salario Mínimo*, 74 D.P.R. 670, 687 (1953). Véanse, además: *García Oyola v. J.C.A.*, supra; *Asoc. Drs. Med. Cui. Salud v. Morales*, 132 D.P.R. 567 (1993); *Silva v. Adm. Sistemas de Retiro*, 128 D.P.R. 256 (1991); *Chase Manhattan v. Emmanuelli Bauzá*, 111 D.P.R. 708 (1981).

| "PARAMETRO | LIMITACION |
|---|---|
| Sólidos Suspendidos Coloidales o Sedimentables | Los sólidos provenientes de las obras o sus desperdicios no deberán ocasionar asentamientos, o ser nocivos a aquellos usos específicos de las aguas. |
| Aceite y Grasa | Las aguas de Puerto Rico deberán estar substancialmente libres de aceites y grasas flotantes no derivados del petróleo, así como de aceites y grasas derivados del petróleo. |
| Oxígeno Disuelto | Contendrá no menos de 5.0 mg/1 excepto cuando causas naturales ocasionen una depresión en este valor. |
| pH | Deberá siempre permanecer entre 6.0 y 9.0 excepto cuando fenómenos naturales ocasionen que el valor de pH salga fuera de este rango. |
| Color | No excederá 15 unidades de acuerdo con los estándares colorimétricos del estándar plantino-cobalto, excepto a causas naturales. Disponiéndose que, en casos donde el cuerpo de agua normalmente excede este valor, se podrá utilizar el mecanismo provisto bajo la Sección 6.10 del Reglamento de Estándares de Calidad de Agua para desarrollar criterios de sitio específico. |
| Turbiedad | No excederá 50 unidades nefelométricas de turbiedad (NTU). |
| Sulfatos | No excederá 250 mg/1. |
| Agentes Tensoactivos como Sustancias Reactivas con Axul de Metileno | No excederá 100 ug/1. |

*Condiciones Especiales*

1. La Junta de Calidad Ambiental (JCA) al emitir este Certificado de Calidad de Agua (CCA), no releva al solicitante, la Autoridad de Acueductos y Alcantarillados, de su responsabilidad *de obtener permisos y/o autorizaciones adicionales de la JCA*, según requerido por la Ley. La emisión del CCA no puede considerarse como una autorización para llevar a cabo actividades que no estén específicamente cubiertas en el CCA.

2. La Autoridad de Acueductos y Alcantarillados deberá:

a) Implantar un programa de monitoría en el estuario del Río Grande de Arecibo para los siguientes parámetros: oxígeno disuelto, salinidad, temperatura, pH, COD, BOD y medidas continuas de flujo.

Un informe sobre los procedimientos de dicho programa de monitoría deberá ser sometido noventa (90) días a partir de la Fecha de Efectividad del Permiso

Las decisiones administrativas merecen la mayor deferencia de los tribunales debido a la experiencia y los conocimientos especializados sobre los asuntos que están dentro de las áreas que se le han delegado. Por esta razón, los tribunales nos limitamos a indagar la razonabilidad de sus acciones cuestionadas, no sustituirlas por nuestros propios

(FEP) emitido por el Cuerpo de Ingenieros para la aprobación de esta Junta. Dicho informe deberá incluir, pero no limitarse a lo siguiente:

(1) Identificación de la organización responsable de realizar el muestreo.

(2) Descripción detallada de la metodología a ser utilizada en la realización del muestreo, incluyendo equipo, recolección de muestras y métodos de análisis.

(3) Diagrama esquemático que indique los puntos de muestreo.

(4) Plan de control y aseguramiento de calidad que incluya el muestreo de campo y análisis de laboratorio.

b) Tomar las medidas necesarias para evitar que los causes de cuerpos de agua y áreas ribereñas sean afectadas durante el proceso de construcción por el movimiento de maquinaria, equipo pesado o vehicular.

c) Tomar las medidas de control necesarias para evitar violaciones a los estándares de calidad de agua aplicables a los cuerpos de agua afectados durante la etapa de construcción.

d) Tomar las medidas necesarias para evitar que residuos de sustancias orgánicas, tales como: aceites, combustibles u otras sustancias químicas puedan ganar acceso a un cuerpo de agua.

e) Tomar las medidas necesarias para satisfacer los requerimientos o recomendaciones del Servicio Federal de Pesca y Vida Silvestre referentes a este proyecto.

f) Obtener de esta Junta la aprobación de un Plan para el Control de Erosión y Sedimentación (CES).

g) En el caso de la instalación de algún tanque para el almacenamiento de combustible (diesel, etc.), se deberá someter a la División de Permisos e Ingeniería del Negociado de Control de Calidad de Agua un Plan de Emergencias, a tenor con el Artículo 11, Inciso 14 de la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970, según enmendada, y la Sección 6.5 del Reglamento de Estándares de Calidad de Agua para prevenir y controlar derrames.

h) Obtener las aprobaciones federales y estatales pertinentes previo a la disposición final de los desperdicios sólidos (material excavado o demolido, remoción de la capa vegetal, etc.) generados por el proyecto de referencia. Además, deberán requerir al contratista la implementación de un Plan de Control de Desperdicios Sólidos (DS-3) de acuerdo a las Normas y Reglamentos aplicables de la JCA.

i) Someter el Informe de Ingeniería, Planos y Especificaciones del sistema de tratamiento de cienos de la planta de tratamiento de agua para la debida evaluación y aprobación de la División de Permisos e Ingeniería del Área de Calidad de Agua.

j) Solicitar y obtener un Permiso Federal de Descarga 'NPDES' de la Agencia Federal para la Protección Ambiental (APA) para la descarga de los desperdicios líquidos tratados, provenientes del sistema de tratamiento de cienos de la planta de tratamiento de agua. Esta solicitud deberá ser sometida a la APA por lo menos 180 días antes de comenzar dicha descarga y no se podrá realizar descarga alguna hasta que se obtenga el PERMISO

criterios. Sólo cuando la actuación administrativa sea irrazonable o constituya un abuso de discreción, o sea claramente arbitraria, o la agencia hubiese cometido un error en la aplicación de la ley, ejerceremos nuestra función revisora. *Fuertes y otros v. A.R.Pe.*, 134 D.P.R. 947 (1993), y casos allí citados.

Misión Industrial plantea que la Junta de Planificación

FINAL de descarga 'NPDES'. Copia de dicha solicitud deberá ser sometida a la JCA.

k) En el caso de que se utilicen sistemas de inyección subterránea tales como: (1) pozos sépticos, (2) trincheras, (3) lechos de percolación, etc. para la disposición de las aguas usadas generadas por la planta de tratamiento de agua, deberán solicitar y obtener los correspondientes permisos para la construcción y operación de dichos sistemas a tenor con el Reglamento para el Control de la Inyección Subterránea y el Reglamento para la Certificación de Planos y Documentos ante la Junta de Calidad Ambiental.

l) Para la descarga de aguas de escorrentía asociadas a la construcción del Superacueducto de la Costa Norte, deberán solicitar y obtener de la Agencia Federal para la Protección Ambiental un permiso 'NPDES' de acuerdo al Código Federal de Reglamentación Núm. 40, Sección 122.26(b)(14)(X).

m) Obtener un permiso de construcción de una fuente de emisión, según la Regla 203 del Reglamento para el Control de la Contaminación Atmosférica vigente.

n) En el caso de que durante la etapa de construcción se encuentre algún hallazgo histórico o arqueológico, deberán detener las obras e informar inmediatamente al Instituto de Cultura Puertorriqueña y a la Oficina Estatal de Preservación Histórica.

3. Las limitaciones y condiciones especiales establecidas en este CCA entrarán en vigencia a partir de la FEP emitido por el Cuerpo de Ingenieros y expirará en FEP + 5 años. El mismo podrá ser renovado, a solicitud del peticionario, conforme a las Reglas y Reglamentos Aplicables a la fecha de radicación de la nueva solicitud.

4. Las condiciones de este CCA son consideradas cada una independientemente de las demás. Por lo tanto, si la aplicabilidad de cualquier condición de este CCA quedara sin efecto debido a cualquier circunstancia, las restantes condiciones no se verán afectadas.

5. La Autoridad de Acueductos y Alcantarillados, deberá cumplir con las condiciones especiales antes mencionadas. De no hacerlo así, el CCA concedido por la JCA será nulo inmediatamente." Tabla A-1, Caso Núm. CC-97-116, págs. 329–332.

*Condiciones impuestas por el Cuerpo de Ingenieros del Ejército de los Estados Unidos al emitir el permiso y autorización de construcción del Superacueducto*
I *Condiciones Generales*

1. La fecha máxima para terminar el proyecto será el 3 de septiembre de 2001.

2. Si se descubre algún objeto de valor arqueológico o histórico, se tiene que notificar inmediatamente al Cuerpo de Ingenieros, quien coordinará con las agencias federales para tomar las medidas pertinentes.

3. La Autoridad cumplirá con las condiciones impuestas en cuanto a la calidad del agua.

no cumplió con su encomienda de analizar la adecuacidad del Superacueducto, a la luz de la política pública ambiental. *Insisten que su construcción y operación tendrá un impacto adverso en los recursos naturales y el ambiente.*

---

4. La Autoridad permitirá la inspección, por parte del Cuerpo de Ingenieros, en cualquier momento para asegurar el cumplimiento de las condiciones de este permiso.

II *Condiciones Especiales*

1. Los humedales deberán restituirse a su condición original, excepto las áreas en que habrá de ubicarse las estructuras y la laguna de retención.

2. Luego de la construcción, se permite la excavación de humedales y las riberas para su reparación, previa notificación al Cuerpo de Ingenieros. Terminadas las reparaciones, se restaurarán las áreas afectadas, dentro de 15 días de concluida la labor.

3. La Autoridad deberá obtener un permiso del Programa Nacional para la Eliminación de Descargas de Contaminantes (*National Pollutant Discharge Elimination System*), o una excepción de la planta de tratamiento de agua antes de comenzar la construcción de la toma de agua.

4. La Autoridad asegurará el flujo mínimo de 20 millones de galones al día por la estación de aforo (*stage gauge station*) de Cambalache.

5. La Autoridad llevará un registro del flujo de agua y proveerá un informe mensual al Cuerpo de Ingenieros, Servicio Federal de Pesca y Vida Silvestre (US-FWS), ANER y Agencia de Protección Ambiental (EPA).

6. La estación de aforo (*stage gauge station*) se calibrará por seis meses.

7. Conducirá estudios para determinar potenciales cambios en la calidad del agua del estuario y para determinar el flujo mínimo requerido para conservar el sistema del estuario.

8. En época en que no haya sequía, se asegurará que el nivel de agua del lago Dos Bocas no disminuya más de 10 pies, por causa del suministro del agua del Superacueducto.

9. La altura del material extraído del área no excederá de 40 metros del nivel del mar y se tendrá que reforestar el área con especies típicas de la vegetación en terrenos de piedra caliza.

10. La Autoridad llevará a cabo un censo de la Boa enfocado en terrenos, rocas y árboles que puedan ser utilizados por la boa. Se llevará a cabo entre 5:00 a 7:30 A.M. del día cuando se vaya a llevar el equipo pesado al área.

(a) de encontrarse alguna boa, se detendrá toda actividad a cincuenta (50) pies del hallazgo y se trasladará la Boa a un área fuera de la zona de construcción.

(b) se preparará un protocolo para el censo, la captura de la boa, así como del lugar a trasladarse.

(c) se preparará un informe resumiendo el censo, observaciones, captura y re-localización de la Boa y se remitirá dentro de sesenta (60) días de haber completado el censo.

11. La Autoridad implementará y conservará en todo tiempo la mejor práctica de control de erosión para prevenir la sedimentación.

12. Las áreas adyacentes a las áreas de construcción permitidas no podrán dañarse por los equipos utilizados en la construcción.

13. Se tiene que proveer un plano de la laguna de retención y de la *estructura para decantar la descarga* (*decant discharge structure*) y la certificación de la *obra según construida* (*completed as-built certification form*).

Al respecto, la Junta de Planificación, en su Resolución de Consulta de Ubicación, expuso:

De los testimonios controvertidos de los técnicos de la peticionaria [Autoridad] así como de los comentarios emitidos por las agencias pertinentes, de la información obrante en el expediente y las medidas de investigación esbozadas en la *alegación de impacto ambiental*, concluimos que el proyecto no tendrá un impacto detrimental en los ecosistemas de la zona. (Énfasis suplido.)

La Junta de Planificación, a base de su conocimiento especializado (*expertise*), estimó que la certificación de la Junta de Calidad Ambiental que acreditaba el cumplimiento del Art. 4(c) de la Ley sobre Política Pública Ambiental, *supra*, era *suficiente* para cumplir con su deber de considerar los impactos ambientales del proyecto propuesto.

Hemos examinado meticulosamente la DIA-F que *contiene un análisis fundamentado* de los efectos del proyecto en el ambiente. Se reconocen *planes de mitigación* de los efectos ambientales e incorporan los comentarios de todas las agencias concernidas. En *específico, se discuten los señalamientos y las preocupaciones de Misión Industrial sobre los efectos al sistema estuario del Río Grande de Arecibo debido a las reducciones en el flujo de aguas, a consecuencia de la toma propuesta.* La Junta de Calidad Ambiental concluyó que, a base de toda la evidencia, el Río Grande no recibiría un *impacto significativo* en el sistema estuario, aún asumiendo una extracción máxima diaria de cien (100) millones de galones de agua. *Como quiera, ordenó a la Autoridad que iniciara un detallado proyecto de rastreo del estuario concurrente con el desarrollo y la operación del proyecto.*

También, Misión Industrial alega que la toma de agua tendrá un efecto adverso en los niveles de la represa Dos Bocas y Caonillas en ocasiones de poca o ninguna lluvia y que la Junta de Planificación no tomó precauciones al respecto. Sobre el particular, la Autoridad discutió esta

preocupación en la DIA y concluyó que ambas represas mantendrían niveles navegables durante todo el año, excepto en momentos de extrema sequía, cuya recurrencia es cada cien (100) años. Véanse: Sec. 3.2.1.4 de la DIA-P y Vol. II, Ap. B3 y B7 de la DIA-F.

Argumenta Misión Industrial que el Superacueducto impactará adversamente las áreas de mogotes, de gran valor en los sistemas de recarga de acuíferos y como hábitat de varias especies protegidas. En *reconocimiento* de esta situación, la Junta de Planificación consignó que el Superacueducto cuenta con un corredor de cincuenta (50) metros, dentro del cual se construirá una servidumbre permanente de quince (15) metros, cuyo espacio tiene la virtud de poder ser relocalizado si se encontrase algún recurso o yacimiento que no pueda ser objeto de mitigación. *Esta flexibilidad de diseño permitirá que no se afecten los mogotes y otros elementos ambientales.*

Otro aspecto que impugna Misión Industrial es que la Junta de Planificación no consideró los efectos de las especies en peligro de extinción, ya fuese por la falta de agua en las zonas estuarias, como por la construcción de la tubería en ruta al Área Metropolitana. Hemos visto cómo se impuso a la Autoridad un protocolo para identificar y proteger a la serpiente conocida como *boa puertorriqueña* y, además, varias condiciones para atemperar el impacto sobre la fauna y otros extremos afectados.

Finalmente, sobre este extremo Misión Industrial señala que la Junta de Planificación no hizo alusión a las consecuencias ambientales de la excavación de unos dos millones trescientos mil (2,300,000) de metros cúbicos para la construcción de la *laguna de retención de aguas crudas.* Contrario a esa contención, la DIA discute los mecanismos que se utilizarán para la disposición de tierras que serán removidas durante la excavación. Dependiendo del material, podrá usarse como agregado. Véase Determinación de Hechos de la Junta Núm. 45. *Aclaramos nuevamente que la Junta de Planificación condicionó su aprobación a que*

*la Autoridad cumpliera con todos los requerimientos de la Junta de Calidad Ambiental.*

*Lo expuesto es un fuerte indicador de que el expediente administrativo contiene evidencia sustancial en apoyo de las determinaciones de la Junta de Planificación, robustecida por la presunción de corrección vigente.*

## VII

Misión Industrial alega que erró la Junta de Planificación al autorizar la Consulta de Ubicación en contravención a su propio Reglamento de Zonas Susceptibles a Inundaciones Núm. 13 (2da ed. rev.) de 6 de marzo de 1987, Junta de Planificación (en adelante Reglamento Núm. 13). Se refieren a la laguna de retención en terrenos clasificados como Zona 1, que sean susceptibles a inundaciones. Aducen que la Autoridad debió hacer un estudio hidrológico-hidráulico para determinar el efecto de la laguna con respecto a las inundaciones en el lugar.

La Sec. 6.01(1) del Reglamento Núm. 13, *supra*, pág. 36, dispone expresamente que:

(1)A partir de la fecha de vigencia del correspondiente Mapa de Zonas Susceptibles a Inundaciones no se permitirá en esta zona la ubicación de nuevas estructuras, relleno, mejoras sustanciales y otros *desarrollos*[, a menos que se demuestre, mediante la realización de un estudio hidrológico-hidráulico que utilice las mejores prácticas de ingeniería, que el propuesto desarrollo no resultará en aumento en los niveles del cauce mayor durante un evento de descarga de una inundación base. Si eso probara ser factible, toda nueva construcción o mejora sustancial cumplirá con los requisitos aplicables para mitigar los efectos de las inundaciones.] (Énfasis suplido.)

Su Sec. 2.01(13) define *desarrollo* como:

Cualquier cambio hecho por el hombre a propiedades mejoradas o sin mejorar incluyendo, pero sin limitarse a, edificios u otras estructuras, minería, dragado, relleno, nivelación, pavimentación, *excavación*; perforaciones o almacenaje de equipo y materiales localizadas dentro de una zona susceptible a

inundaciones. (Énfasis suplido.) Reglamento Núm. 13, *supra*, pág. 11.

La laguna de retención de aguas se ubicará en terrenos clasificados como Zona 1. La Autoridad y la Junta de Planificación argumentan que, a pesar de que la excavación de la laguna se encuentra dentro de la definición de *desarrollo* del Reglamento Núm. 13, el tipo de construcción que se pretende no requiere del estudio hidrológico-hidráulico. Se fundamentan en que la excavación propuesta *no supone la construcción de estructura alguna que obstaculice el flujo de agua,* por lo que su efecto real en este sentido sería mínimo, si alguno. *Aducen, además, que la construcción de la laguna no considera el uso de diques, depósitos de relleno u otros movimientos de tierra que afecten el flujo natural del agua.* Concluyen que por estas razones era innecesario que la Autoridad preparase un estudio hidrológico-hidráulico.

La Resolución de la Junta de Planificación no contiene determinación o expresión alguna sobre el mencionado estudio hidrológico-hidráulico. De otra parte, surge que la Autoridad informó *haber preparado dicho estudio con posterioridad* a la aprobación de la consulta de ubicación.

Hemos analizado los criterios que serán utilizados por la Junta de Planificación al momento de evaluar la consulta y nada dispone al respecto. Sólo le exige que *considere* los mapas de zonas inundables *antes* de tomar una decisión sobre la consulta. Tampoco requiere comentar *todos* los aspectos relativos a la adecuacidad de la consulta propuesta. En este caso, por su particularidad, comentar sobre el efecto de la laguna de retención de aguas en un terreno clasificado como inundable *era un elemento que caía dentro de la sana discreción de la Junta de Planificación.*

De otra parte, surge del expediente que Misión Industrial hizo el mismo planteamiento aquí discutido en su *solicitud de reconsideración* ante la Junta de Planificación, la cual fue declarada sin lugar. Es evidente que dicho organismo evaluó el señalamiento y aspecto de los terrenos

inundables y, repetimos, en el ejercicio de su discreción, lo estimó improcedente.

La Junta de Planificación, como agencia encargada de reglamentar el uso de los terrenos *inundables* del país, posee el *conocimiento especializado necesario* para evaluar la cuestión. En deferencia, la omisión de mencionar el aspecto de los terrenos inundables y el no haber exigido *antes* el estudio hidrológico-hidráulico, no invalidan per se su resolución. Valga repetir que la aprobación de la consulta fue *condicionada* a que *posteriormente* la Autoridad cumpliera con todos los requerimientos de las agencias estatales, como lo es la propia Junta de Planificación.

## VIII

De otra parte, Misión Industrial argumenta que la Junta de Planificación no acató la política pública esbozada en su propio *Plan de Usos de Terrenos*, según lo exige el Art. 21 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A. sec. 62t, y la Sec. 7.01 de su Reglamento para Procedimientos Adjudicativos, *supra*. Aducen que la utilización de *terrenos fértiles* en la construcción de la laguna de retención y de obras relacionadas es contraria a la política anunciada en la Sec. 9.01 del referido Plan de Usos de Terrenos.

La citada Sec. 9.01 establece que los terrenos de alta productividad agrícola (Categorías I al IV, según el Servicio Federal de Conservación de Terrenos) sean utilizados exclusivamente para esos fines. *Estos terrenos podrán ser destinados a otros usos,* "sólo cuando se demuestre que no *existen otros terrenos alternos* para la ubicación de la actividad no-agrícola *que es apremiante y de importancia para el desarrollo de nuestro país*". (Énfasis suplido.) Sec. 9.01 del Plan de Usos de Terrenos, *supra*.

Los terrenos para la construcción de la laguna y otras obras relacionadas se encuentran clasificados entre las categorías de *alta productividad agrícola*. Frente a esa característica, no cabe duda de *la importancia y el alto interés*

*estatal* en asegurar los abastos de agua para miles de familias en la costa norte.([18]) *Al Superacueducto le aplica esta excepción, pues la Junta de Planificación evaluó la posibilidad de existir terrenos alternos para ubicarlo.*

Surge de un examen de su resolución que dicho organismo estudió *todas* las alternativas (o cuarenta y una (41) alternativas) al proyecto, *incluso en el contexto de su impacto sobre las prácticas agrícolas.* En su análisis final, la Junta de Planificación realizó un balance entre la deseabilidad del uso de los terrenos para el cultivo agrícola frente a la construcción del Superacueducto, como la alternativa menos costosa, rápida y efectiva para resolver el *urgente* problema de abastos de agua en la costa norte. *Asimismo, el Departamento de Agricultura, agencia con mayor conocimiento en el área, endosó el proyecto sujeto a los planes adoptados por la Autoridad para minimizar el impacto en los terrenos con capacidad agrícola.*([19]) Determinaciones de Hechos de la Junta de Planificación Núms. 8, 52 y 53.

La decisión de la Junta de Planificación estuvo fundamentada en un balance de intereses, tomando en consideración la evidencia obrante en el expediente.

## IX

Por último, alega Misión Industrial que la Junta de Planificación incurrió en violaciones a la Ley sobre Política Pública Ambiental al aprobar la Consulta de Ubicación, sin que la DIA preparada por la Autoridad sobre el efecto del Superacueducto cumpliera las exigencias del Art. 4(c) de esta citado ley, y las Secs. 5.35 y 5.36 del Reglamento sobre Declaraciones de Impacto Ambiental, *supra*, según las Secs. 4.03 y 7.01 del Reglamento para Procedimientos Adjudicativos, *supra*.

---

([18]) La sección 20.00 del citado documento provee para "aumentar y mejorar la infraestructura de distribución de agua potable dirigido a la interconexión de los sistemas y la integración del mismo en áreas donde sea factible".

([19]) Según Misión Industrial, los terrenos cultivables que habrán de ser usados son alrededor de cuatrocientas (400) cuerdas.

La Sec. 4.03 del aludido Reglamento, *supra*, pág. 4.6, dispone, en lo pertinente, que "[l]a agencia originadora [Autoridad] deberá evidenciar mediante certificación al efecto que para dar cumplimiento a la [Ley sobre Política Pública Ambiental], ha radicado la documentación correspondiente ante la Junta de Calidad Ambiental". Como expresáramos, la Autoridad presentó su DIA ante la Junta de Calidad Ambiental y ésta *se hizo formar parte de la resolución de la consulta de ubicación de la Junta. Evidentemente se observó la Sec. 4.03 del Reglamento para Procedimientos Adjudicativos, supra.*

Sobre la contención de que la DIA preparada no cumplió con los requisitos de la Ley sobre Política Pública Ambiental y el Reglamento de la Junta de Calidad Ambiental, notamos que la Sec. 7.01 del Reglamento de Procedimientos Adjudicativos, de la Junta de Planificación, *supra*, exige que las declaraciones de impacto ambiental se preparen de acuerdo con el Reglamento sobre la DIA. Al respecto, surge de la Resolución de 23 de mayo de 1996 que la Junta de Calidad Ambiental *certificó* que la DIA del Superacueducto presentada por la Autoridad *fue preparada conforme a la ley y al reglamento antes mencionados. Como señaláramos, dicha resolución advino final y firme.*

Sin embargo, lo anterior no exime a la Junta de Planificación de su obligación de velar por el fiel cumplimiento de la política pública ambiental. Según su ley orgánica y su reglamento deberá, *antes* de aprobar una consulta de ubicación, incorporar a su análisis *todas las consideraciones de impacto ambiental.* Ello se explica en vista de que es la agencia llamada a coordinar y guiar el desarrollo integral de Puerto Rico maximizando el uso de las tierras y los recursos naturales. 23 L.P.R.A. sec. 62c. Asimismo, la Ley sobre Política Pública Ambiental le impone a *todas* las agencias gubernamentales implantar dicha política. 12 L.P.R.A. sec. 1124.

Sobre este extremo, la revisión judicial se limita a determinar si la Junta de Planificación, *en efecto*, consideró los impactos ambientales del proyecto y si sus conclusiones

están sostenidas por evidencia sustancial. Conforme a sus determinaciones de hecho, la Junta de Planificación evaluó y consideró los efectos ambientales del Superacueducto en las áreas siguientes. Sobre el *estuario* concluyó que el rendimiento del sistema era de alrededor de ciento veintitrés (123) MGD, y que con la extracción propuesta de cien (100) MGD quedaría un remanente de veintitrés (23) MGD que fluyen hacia el estuario. Estimó que el estuario necesita un mínimo de diez (10) MGD para mantener el ecosistema existente. Determinación de Hecho Núm. 28. En cuanto al *humedal del Caño Tiburones*, concluyó que no recibe mucha agua del acuífero del valle y casi ninguna del río, alimentándose casi en su totalidad de la escorrentía local y de agua de mar. Determinación de Hecho Núm. 29. Sobre el *acuífero de Arecibo*, determinó que no sería afectado por la extracción de agua asociada al Superacueducto. Determinación de Hecho Núm. 30. En cuanto a la *flora* y *fauna* del lugar, se realizaron estudios de los niveles de oxígeno, de sedimentación y se preparó un plan de manejo de su cuenca y para reducir sedimentación en Dos Bocas y Caonillas. También se *realizó un modelo hidráulico del Río Grande de Arecibo* para asegurarse de que puede suplir toda el agua que se necesita. Determinación de Hecho Núm. 32.

En lo referente a los *hallazgos arqueológicos*, se hicieron estudios para evitar el impacto sobre posibles yacimientos y para mitigación de daños. Además, el Superacueducto cuenta con un amplio corredor de cincuenta (50) metros, dentro del cual se construirá una servidumbre permanente de quince (15) metros, lo cual permite ser relocalizado en caso de encontrarse algún recurso protegido o un yacimiento que no puedan ser objeto de mitigación. Determinación de Hecho Núms. 34 y 35. Iguales providencias fueron tomadas en el caso de los *mogotes*. Determinación de Hecho Núm. 36. Sobre los efectos en el aire y ruido se realizaron estudios por todo el corredor del proyecto, en la toma de agua, en la planta y en la tubería.

Los humedales en el corredor fueron analizados y se adoptaron *planes de mitigación de daños.* Determinación de Hecho Núm. 35. Se hizo un estudio de rendimiento seguro en el Sistema Caonillas, Dos Bocas, Río Tanamá y otros. Determinación de Hecho Núm. 27. Por último, se consideró la disposición del material sobrante de las excavaciones que sería usado como agregado o relleno. Determinación de Hecho Núm. 15.

En cuanto a las alternativas a la construcción del Superacueducto, surge que se evaluaron varios métodos posibles para atender las deficiencias en los abastos de agua en la Costa Norte. Determinación de Hecho Núm 5. La Junta de Planificación consideró las siguientes: un programa no estructural, la reparación de noventa mil (90,000) salideros de agua (Determinación de Hecho Núm. 6); un programa de conservación de agua, un programa para conservación y para la enseñanza en las escuelas (Determinación de Hecho Núm. 7); programas de rehabilitación de los embalses Carraízo, La Plata y Cidra donde se comienza la reforestación de áreas cercanas para evitar la sedimentación (Determinación de Hecho Núm. 8); la toma de agua del Río Grande de Manatí, un embalse, una planta de filtración y la línea de transmisión hacia la Zona Metropolitana, descartado por ser muy costoso, aproximadamente cuatrocientos millones de dólares ($400,000,000), y cuya construcción demoraría de quince (15) a veinte (20) años (Determinación de Hecho Núm. 9); inacción en el desarrollo de facilidades adicionales durante los pasados veinte (20) años (Determinación de Hecho Núm. 21); utilización de agua subterránea, descartada por ser insuficiente y su salinidad (Determinación de Hecho Núm. 24); la reducción de pérdidas a menos de 15%, prescindido por la naturaleza de los sistemas y el reconocimiento de que las conexiones clandestinas podrían alcanzar hasta un 10% (Determinación de Hecho Núm. 29), y el reuso de aguas, rechazado por su alto costo, aproximadamente seiscientos millones de dólares ($600,000,000) y el extenso período de construcción (Determinación de Hecho Núm. 49).

La Junta de Planificación, en cumplimiento con su obligación de la Ley sobre Política Pública Ambiental, al menos, ponderó cuarenta y un (41) alternativas adicionales al Superacueducto. Sin embargo, concluyó que su construcción era la alternativa menos costosa, rápida y efectiva de entre todas las demás. Determinación de Hecho Núm. 52.

## X

Hasta el presente, la participación activa de Misión Industrial, y demás ciudadanía ante los foros administrativos que evaluaron el Superacueducto, ha contribuido significativamente a que la Autoridad, como entidad proponente, haya aclarado y atendido las preocupaciones legítimas de éstos.[20] *Como resultado se le han impuesto numerosas exigencias que la Autoridad debe cumplir.*

Toda obra humana, por leve que sea, tiene un efecto inmediato en el medio ambiente. Desde la óptica de los opositores al proyecto —sobre todo, residentes en áreas colindantes— es perfectamente entendible y legítimamente comprensible que se manifiesten en contra. En algunas áreas— por ejemplo, la laguna de retención— la alteración del escenario natural será mayor que en otras, digamos, la instalación de tubería paralela a las carreteras estatales Núms. 2 y 22. El Superacueducto, como obra de gran magnitud, complejidad y semejante naturaleza, requiere la realización de múltiples detalles, la implantación de numerosas técnicas y pruebas de diversos aspectos, los cuales conllevan un elemento de incertidumbre y riesgo que puede ser señalado y destacado válidamente por quienes se oponen a su construcción. Ahora bien, por sí solo, es fundamento para que judicialmente se paralice. Es menester demostrar, no sólo la realidad de un impacto ambiental detri-

---

[20] Durante los foros administrativos depusieron, entre otros: Misión Industrial, Inc.; Dr. Neftalí García; Ing. Félix Aponte Ortiz; Comité Defensores Salud Comunidad Río Arriba, y Ciudadanos en Defensa del Agua, Aire y Tierra.

mental *significativo*, sino que se han ignorado, o no se han requerido o no se han adoptado, las medidas necesarias para minimizar el impacto ambiental y rehabilitar las áreas implicadas según requerido en las leyes y reglamentaciones vigentes.

La evaluación de los posibles efectos ambientales en la flora, fauna y en los ecosistemas a través de los cuales discurrirá el Superacueducto, es tan importante como la solución al problema existente en los abastos de agua. De ahí que en su aprobación, las agencias concernidas[21] le requirieron a la Autoridad el cumplimiento de las medidas siguientes, a los fines de minimizar su impacto ambiental: rehabilitar cualquier humedal afectado por la construcción, sujeto a ser modificado hasta el límite necesario; mantener un flujo de agua mínima de veintitrés (23) millones de galones diarios en el área de Cambalache para conservar el estuario; realizar estudios, vía medición de la salinidad y el oxígeno disuelto sobre los cambios en el estuario y la adopción de medidas para preservarlo; efectuar estudios durante la mañana para detectar la presencia de la "boa puertorriqueña" antes de que cualquier otro tipo de maquinaria pesada llegue al lugar (si se observa alguna, la obra deberá detenerse en un radio de cincuenta (50) pies de la culebra. Se preparará un plan para estimar la cantidad de este tipo de reptil, su captura y traslado a un lugar seguro); notificar a las agencias concernidas de descubrirse remanentes arqueológicos y detener las obras en el área; analizar características del agua entre el estuario y la laguna *durante un año antes y un año después de comenzada la operación*, y tomar medidas para evitar la erosión del terreno.

---

[21] En específico, el Cuerpo de Ingenieros del Ejército de Estados Unidos, el Servicio Federal de Pesca y Vida Silvestre, la Junta de Calidad Ambiental y el Departamento de Recursos Naturales y Ambientales.

## XI

Es evidente que el proyecto propuesto por la Autoridad es *integrado* e incluye entre sus componentes principales la toma de agua y la tubería de transmisión de agua potable. La única razón para continuar la suspensión, aunque sea parcial, es que la mayoría ha estimado que *probablemente* la aprobación de la consulta de ubicación no cumplió con todos los trámites legales y administrativos dispuestos por las leyes y los reglamentos aplicables. Ante esa disyuntiva, la paralización parcial sólo puede interpretarse como que no está segura de su ilegalidad.

Los señalamientos de error de Misión Industrial contra la aprobación de la consulta de ubicación van dirigidos a la generalidad de la acción administrativa: su concepción como alternativa para suplir los abastos de agua de la Costa Norte, la aprobación de permisos y la evaluación del impacto ambiental de la *totalidad* del proyecto. *No es posible ordenar remedios a medias; el Tribunal estaba obligado a escoger entre dos (2) alternativas decisorias: paralizarlo o no.*

El impacto económico directo sobre la Autoridad, por la paralización aún parcial de la obra, independientemente de la certeza de la cuantía, es cuando menos *estimable en miles* de dólares diarios. También es claro que cualquier demora en la construcción y funcionamiento del Superacueducto afectará la viabilidad y el desarrollo de proyectos de viviendas y otros desarrollos que dependerán de su operación.

*Desde la psicodinámica judicial estamos persuadidos de que el fenómeno histórico, cultural, económico, social, ambiental y laboral que resume la complejidad del Superacueducto, podemos expresarlo del modo siguiente: para quienes defienden el ambiente, una medida inútil y costosa para resolver el problema de abastos de agua, que conlleva grave daño ecológico a la zona norte de la isla; para el pescador, un cambio dramático en su entorno natural; para los suplidores y el constructor, un reto técnico a la par que un gran*

*beneficio económico; para el obrero, su trabajo y fuente de ingresos; para la Autoridad, una forma de resolver el gran problema de abasto de aguas; para el Primer Ejecutivo, la solución a los reclamos de la ciudadanía, y para el ciudadano común que carece de agua potable, la esperanza de que finalmente tendrá disponible el preciado líquido, elemento vital.*

El Tribunal de Circuito de Apelaciones erró al decretar la paralización de su construcción.

— O —

Opinión concurrente y disidente emitida por el Juez Asociado Señor Rebollo López.

La controversia que plantea el presente recurso es si el Tribunal de Circuito de Apelaciones erró, o no, al mantener en vigor la paralización de las obras de construcción del proyecto conocido como el Superacueducto de la Costa Norte (en adelante el Superacueducto), que lleva a cabo la Autoridad de Acueductos y Alcantarillados (en adelante la A.A.A.) con el propósito de proveerle un servicio de excelencia a la región norte de nuestra isla, incluyendo al área metropolitana; paralización que tiene su génesis en la expedición, por dicho foro judicial apelativo, del recurso de revisión que ante el mismo presentara la recurrida, Misión Industrial.

Incomprensiblemente, una mayoría de los integrantes de este Tribunal es del criterio que una determinación o actuación judicial, completa y totalmente errónea, pierde dicha característica si se aminora él impacto de la misma; esto es, entiende la mayoría que, si modifica dicha orden con el propósito de que la misma sea "medianamente" equivocada, no hay problema alguno.

*Diferimos.* Somos del criterio que, dados los hechos particulares del presente caso, *no* procede *ni* la paralización total ordenada por el Tribunal de Circuito de Apelaciones *ni* la parcial que crea la mayoría en el día de hoy. El Tri-

bunal, al así actuar, está "jugando" y poniendo en serio riesgo el futuro y bienestar general de nuestro pueblo; *actuación judicial que no solamente es errónea, sino que la misma es caprichosa y carente de toda lógica y fundamento jurídico.*

*Ello en vista del hecho de que hay ausencia absoluta de evidencia demostrativa que justifique dicho remedio.* Misión Industrial *no* ha presentado —*ni ante el foro administrativo ni ante el foro judicial*— "scintilla" alguna de evidencia de daños concretos al ambiente que justifiquen la paralización.

## I

Constituye un hecho innegable que las reservas de aguas existentes en nuestra isla *no* son suficientes. No hay que ser un experto en la materia para poder darse cuenta de que ello se debe al aumento en el consumo de agua; aumento causado, de manera principal, por el crecimiento que ha experimentado nuestra población durante los últimos años y al hecho de que en aquel solar donde antes enclavaba una vivienda unifamiliar, ahora conviven un sinnúmero de familias en un edificio multipisos. Es por ello que las represas existentes rápidamente se vacían ante la demanda por agua, no importando la precipitación pluvial que ocurra.

Dicha situación obligó al Poder Ejecutivo a tomar acción al respecto. Se consideraron varias alternativas, predominando el criterio de que la más viable era la del Superacueducto; la corrección de cuya decisión, dicho sea de paso, *no* es de nuestra incumbencia.

A esos efectos, la A.A.A. presentó ante la Junta de Planificación una solicitud de consulta de ubicación para la construcción del Superacueducto. Luego de la celebración de vistas públicas, la Junta de Planificación *aprobó* la referida consulta de ubicación.

No conforme con ello, el 27 de septiembre de 1996, Misión Industrial de Puerto Rico, Inc., el Comité Defensores

de la Salud de la Comunidad Río Arriba, Nilda Maldonado Medina, Conchita Cordero, María González, Salvador Rivera, María Olivero, César Torrera, Juan Vilella y el Comité en Defensa del Ambiente de Arecibo (en adelante Misión Industrial) solicitaron la *reconsideración* de la resolución emitida por la Junta de Planificación aprobando la consulta de ubicación. Dicha solicitud fue *denegada.*

Acto seguido, Misión Industrial presentó ante el Tribunal de Circuito de Apelaciones (en adelante el T.C.A.) una solicitud de revisión de la aprobación por parte de la Junta de Planificación de la consulta de ubicación aludida. Posteriormente, presentó una moción en auxilio de jurisdicción, solicitando la paralización de las obras de construcción del Superacueducto.

El T.C.A. celebró una vista oral a la cual comparecieron todas las partes. El 28 de febrero de 1997, notificada el 3 de marzo de 1997, el T.C.A. emitió una resolución mediante la cual acogió el recurso y ordenó la paralización de las obras de construcción del Superacueducto. Además, ordenó la elevación de los autos certificados del proceso administrativo y que se transcribieran las vistas evidenciarias celebradas ante la Junta de Planificación.

El viernes 7 de marzo de 1997, tanto la Junta de Planificación como la A.A.A. recurrieron ante este Tribunal con sendas peticiones de *certiorari.* Ambas peticiones vinieron acompañadas de mociones en auxilio de jurisdicción. Solicitan la revisión de la resolución recurrida y la revocación de la determinación del foro apelativo de expedir el auto de revisión o, en la alternativa, que emitamos una orden permitiendo la continuación de las obras, mientras el T.C.A. decide el recurso de revisión.

El 10 de marzo de 1997, este Tribunal emitió una resolución, mediante la cual se consolidaron ambos recursos. Se le concedió término a las partes para expresarse en torno a: (1) la adecuacidad de conceder un *injunction* preliminar autorizando la continuación de las obras de construcción; (2) si el T.C.A. abusó de su discreción al expedir el auto de revisión y no emitir una orden autorizando la con-

tinuación de las obras de construcción, mientras resolvía el recurso en sus méritos; (3) la aplicación de los criterios jurisprudenciales a tomarse en consideración para la concesión de un remedio extraordinario de la naturaleza de un *injunction* preliminar; (4) la posible concesión de remedios intermedios para mitigar parte de los daños y lograr un adecuado balance de los intereses involucrados, sin que necesariamente se paralizaran totalmente las obras de construcción, y (5) aquellos otros criterios que estimaran pertinentes para que este Tribunal llegara a una conclusión informada sobre los méritos de los recursos.

Se señaló el caso para una vista oral, la cual se celebró el 14 de marzo 1997.

## II

Misión Industrial alega, en síntesis y en lo pertinente, que la Junta de Planificación incurrió en graves violaciones de la Ley sobre Política Pública Ambiental,[1] al impartir su aprobación a la consulta de ubicación necesaria para la construcción del Superacueducto, sin que la declaración de impacto ambiental (en adelante la D.I.A.) que se preparó cumpliera con las exigencias que la Ley y el Reglamento sobre Declaraciones de Impacto Ambiental Núm. 3106 de 4 de junio de 1984, Junta de Calidad Ambiental, disponen al respecto.[2]

Entre las "violaciones" aludidas por Misión Industrial, se señala que el Reglamento para el Aprovechamiento, Uso, Conservación y Administración de las Aguas de Puerto Rico de 28 de enero de 1993, Departamento de Recursos Naturales (en adelante el Reglamento de Aguas) exige que el Secretario del Departamento de Recursos Na-

---

[1] 12 L.P.R.A. sec. 1121 *et seq.*

[2] Entendemos que se está tratando de impugnar la D.I.A. por una vía colateral, puesto que el asunto que tenemos ante nuestra consideración es uno relativo a la validez de la consulta de ubicación. La resolución aprobando la Declaración de Impacto Ambiental se emitió el 20 de mayo de 1996 y la misma no fue objeto de revisión judicial.

turales y Ambientales (en adelante el D.R.N.A.) prepare una D.I.A. en casos en que pueda afectarse el ambiente de una manera significativa. Alegan por tanto, que la A.A.A. erró al adjudicarse la prerrogativa de preparar dicha D.I.A., pues entendían que el D.R.N.A. era la agencia con la responsabilidad principal y el conocimiento especializado relativo al recurso agua.

Por otra parte, Misión Industrial alega que no surge del expediente ante la Junta de Planificación que la resolución mediante la cual se aprobó la consulta de ubicación estuviera condicionada o limitada a los permisos que en su día la A.A.A. debía obtener del D.R.N.A.; es decir, el permiso de construcción de toma de agua y posteriormente, el de franquicia. Indican que la referida resolución es, por tanto, ilegal pues pretende adjudicar lo relativo al uso y aprovechamiento de cantidades significativas de agua, facultad que le corresponde evaluar y ejercitar al D.R.N.A.

Misión Industrial señala, además, que la Junta de Planificación no tomó en consideración los impactos ambientales que el Superacueducto ocasionaría, violentando con ello las disposiciones de su propio reglamento y de la Ley sobre Política Pública Ambiental. Entienden, por tanto, que la Junta de Planificación no debió aprobar la consulta de ubicación debido a los impactos ambientales que ello ocasionaría. Se alega, además, *en forma somera y carente de prueba*, que la construcción del Superacueducto tendrá consecuencias adversas en los recursos naturales y en el ambiente.

## III

A la luz de los errores señalados, resulta pertinente considerar la corrección del procedimiento seguido, hasta el momento, por la A.A.A. para la obtención de los permisos necesarios para la construcción del Superacueducto. Veamos.

La A.A.A. preparó una D.I.A. como parte del procedimiento necesario para obtener los permisos para la cons-

trucción del Superacueducto. Ello lo hizo de conformidad con la Sec. 5.1.1 del Reglamento sobre Declaraciones de Impacto Ambiental de la Junta de Calidad Ambiental, *supra*, pág. 16, la cual responsabiliza a "[l]a agencia *proponente de un proyecto* o acción ... por la preparación de la D.I.A. correspondiente, conforme a las Guías para la Preparación de [Declaración de Impacto Ambiental]". (Énfasis suplido.)

Además, la Sec. 5.1.2 del mismo Reglamento, *supra*, pág. 16, especifica, en lo pertinente, que "[c]uando más de una agencia participe en la misma acción o en un grupo de acciones que estén directamente interrrelacionadas por su dependencia funcional o proximidad geográfica, *se seleccionará entre ellas una agencia principal que asumirá la responsabilidad de la preparación de una D.I.A.*". (Énfasis suplido.)

Conforme a lo anterior, y según lo requiere la Ley Núm. 9 de 18 de junio de 1970 (Ley sobre Política Pública Ambiental), 12 L.P.R.A. sec. 1122 *et seq.*, la A.A.A. *efectivamente preparó* la D.I.A. correspondiente y la sometió ante la Junta de Calidad Ambiental (en adelante la J.C.A.) para su aprobación. La misma, además, se *circuló* entre las agencias gubernamentales con competencia sobre el proyecto del Superacueducto. El 20 de mayo de 1996, notificada el 23 de mayo del mismo año, la J.C.A. emitió una resolución aprobando la referida D.I.A., *la cual posteriormente advino final y firme.*

Por otra parte, conforme al Reglamento para Procedimientos Adjudicativos de la Junta de Planificación, revisado, Núm. 5244 de 21 de marzo de 1995, Oficina del Gobernador, la A.A.A. tenía que solicitar ante la Junta de Planificación una consulta de ubicación para el uso de los terrenos necesarios para la construcción del Superacueducto. Conforme a ello, el 21 de junio de 1995, la A.A.A. *presentó* ante la Junta de Planificación dicha solicitud y posteriormente, se celebraron las correspondientes vistas públicas. El 5 de julio de 1996 la Junta emitió una

resolución mediante la cual, luego de analizar la solicitud a la luz de las leyes, los reglamentos y las normas de planificación vigentes, determinó que era *viable* el desarrollo de los terrenos para el uso propuesto. Conforme a ello, aprobó la consulta de ubicación para el Superacueducto que se establecerá en los municipios de Arecibo, Barceloneta, Manatí, Vega Baja, Toa Alta, Toa Baja, Dorado y Bayamón.

Cabe señalar que la Sec. 7.01 del Reglamento para Procedimientos Adjudicativos de la Junta de Planificación, *supra*, hace *potestativa* la radicación de una D.I.A. para conceder una consulta de ubicación. En su consideración de la solicitud de consulta de ubicación, la Junta de Planificación solamente está obligada a cumplir con las disposiciones de la Ley Núm. 9 sobre Política Pública Ambiental, *supra*, en la medida en que debe "integrar y considerar las consideraciones [sic] ambientales y ecológicas en sus procesos decisionales y en sus procesos administrativos, ... en estricta conformidad con la política pública anunciada ... en dicha ley".

Por tanto, entendemos que la Junta de Planificación, en efecto, cumplió con dicho mandato al haber solicitado y tomado incluso en consideración la D.I.A. preparada por la A.A.A. al momento de aprobar la consulta de ubicación, aun cuando, por ley, *no* estaba *compelida* a solicitarla.

Por otra parte, el D.R.N.A. es la agencia encargada de velar y regular todo lo relativo a la utilización de los recursos naturales en Puerto Rico. 3 L.P.R.A. sec. 153. Conforme a ello, se requiere que, previo al inicio de la construcción de una obra que conlleve el uso del recurso agua, se obtenga un permiso o aprobación del D.R.N.A.

Para ello, el Reglamento de Aguas establece un procedimiento para la aprobación de la franquicia de agua, el cual, en síntesis y en lo pertinente, es el siguiente. En primer lugar, el proponente presenta su solicitud de franquicia y la solicitud de permiso para la construcción de toma de agua. Luego, el D.R.N.A. evalúa de *manera preliminar* la solicitud de franquicia y si esta evaluación es favorable,

evalúa el permiso de construcción de toma de agua. En caso de concederse tal permiso, el tenedor construye la obra y rinde un informe de terminación de obra. Por último, el Secretario del D.R.N.A., una vez acepta el informe de terminación de obra, evalúa la solicitud de franquicia.[3]

Conforme a lo requerido por ley, la A.A.A. *solicitó* el permiso de construcción de toma de agua en el Río Grande de Arecibo. El 18 de septiembre de 1996, el D.R.N.A. le concedió el permiso solicitado, *sujeto a ocho (8) condiciones generales y a nueve (9) condiciones especiales.* En el permiso se especificó que el mismo quedaba sujeto a que se le diera cumplimiento a la Ley para la Conservación, el Desarrollo y Uso de los Recursos de Agua de Puerto Rico (en adelante la Ley de Aguas,[4] la Ley sobre Política Pública Ambiental,[5] la Ley Orgánica del Departamento de Recursos Naturales y Ambientales[6] y a las condiciones especificadas. El D.R.N.A. enfatizó, en el permiso de construcción de la toma de agua que expidió, que el incumplimiento con cualquiera de tales disposiciones podría conllevar la revocación del mismo.

Al examinar las condiciones generales y especiales impuestas por el D.R.N.A. en el permiso que expidió, *forzoza resulta la conclusión de que el D.R.N.A. ponderó, estudió y analizó los criterios establecidos en la Sec. 5.2 del Reglamento de Aguas*, ante, *pág. 17, para la evaluación preliminar de la solicitud de franquicia de agua.*

A la luz de lo discutido anteriormente, somos del criterio que la A.A.A. estaba facultada para preparar la D.I.A., y que el D.R.N.A. hasta la fecha ha cumplido con todas las obligaciones que le imponen las leyes y los reglamentos pertinentes. Además, entendemos que la A.A.A. siguió el procedimiento prescrito por la Ley de Aguas, para la con-

---

[3] Véanse las Secs.: 5.2, 7.12, 8.7 y 8.8 para el Aprovechamiento, Uso, Conservación y Administración de las Aguas de Puerto Rico de 28 de enero de 1993, Departamento de Recursos Naturales, págs. 17, 26 y 29.

[4] 12 L.P.R.A. sec. 1501 *et seq.*

[5] 12 L.P.R.A. sec. 1121 *et seq.*

[6] 3 L.P.R.A. sec. 151 *et seq.*

cesión del permiso de construcción de la toma de agua por parte del D.R.N.A. En resumen, *prima facie no parece haber mediado ilegalidad alguna.*

## IV

Como señaláramos anteriormente, el T.C.A. decidió expedir el recurso de revisión presentado por Misión Industrial en el caso de epígrafe. Dicha expedición tuvo el efecto automático de paralizar las obras de construcción del Superacueducto. La A.A.A. y la Junta de Planificación alegan que tal actuación le está causando cuantiosas pérdidas económicas al erario, razón por la cual entienden debemos ordenar la continuación de las mismas.

Por su parte, la posición de Misión Industrial ha sido la de que no se deben continuar dichas obras de construcción, por cuanto las mismas están causando serios daños ambientales y ecológicos debido a que no se ha cumplido con los procedimientos y requisitos necesarios para obtener los permisos para la construcción del Superacueducto. *Ello no obstante,* ni en los escritos presentados ante nos, ni en la vista oral celebrada ante este Foro, han podido demostrar concretamente los daños alegados. *Específicamente, Misión Industrial no ha podido demostrar —ni tan siquiera señalar— la naturaleza de los daños que está ocasionando la construcción de la obra, ni si los mismos son irreparables o temporales.* Ello, *vis à vis* el impacto sobre el interés público que conlleva la actual paralización de las mismas y el interés del pueblo de Puerto Rico en satisfacer sus actuales y futuras demandas por el recurso de agua.

En la resolución que emitiéramos el 10 de marzo de 1997, se le ordenó a *todas* las partes expresarse, entre otras cosas, sobre la aplicación de los criterios jurisprudenciales aludidos en *P.R. Telephone Co. v. Tribunal Superior,* 103 D.P.R. 200 (1975), de modo que pudiéramos ponderar adecuadamente la posibilidad de ordenar el cese o la continuación de las obras de construcción del Superacueducto.

Dichos criterios son los siguientes: "la naturaleza de los

daños que pueden ocasionárseles a las partes de concederse o denegarse el [remedio extraordinario]; su irreparabilidad o la existencia de un remedio adecuado en ley; la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo; la probabilidad de que la causa se torne académica de no concederse el [remedio provisional] y, sobre todo, el posible impacto sobre el interés público del remedio que se solicita". *P.R. Telephone Co. v. Tribunal Superior*, ante, pág. 202.

Las partes tenían que presentar prueba para demostrar sus alegaciones. *Al día de hoy, luego de amplias oportunidades para expresarse, Misión Industrial no ha presentado ni ante el foro administrativo ni ante el foro judicial la evidencia necesaria para probar los daños que alega están sufriendo los recursos ambientales y ecológicos en el área bajo construcción.*

En *ausencia de prueba* específica sobre daños concretos al medio ambiente y a la ecología, *no procede la continuación de la paralización de las obras.* Entendemos, además, que tampoco procede la impráctica e infundada solución acogida en el día de hoy por la mayoría de los integrantes de este Tribunal, la cual intenta lograr un "punto medio" para la solución temporal de esta controversia, al decretar la semiparalización de la construcción del Superacueducto. Dicha solución nos parece no sólo absurda, sino ridícula y muy costosa, además de que no soluciona en lo absoluto los reclamos de ninguna de las partes involucradas en el caso. *Debe recordarse que la orden que es incorrecta; no deja de serlo por razón de que se reduzcan sus efectos a la mitad.*

En situaciones como la de autos, corresponde claramente realizar un adecuado balance de intereses. Por una parte, es necesario considerar y constatar que las agencias administrativas con jurisdicción se atengan a las leyes, reglamentos y procedimientos aplicables. Por otro lado, es menester considerar los impactos ambientales y ecológicos que las obras de construcción del Superacueducto pueden ocasionar. Sin embargo, todo esto debe sopesarse a su vez, con el interés de nuestra ciudadanía de contar con agua

suficiente para su consumo personal, comercial y recreacional, entre otros. No hay duda además, de que el agua es indispensable para el desarrollo poblacional, económico y de la infraestructura de nuestra isla.

Por otra parte, la mayoría también pierde de vista el hecho de que las agencias administrativas poseen una pericia particular sobre los asuntos que el Estado les ha delegado y que asimismo, sus decisiones gozan de una *presunción de corrección*, razón por la cual los tribunales les deben una gran deferencia. *Fuertes, Guillermety v. A.R.Pe.* 130 D.P.R. 971 (1992); *Viajes Gallardo v. Clavell*, 131 D.P.R. 275 (1992). "Reiteradamente hemos sostenido que las conclusiones e interpretaciones de los organismos administrativos especializados merecen gran consideración y respeto y que su revisión judicial se limita a determinar si la agencia actuó arbitraria o ilegalmente o en forma tan irrazonable que su actuación constituyó un abuso de discreción". *Murphy Bernabe v. Tribunal Superior*, 103 D.P.R. 692, 699 (1975); *Reyes v. Junta Planificación*, 79 D.P.R. 620 (1956).

A la luz de dichas normas de derecho administrativo, resulta forzoso concluir que, conforme los hechos que surgen del expediente y *de la información que tenemos ante nos*, la A.A.A. y la Junta de Planificación han seguido los procedimientos requeridos por ley para la obtención de los permisos necesarios para la construcción del Superacueducto. Las alegaciones de Misión Industrial no nos han convencido, ya que no han aportado prueba sustancial, indicativa de que el Gobierno incumplió su deber de seguir los procedimientos establecidos por ley.

En resumen, la presunción de legalidad y corrección no ha sido rebatida, *al menos en esta etapa de los procedimientos*, por Misión Industrial. Corresponde ahora al T.C.A. efectuar un estudio minucioso del análisis llevado a cabo por las diversas agencias administrativas involucradas al evaluar los correspondientes permisos solicitados, para determinar si en efecto cumplieron su encomienda y utilizaron sabiamente la pericia que sobre el asunto

poseen. *Resultan totalmente improcedentes, sin embargo, tanto la paralización total como la parcial de las obras de construcción mientras se realiza ese examen por el foro judicial.* El daño que le cause la mayoría a la ciudadanía puertorriqueña, al mantener la orden de paralización en vigor, aunque parcial, es uno por el cual tendrán que responder ante la historia.

— O —

Opinión disidente del Juez Asociado Señor Corrada Del Río.

I

El 21 de junio de 1995 la Autoridad de Acueductos y Alcantarillados (en adelante la A.A.A.) presentó ante la Junta de Planificación de Puerto Rico (en adelante la Junta de Planificación) una solicitud que perseguía la aprobación de la ubicación del Superacueducto de la Costa Norte (en adelante el S.A.N.) sobre terrenos localizados en ocho (8) municipios del norte de Puerto Rico. Luego de que se notificara por los medios de comunicación masiva a los propietarios de los terrenos aledaños a la ubicación del proyecto, la Junta de Planificación celebró vistas públicas el 18, 19, 22 y 26 de diciembre de 1995 y, con el beneficio de éstas, aprobó la ubicación del proyecto mediante Resolución de 18 de julio de 1996.

Misión Industrial, Inc. y otros grupos ambientalistas (en adelante Misión Industrial) presentaron ante la Junta de Planificación unas solicitudes de reconsideración el 5 y 7 de agosto de 1996. Éstas fueron denegadas por la Junta de Planificación el 30 de agosto de 1996.

El 27 de septiembre de 1996 los grupos opositores a la ubicación del proyecto presentaron un recurso de revisión ante el Tribunal de Circuito de Apelaciones, Circuito Regional I, para recurrir debido a la determinación de la

Junta de Planificación que aprobaba la consulta de ubicación. Luego de haber sido concedida una prórroga, el 6 de noviembre de 1996 la Junta de Planificación presentó ante ese foro su oposición a que se expidiera el auto solicitado.

El 20 de diciembre de 1996, casi tres (3) meses después de su solicitud para que se expidiera el auto de revisión, Misión Industrial presentó ante ese foro una moción en auxilio de jurisdicción, en la cual solicitó la paralización de la construcción del Superacueducto. Para fundamentar su solicitud de que se paralizara el proyecto, esa parte alegó en su moción que la A.A.A. había comenzado la construcción del S.A.N. sin haber obtenido los permisos necesarios. El Tribunal de Circuito de Apelaciones celebró vista oral el 22 de enero de 1997, y el 24 de enero de 1997 la Junta de Planificación sometió una moción de réplica.

El 28 de febrero de 1997, dos (2) Jueces del panel del Tribunal de Circuito de Apelaciones, Hon. Liana Fiol Matta y Hon. Dolores Rodríguez de Oronoz, emitieron una resolución mediante la cual se expidió el auto de revisión administrativa solicitado, decretándose automáticamente la paralización de la construcción del S.A.N. En la resolución ordenaron que se presentaran los autos certificados del proceso administrativo, así como la transcripción de las vistas evidenciarias ante la agencia. La notificación de esa resolución fue archivada en autos el 3 de marzo de 1997.

El Hon. Juez Gilberto Gierbolini emitió un voto disidente a la ponencia de la mayoría por entender que, aunque se requería el examen del expediente administrativo y las transcripciones para evaluar los méritos del recurso, ordenar la paralización de la construcción del proyecto constituía una medida demasiado onerosa y extrema, dadas las alegaciones ante el tribunal y el costo y la importancia del proyecto.

El 5 de marzo de 1997 la Junta de Planificación, mediante una moción, le informó al Tribunal de Circuito de Apelaciones que tomaría de tres (3) a cuatro (4) semanas preparar las transcripciones de las vistas públicas celebra-

das por esa agencia y una semana para entregar los autos originales del caso.

Inconformes, la A.A.A. y la Junta de Planificación acudieron ante este Tribunal. El 7 de marzo de 1997, éstas presentaron sendas peticiones de *certiorari* y mociones en auxilio de jurisdicción. En dichos escritos se arguye que el Tribunal a quo incidió al expedir el auto de revisión y se suplica la revocación de la paralización de la construcción del S.A.N. A tenor de nuestra Resolución de 10 de marzo de 1997, las partes presentaron sus alegatos suplementarios el 12 de marzo de 1997. Celebramos vista oral el 14 de marzo de 1997. Los casos fueron consolidados. Estamos en posición de disponer de esta controversia.

## II

La Constitución de Puerto Rico establece nuestra política pública sobre la protección del ambiente:

> Será política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad. Art. VI, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 379.

Para cumplir con ese mandato constitucional, la Asamblea Legislativa aprobó la Ley sobre Política Pública Ambiental, Ley Núm. 9 de 18 de junio de 1970 (12 L.P.R.A. sec. 1121 *et seq.*). Mediante esa ley, la Asamblea Legislativa declaró:

> ... [Es la] política continua del Gobierno del Estado Libre Asociado ... en cooperación con las organizaciones públicas y privadas interesadas, utilizar todos los medios y medidas prácticas ... para crear y mantener las condiciones bajo las cuales el hombre y la naturaleza puedan existir en armonía productiva y cumplir con las necesidades sociales y económicas y cualesquiera otras que puedan surgir con las presentes y futuras generaciones de puertorriqueños. 12 L.P.R.A. sec. 1123(a).

Ante estas directrices, sabemos que cada paso que tome el desarrollo de la infraestructura de nuestra isla para me-

jorar las condiciones de vida de nuestro pueblo tendrá un impacto sobre el ambiente. Es por eso que, al revisar dictámenes administrativos que conceden permisos para llevar a cabo este progreso, nos vemos obligados a sopesar los intereses conflictivos. El recurso ante nos requiere ese balance: por un lado está el beneficio público que ofrece la construcción del S.A.N.; por el otro, están las preocupaciones que llevaron al Tribunal de Circuito de Apelaciones a emitir el auto de revisión administrativa, paralizando así la construcción. Para cumplir con nuestra función es necesario escudriñar la sustancia de los intereses que habrán de ser balanceados.

En cuanto a la importancia de la construcción del S.A.N., tomamos conocimiento judicial de que la infraestructura de almacenamiento y abastecimiento del agua es, por su obsolescencia, ineficaz en su propósito. En los últimos veinticinco (25) años no se han llevado a cabo construcciones mayores para actualizar este sistema.[1] Los abastos de agua actualmente disponibles se muestran incapaces de cumplir con la creciente demanda de ese servicio. Del expediente presentado notamos que la necesidad actual de agua potable para el área de la costa norte de Puerto Rico alcanza los doscientos (200) millones de galones diarios (en adelante M.G.D.). El sistema con que en la actualidad cuenta la A.A.A. llega a suplir sólo ciento setenta (170) M.G.D. En épocas de sequía, esa cantidad se reduce a ciento treinta y cuatro (134) M.G.D. Sencillamente, la infraestructura actual no tiene la capacidad de suplir la cantidad de galones que el pueblo necesita. Se estima que el problema de este déficit será solucionado una vez el S.A.N. comience su operación, ya que éste proveerá alrededor de cien (100) M.G.D.[2]

En 1993, el Gobernador designó una fuerza o grupo de

---

[1] Moción en Cumplimiento de Orden presentada por la Autoridad de Acueductos y Alcantarillados (en adelante la A.A.A.) el 12 de marzo de 1997, pág. 19.

[2] Para una discusión más detallada de estas cifras, véanse: Moción en Cumplimiento de Orden presentada por la A.A.A. el 12 de marzo de 1997, pág. 20; la Resolución de la Junta de Planificación de 5 de julio de 1996, págs. 2–4.

trabajo, el cual rindió un informe sobre el estado crítico de la infraestructura de ese sistema de abastecimiento y suministro. El informe indica que

[e]l sistema de suministro de agua de la Autoridad de Acueductos y Alcantarillados de Puerto Rico es amplio y grande, *pero es insuficiente.* El tiempo ha demostrado que el sistema no está preparado para enfrentar una verdadera sequía. El área metropolitana de San Juan es y será la más afectada. Aún en las épocas de lluvia, numerosas comunidades suburbanas de la ciudad y las zonas rurales sufren escasez de agua debido a los problemas crónicos del sistema de distribución. (Énfasis suplido.) Moción en Cumplimiento de Orden presentada por la AAA de 12 de marzo de 1997, pág. 18.

Para evadir cualquier duda al respecto, basta recordar que en 1993 y 1994 una sequía azotó nuestra isla y nuestro sistema de abastecimiento de agua potable no pudo responder de forma adecuada. Alrededor de 1.4 millones de puertorriqueños sufrieron el racionamiento severo del servicio de agua durante casi un año. El estado de sequía y racionamiento de agua también perjudicó severamente nuestra economía. La Junta de Planificación estima que las pérdidas atribuibles a esa sequía ascendieron a los $200 millones. El sector económico incurrió $165 millones en pérdidas atribuibles a la sequía; el sector agrícola sufrió pérdidas cercanas a los $92 millones. Otros sectores de nuestra economía perdieron hasta $84 millones. La propia A.A.A. perdió $35 millones: $20 millones en ingresos no recibidos, más los $15 millones que se utilizaron para proveer medidas de emergencia.([3])

El sistema de abastecimiento y distribución de agua se encuentra en condiciones tan graves que el Gobernador se vio obligado a declarar un estado de emergencia en la A.A.A. a través de las órdenes ejecutivas emitidas el 13 de septiembre de 1993 y el 16 de octubre de 1995.([4]) Por su

---

([3]) Véase Moción en Cumplimiento de Orden presentada por la A.A.A. el 12 de marzo de 1997, pág. 8.

([4]) Véase Moción en Cumplimiento de Orden presentada por la A.A.A. el 12 de marzo de 1997, pág. 8, y sus Anejos 2 y 3.

parte, el 30 de abril de 1994, el entonces Director Ejecutivo de la A.A.A. también declaró que la agencia se encontraba en un estado de emergencia; esa evaluación fue reafirmada el 15 de julio de 1994.

Ante este estado de emergencia, el Gobernador determinó que procedía tomar medidas extraordinarias para rehabilitar la infraestructura de la A.A.A. En el Boletín Administrativo Núm. OE-1993-41([5]) 13 de septiembre de 1993, el Gobernador se expresó de la manera siguiente:

> POR TANTO: YO, PEDRO ROSSELLO, Gobernador de Puerto Rico, en virtud de los poderes inherentes de mi cargo y de la autoridad que me ha sido conferida por la Constitución y las Leyes del Estado Libre Asociado de Puerto Rico por la presente dispongo:
> PRIMERO: Declaro un ESTADO DE EMERGENCIA en la Autoridad de Acueductos y Alcantarillados, incluyendo todas las fases de mantenimiento, operaciones y de administración en dicha agencia.
> SEGUNDO: Ordeno al Director Ejecutivo de la Autoridad de Acueductos y Alcantarillados a que sin dilación alguna proceda a tomar todas las medidas necesarias incluyendo pero sin limitarse a realizar de inmediato subastas, compras y gestiones para proveer los recursos que permitan corregir la situación imperante que se describe en este boletín.
> TERCERO: Ordeno a los funcionarios pertinentes de la Autoridad de Acueductos y Alcantarillados a que evalúen e implanten las recomendaciones del informe que sometió el grupo de trabajo mencionado.
> CUARTO: Ordeno a toda la estructura gubernamental del Estado Libre Asociado de Puerto Rico a que preste la mayor cooperación en la solución de los problemas de la Autoridad de Acueductos y Alcantarillados.

Luego de vivir esa traumatizante experiencia, todo puertorriqueño puede reconocer que la carencia del servicio de agua no puede considerarse una mera inconveniencia. El servicio de agua potable es necesario para nuestra calidad de vida, nuestra salud y nuestra economía. Con esto en mente, la Fuerza o Grupo de Trabajo preparó un plan para mejorar el sistema de abasteci-

---

([5]) Véase la Moción en Cumplimiento de Orden presentada por la A.A.A. el 12 de marzo de 1997, Anejo 2.

miento y distribución de agua. El proyecto clave de ese plan es la construcción del SAN, que ahora yace paralizado.

Aproximándose el verano, sabemos que la posibilidad de otra sequía en nuestro futuro es impredecible, pero los números nos sugieren que, de no mejorar nuestro sistema de abastecimiento y suministro de agua, los daños que puedan causar las sequías serán cada vez más graves. Considérese que la población de la costa norte, donde se sufrieron los peores efectos de la última sequía, se ha duplicado en los últimos veinticinco (25) años, para llegar a la cantidad de 1.65 millones de personas; o sea, un 44% de la población de Puerto Rico.[6]

Las agencias pertinentes entienden que el S.A.N. es la solución más rápida y efectiva al problema de la incapacidad de nuestra infraestructura de asegurar el servicio de agua para el área norte de Puerto Rico. De los escritos sometidos se desprende que otros proyectos fueron considerados como posibles soluciones para la creciente crisis de agua, pero que el S.A.N. prevaleció como la alternativa más rápida y económica. Es por eso que nos parece imposible exagerar la importancia que tiene este Superacueducto. Llevar agua a los hogares y a las empresas de nuestra isla no es tan sólo un servicio público más, sino el servicio público más esencial, porque éste suple a la comunidad con el líquido de vida. El S.A.N. representa la forma de brindar ese servicio con miras al próximo siglo.

## III

Por otro lado, debemos considerar con cautela el impacto que esta medida de progreso podría tener sobre el ambiente, y su debido cumplimiento con los requeridos permisos y reglamentos. Entendemos que esta consideración fue el factor decisivo para la determinación del Tribu-

---

[6] Moción en cumplimiento de Orden presentado por la A.A.A. el 12 de marzo de 1997, pág. 20.

nal de Circuito de Apelaciones de emitir el auto de revisión y paralizar el proyecto.

En este caso el Tribunal de Circuito de Apelaciones tiene ante sí la solicitada revisión de la aprobación de la consulta de ubicación por parte la Junta de Planificación. La Ley Orgánica de la Junta de Planificación de Puerto Rico establece que la Junta de Planificación tiene como función organizar a largo plazo el uso de terrenos. 23 L.P.R.A. sec. 62j(13). El S.A.N. se clasifica como una mejora pública y, por lo tanto requiere, según lo dispuesto por la Sec. 3.03(d) del Reglamento para Procedimientos Adjudicativos de la Junta de Planificación (revisado) Núm. 5244 de 21 de marzo de 1955, Oficina del Gobernador, pág. 3.2 la presentación de una consulta de ubicación ante esa agencia. La consulta de ubicación se define de la manera siguiente:

> Trámite mediante el cual la Junta de Planificación evalúa y decide según estime pertinente, sobre propuestos usos de terrenos que no son permitidos ministerialmente por la reglamentación aplicable en áreas zonificadas pero que las disposiciones reglamentarias proveen para que se consideren. En áreas no zonificadas incluye propuestos usos de terrenos que por su naturaleza, complejidad, magnitud, impacto físico, económico, ambiental y social pudiesen afectar significativamente el desarrollo de un sector. Sec. 2.6 del Reglamento para Procedimientos Adjudicativos de la Junta de Planificación, *supra*, pág. 2.3.

Esto es, a través de la consulta de ubicación se persigue una autorización que depende de si los usos propuestos para un terreno particular son cónsonos con los planes que la Junta de Planificación tenga sobre éstos; que se cumpla con los reglamentos aplicables, y que no se contravenga la política pública ambientalista.

Para poder aprobar la consulta de ubicación, la Junta de Planificación tiene que asegurarse de que el proyecto está en armonía con la Ley de Planificación y el Plan de Usos, 23 L.P.R.A. ant. sec. 2, y la Ley sobre Política Pública Ambiental. Para obtener esa autorización de ubicación, la parte promovente debe contar con todos los permisos gubernamentales pertinentes.

Sobre la revisión judicial de la aprobación de la consulta de ubicación, recordemos que reiteradamente hemos expuesto que nuestra función de revisión administrativa requiere deferencia a las determinaciones de las agencias que, con más conocimiento y experiencia, pueden pronunciarse mejor sobre sus respectivas áreas. Véanse: *Ríos Colón v. F.S.E.*, 139 D.P.R. 167 (1995); *Com. Electoral P.I.P. v. C.E.E.*, 139 D.P.R. 48 (1995); *Asoc. Drs. Med. Cui. Salud v. Morales*, 132 D.P.R. 567 (1993); *Viajes Gallardo v. Clavell*, 131 D.P.R. 275 (1992); *Fuertes, Guillermety v. A.R.Pᴇ.*, 130 D.P.R. 971 (1992); *Colón v. Méndez, Depto. Recursos Naturales*, 130 D.P.R. 433 (1992); *Murphy Bernabe v. Tribunal Superior*, 103 D.P.R. 692, 699 (1975).

Ante tal deferencia, el Tribunal de Circuito de Apelaciones estaba obligado a presumir la legalidad y corrección de la Resolución de 18 de julio de 1996, emitida por la Junta de Planificación que aprobaba la ubicación del S.A.N. Véanse: *Rodrigo v. Tribunal Superior*, 101 D.P.R. 151 (1973); *Román v. Superintendente de la Policía*, 93 D.P.R. 685 (1966).

De manera que sólo procede la corrección judicial de una determinación administrativa si ella se percibe como arbitraria, ilegal o irrazonable. *Fuertes y otros v. A.R.Pᴇ.*, 134 D.P.R. 947 (1993). Dirigidos por esa presunción, no encontramos problema alguno plagando la consulta de ubicación concedida por la Junta de Planificación. La parte aquí recurrida, Misión Industrial, no ha probado que la consulta fue emitida de manera contraria a derecho, ni que esa decisión de la Junta de Planificación fue arbitraria o irrazonable. Por lo tanto, en esta etapa preliminar, sin prueba en contrario, la resolución emitida por la Junta de Planificación debe prevalecer.[7] Ante esto, y en especial

---

[7] Es importante subrayar que la consulta de ubicación concedida por la Junta de Planificación es de índole preliminar. En la Resolución de 18 de julio de 1996 la Junta de Planificación establece que la ubicación del Superacueducto (S.A.N.) es concedida a condición de que el proyecto eventualmente cumpla con otros permisos administrativos. Para así condicionar la ubicación, esa resolución dispone, en sus porciones pertinentes:

ante un caso de esta índole, el Tribunal de Circuito de Apelaciones abusó de su discreción al expedir el auto de revisión y no dejar sin efecto la paralización del proyecto que ello conllevaba.

La norma revisora en el campo del derecho administrativo es que lo planteado ante una agencia administrativa para su adjudicación determina la capacidad jurisdiccional de un tribunal para revisarla. D. Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, 1ra ed., Bogotá, Ed. Forum, 1993, sec. 9.4(A), pág. 525; *Rybachek v. U.S.E.P.A.*, 904 F.2d 1276, 1296 (9no Cir. 1990); *Batch v. Town of Chapell Hill*, 387 S.E.2d 655 (1990); *Wadman v. City of Omaha*, 438 N.W.2d 749 (1989); *Love v. Thomas*, 858 F.2d 1347, 1356 (9no Cir. 1988); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985); *Franklin County Sheriff's Office v. Sellers*, 646 P.2d 113 (Wash. 1982); *Methuen Retirement v. Contributory Retirement*, 424 N.E.2d 242 (1981); *Howell v. Harden*, 203 S.E.2d 206, 207 (1974). "[T]he reviewing function is one ordinarily limited to consideration of the decision of the agency ... and of the evidence on which it was based." *United States v. Bianchi & Co.*, 373 U.S. 709, 714–715 (1963). Véanse, también: *Ross v. Governors of Knights of Ar-Sar-Ben*, 299 N.W.2d 145, 146 (1980); *Twiggs v. U.S. Small Business Administration*, 541 F.2d 150 (3er Cir. 1976).

El recurso pendiente ante el Tribunal de Circuito de Apelaciones incumbe la determinación de la Junta de Planificación de autorizar la ubicación del S.A.N., pero el Tribunal de Circuito de Apelaciones en su resolución no se limitó a ese asunto. De la resolución emitida el 28 de febrero de 1997 por ese foro se desprende que otras consideraciones influyeron para la expedición del auto de revisión.

---

"3. Se cumplirá con todos los requerimientos de la Junta de Calidad Ambiental;

"4. Deberá cumplir con todas las obras de mitigación y/o recomendaciones impuestas por la Declaración de Impacto Ambiental Final;

"5. Se debe proveer a los ciudadanos un servicio adecuado, confiable, y de alta calidad." Resolución de la Junta de Planificación de 18 de julio de 1996, pág. 19.

El Tribunal a quo dice tomar en consideración el permiso de construcción de toma de agua y el permiso de franquicia de aprovechamiento de agua, ambos aún pendientes ante el Departamento de Recursos Naturales y Ambientales (en adelante el D.R.N.A.). El tribunal también consideró la legalidad de la evaluación favorable que la Junta de Calidad Ambiental (en adelante la J.C.A.) le emitiera a la Declaración de Impacto Ambiental (en adelante la D.I.A.) presentada por la A.A.A., no empece el hecho de que la determinación de la J.C.A. sobre el particular advino final y firme, sin que se solicitara una revisión judicial de ella. A este respecto, el tribunal a quo incidió. En este caso, la jurisdicción del Tribunal de Circuito de Apelaciones, que emana de su revisión del dictamen hecho por la Junta de Planificación, no se extiende a revisar los permisos que son concedidos por la J.C.A. o por el D.R.N.A. La Junta de Planificación es la única agencia que está siendo revisada por el auto emitido; esa junta no tiene capacidad alguna para revisar las determinaciones del D.R.N.A. sobre los permisos de toma de agua y de franquicia de agua, ni puede afectar la determinación de la J.C.A. sobre su evaluación de la D.I.A. No obstante, para nuestro análisis, examinemos los fundamentos que, aún fuera de su jurisdicción, fueron utilizados injustificadamente por el Tribunal de Circuito de Apelaciones para expedir el auto y paralizar la construcción.

El tribunal a quo dice estar particularmente preocupado por la posibilidad de que, luego de terminado el Superacueducto, el D.R.N.A. deniegue a la A.A.A. el permiso de toma de agua y la franquicia de aprovechamiento de agua, lo que ciertamente rendiría el S.A.N. inútil para su propósito. Sin embargo, el 3 de julio de 1996, la A.A.A. presentó ante el D.R.N.A. la solicitud para el permiso de construcción de la toma de agua y para obtener la franquicia de agua. El D.R.N.A. aprobó el permiso de toma de agua en su Resolución de 18 de septiembre de 1996. La franquicia de agua todavía está pendiente ante el D.R.N.A. Por lo tanto, el pronunciarse sobre lo que aún está bajo la consideración

administrativa de esa agencia es prematuro. Representa una usurpación indebida del Poder Judicial de las funciones de agencias administrativas. Nos explicamos más a fondo.

La Ley para la Conservación, el Desarrollo y Uso de los Recursos de Agua en Puerto Rico, Ley Núm. 36 de 3 de junio de 1976, según enmendada, 12 L.P.R.A. sec. 1501 *et seq.*, le cede al D.R.N.A. facultades sobre la conservación del recurso agua. A tenor con esa ley, el D.R.N.A. creó el Reglamento para el Aprovechamiento, Uso, Conservación, y Administración de las Aguas de Puerto Rico de 28 de enero de 1993, Departamento de Recursos Naturales (en adelante el Reglamento de Aguas), según enmendado, el cual rige la expedición de los permisos de toma y franquicia de agua. Véase, también, 12 L.P.R.A. secs. 1505(j) y 1509.

El Reglamento de Aguas dispone que la franquicia se obtiene después de completada la construcción de la obra. El Art. 8 del Reglamento de Aguas, *supra*, pág. 28, especifica que la solicitud de la franquicia debe señalar el propósito y la cantidad de la extracción de agua de su fuente y el sistema que ha de utilizarse para esto. El Art. 8.7 del Reglamento de Aguas, *supra*, pág. 29, dispone que el D.R.N.A. llevará a cabo una evaluación preliminar de la solicitud. Esta determinación preliminar tiene como su norte el "descubrir cualquier razón o circunstancia que impida la concesión de la franquicia antes de que el solicitante comience la construcción" (íd.); pero no obliga al D.R.N.A. a aprobar la franquicia ante una construcción que no se amolde a los requisitos pertinentes.

Erró el tribunal a quo al paralizar la construcción del S.A.N., por éste carecer de la franquicia de agua. Lo cierto es que, según el reglamento, la franquicia es concedida luego de que la construcción ha sido completada y reexaminada. Al respecto, el Art. 8.8 del Reglamento de Aguas, *supra*, pág. 29, dispone, en lo pertinente:

8.8 Evaluación de la Solicitud de Franquicia
Una vez completados los trámites requeridos por este reglamento *y aceptado el informe de terminación de obras según requerido en la sección 7.12 de este reglamento*, el Secretario evaluará la solicitud de franquicia. (Énfasis suplido.)

Nuestro examen del Reglamento de Aguas revela que el procedimiento para solicitar la cesión del permiso de toma de agua y la franquicia de agua está compuesto de cinco (5) etapas. Según lo dispuesto en el Art. 7.4 del Reglamento de Aguas, *supra*, pág. 23, la parte promovente primero debe someter ante el D.R.N.A. una solicitud de franquicia de agua y un permiso para construcción de toma de agua. El D.R.N.A. entonces efectúa una evaluación preliminar de la solicitud de franquicia. Véase Art. 8.7 del Reglamento de Aguas, *supra*, pág. 29. De darle el D.R.N.A. su visto bueno al proyecto en su evaluación preliminar, se pasa a evaluar el permiso de construcción de toma de agua. Véase Art. 7.10 del Reglamento de Aguas, *supra*, pág. 25. Es sólo si el D.R.N.A. concede su permiso para la construcción de la toma de agua que la parte promovente comienza su construcción. Una vez terminada la construcción de la toma de agua, la parte promovente presenta ante el D.R.N.A. un informe sobre la terminación de la obra. Véase Art. 7.12 del Reglamento de Aguas, *supra*, pág. 26. Al agotarse todas estas etapas, *y luego de completada la construcción de la obra*, el D.R.N.A. evalúa con carácter de finalidad la solicitud de toma de agua y de franquicia. Véanse: Arts. 8.8 y 8.9 del Reglamento de Aguas, *supra*, págs. 29–30.

Al paralizar la obra por temor de que ésta no reciba en la eventualidad los permisos del D.R.N.A., el Tribunal de Circuito de Apelaciones está creando una situación intolerable y arbitraria. El tribunal no permite la terminación del Superacueducto porque no se tiene el permiso del D.R.N.A., mientras el Reglamento de Aguas del D.R.N.A. requiere la terminación de la obra para evaluar la permi-

sibilidad de la toma y la franquicia.([8]) El requisito que impone el Tribunal de Circuito de Apelaciones es un obstáculo arbitrario e infranqueable. De aplicar tal norma doctrinal a todas las solicitudes de toma y franquicia de agua, ninguna sería aprobada.

Por otro lado, los autos señalan con claridad que las probabilidades de que el D.R.N.A. deniegue la franquicia son mínimas. El esquema procesal discutido está diseñado para minimizar el riesgo de que el D.R.N.A. tenga que denegar la franquicia de agua luego de que la parte promovente haya invertido sus recursos en terminar su obra de construcción. Al llevar a cabo su evaluación preliminar, el D.R.N.A. tiene la oportunidad de percatarse de los detalles de la obra que habrá de construirse y, ya que la agencia tiene la potestad de denegar el permiso en esta etapa preliminar, ella dirige la parte que interesa la franquicia a cumplir con el reglamento y con los criterios dispuestos. Como dispone el Reglamento de Aguas, y como se hizo en cuanto a ´esta obra, el D.R.N.A. realizó una detallada y exhaustiva evaluación preliminar del proyecto. Esta evaluación, aunque preliminar, no es de índole superficial o arbitraria. La evaluación está sujeta a unos criterios estrictos, dispuestos en el Art. 5 del Reglamento de Aguas, *supra*, pág. 17, denominado "Criterio del Uso de las Aguas".([9]) Al cumplir con los requisitos allí expuestos, po-

---

([8]) Situación ilegal que coloca al interés del pueblo de Puerto Rico en el dilema de "palo si boga, palo si no boga" o como se dice modernamente un *catch-22*.

([9]) El Art. 5.2 del Reglamento para el Aprovechamiento, Uso, Conservación y Administración de las Aguas de Puerto Rico de 28 de enero de 1993, Departamento de Recursos Naturales, pág. 17 (en adelante Reglamento de Aguas) dispone varios criterios sobre el uso y beneficio de agua, los cuales son evaluados para expedir el permiso preliminar. Entre los criterios se encuentran: (1) que el agua extraída de su fuente se utilice sólo para satisfacer necesidades agrícolas (en cuyo caso se requiere certificación o endoso del Departamento de Agricultura) o domésticas, comerciales, industriales o recreativas (para cuales usos se requiere que se cumpla con el uso satisfactorio del acueducto, según lo dispuesto por la A.A.A.); (2) que la extracción se lleve a cabo en conformidad con la Ley sobre Política Pública Ambiental; (3) que el uso particular sea eficiente en la utilización del recurso agua y no conlleve su desperdicio; (4) que la cantidad de agua que vaya a ser extraída no sea irrazonable en relación con el uso propuesto; (5) que no se permita el uso de aguas subterráneas

demos razonablemente presumir que la obra se coloca en buen camino de, al ser finalizada, recibir el permiso de la toma y franquicia de agua.

Por supuesto, cuando el D.R.N.A. —en su momento— emita su decisión sobre la toma y franquicia de agua para el S.A.N., cualquier parte interesada podrá solicitar la revisión judicial correspondiente. De entenderlo prudente, las partes recurridas en el caso que nos ocupa tienen un recurso en ley para atacar la determinación del D.R.N.A. sobre la toma y la franquicia, cuando ésta sea finalmente emitida.

## IV

Otro riesgo que el Tribunal de Circuito de Apelaciones expone como fundamento para expedir el auto solicitado concierne a la D.I.A.

La Ley sobre Política Pública Ambiental requiere que las agencias, las corporaciones públicas, los municipios y las instrumentalidades del Estado preparen una D.I.A. antes de efectuar una acción o promulgar una decisión gubernamental que afecte significativamente la calidad del medio ambiente. Véanse, también: el Reglamento sobre Declaraciones de Impacto Ambiental Núm. 3106 de 4 de junio de 1984, Junta de Calidad Ambiental, pág. 6, y el Manual para la Preparación de las Declaraciones de Impacto Ambiental, los cuales disponen el procedimiento que se ha de seguir para preparar esa declaración de impacto.

---

para fines de los sistemas de enfriamiento, a menos de que no se cumpla con los requisitos especificados.

Para su evaluación preliminar, el D.R.N.A. también aplica los criterios establecidos en la Sec. 5.3 del Reglamento de Aguas, *supra*, pág. 18, el cual requiere para la expedición de una franquicia que el uso esté en armonía con el Plan de Agua y el interés público. La Sec. 5.4 del Reglamento de Aguas, *supra*, pág. 18, define los criterios para evaluar el interés público mencionado en la citada Sec. 5.3, a saber: (1) que la cantidad y el uso de agua debe ser compatible con otros proyectos que se consideren; (2) el posible menoscabo de los derechos adquiridos o las franquicias ya expedidas; (3) el efecto a la salud y la seguridad pública; (4) el efecto sobre la integridad del medio ambiente; (5) el efecto socio-económico, y (6) la posibilidad de satisfacer propósitos múltiples.

Para el S.A.N., la D.I.A. fue preparada por la A.A.A. y sometida ante la J.C.A., como lo requiere el Art. 4 de la Ley sobre Política Pública Ambiental, 12 L.P.R.A. sec. 1124.([10]) Como parte del proceso de preparación y presentación de la D.I.A., ésta fue circulada a las diversas agencias gubernamentales, muchas de las cuales presentaron recomendaciones que fueron adoptadas en la versión final de la D.I.A. Nuestro examen de esta D.I.A. nos lleva a considerarla como una evaluación exhaustiva de los impactos ambientales que podría tener la construcción y operación del S.A.N.([11]) De todas maneras, es esencial señalar que esa

---

([10]) Misión Industrial ha argüido que la D.I.A. presentada ante la J.C.A. es inválida por haber sido preparada por la A.A.A., una parte con interés en su aprobación. Ese argumento es inmeritorio. La Sec. 2.1(f) del Reglamento sobre Declaraciones de Impacto Ambiental Núm. 3106 de 4 de junio de 1984, Junta de Calidad Ambiental, pág. 6, define la *parte promovente* como la que tiene que preparar y presentar la D.I.A.:

"*Agencia Promovente*—Es la agencia o instrumentalidad gubernamental del Estado Libre Asociado de Puerto Rico que se propone llevar a cabo una acción para la cual se requiere una Declaración de Impacto Ambiental (DIA), o una Determinación de Impacto Ambiental no significativa (D-N), o en caso de una acción multiagencial, la agencia o instrumentalidad que asume la responsabilidad de cumplir con el Artículo 4 de la Ley Número 9 del 18 de junio de 1970, según enmendada."

Ciertamente, la parte promovente para que se apruebe la D.I.A. sobre el S.A.N. es la A.A.A. Ante eso, nótese lo dispuesto en la Sec. 5.1.1 del Reglamento sobre Declaraciones de Impacto Ambiental de Puerto Rico, *supra*, pág. 16:

"5.1 RESPONSABILIDAD POR LA PREPARACIÓN DE UN D.I.A.

"5.1.1. La agencia proponente de un proyecto o acción será responsable por la preparación de la DIA correspondiente, conforme a las guías para la Preparación de DIA."

([11]) Los estudios siguientes fueron efectuados para esta D.I.A.:

"1. Alineación del Corredor para la Línea de Transmisión del [SAN];

"2. Hidrología;

"3. Hidrología de agua superficial para la cuenca del Río Grande de Arecibo;

"4. Rendimiento Firme: Dos Bocas/Caonillas;

"5. Rendimiento Firme: Río Tanamá;

"6. Investigación sobre sedimentos en el Río de Arecibo y su Cuenca Hidrológica;

"7. Condiciones de calidad de Agua en la Cuenca Hidrológica del Río Grande de Arecibo;

"8. Potencial de cambio en la Calidad de Agua en la Represa Dos Bocas como Resultado de la Extracción de Agua;

"9. Modelo Conceptual para el Requerimiento de Agua para el Estuario del Río Grande de Arecibo;

"10. Hidrología del Estuario del Río Grande de Arecibo al Norte de Puerto Rico;

"11. Hidrología del Área del Caño Tiburones al Norte de Puerto Rico;

D.I.A. fue certificada por la J.C.A. como un análisis confiable del impacto ambiental que cumple con los requisitos dispuestos por la Ley sobre Política Pública Ambiental.([12]) A esos efectos, la J.C.A. emitió la Resolución Núm. R-96-20-1 de 20 de mayo de 1996, la cual fue notificada el 23 de mayo de 1996. Le debemos deferencia a esa certificación.

De todos modos, no se solicitó una revisión judicial sobre esa resolución ante el foro competente, ni por Misión Industrial ni por otra parte, por lo que ésta permanece final, firme e inmune, y habrá de ser revisada por el Tribunal de Circuito de Apelaciones. Ante nos, Misión Industrial in-

---

"12. Hidrogeología: Calizas en la Costa Norte de la Cuenca Baja [del] Río Grande de Arecibo;

"13. Interacción del Agua superficial y Subterránea en la Región Cársica del Río Grande de Arecibo;

"14. Descripción General de la Flora y Fauna Acuática en la Región Norte Central de Puerto Rico;

"15. Ecología Terrestre;

"16. Descripción General del Área del Caño Tiburones al Norte de Puerto Rico;

"17. Fase IA de los Estudios Arqueológicos e Históricos para el Superacueducto de la Costa Norte;

"18. Calidad de Aire y Ruido;

"19. Plan de Manejo para la Cuenca Alta del Río Grande de Arecibo." Resolución de 23 de mayo de 1996, Junta de Calidad Ambiental, págs. 4–5.

([12]) La Junta de Calidad Ambiental (en adelante J.C.A.) nos informa que para su evaluación de la Declaración de Impacto Ambiental, le consultó a las agencias e instrumentalidades públicas siguientes:

(1) la Autoridad de Energía Eléctrica;

(2) el Departamento de Agricultura;

(3) la Administración de Terrenos;

(4) la Compañía de Fomento Industrial;

(5) el Departamento de Transportación y Obras Públicas;

(6) el Departamento de Recursos Naturales;

(7) la Administración de Reglamentos y Permisos (ARPE);

(8) la Autoridad de Carreteras;

(9) la Puerto Rico Telephone Co.:

(10) la Administración de Fomento Comercial;

(11) el Departamento de la Salud;

(12) el Departamento de Recreación y Deportes;

(13) el Departamento de Educación;

(14) el Departamento de la Vivienda;

(15) los Alcaldes Municipales afectados;

(16) la Junta Calidad Ambiental;

(17) la Compañía de Turismo;

(18) la Administración de Desarrollo de la Vivienda, y

(19) el Instituto de Cultura Puertorriqueña.

tenta un ataque colateral contra ese dictamen, y el Tribunal de Circuito de Apelaciones, sin jurisdicción, pretende inmiscuirse en dicho asunto.

## V

Durante la ventilación del recurso que nos ocupa surgió una controversia sobre el permiso requerido para colocar los tubos del acueducto que compondrán el S.A.N. En la vista oral celebrada se nos informó que la construcción para colocar esta tubería comenzó el 6 de septiembre de 1996. Se arguye que el permiso para esa construcción no se ha concedido, por lo que se sugiere que se ha comenzado ilegalmente con la construcción del S.A.N. Se intenta fundamentar esa proposición con referencia a la Ley de Certificaciones, Ley Núm. 135 de 15 de junio de 1967, según enmendada, 23 L.P.R.A. sec. 42a, la cual establece que para la construcción de proyectos de esta naturaleza se requiere un permiso de la Administración de Reglamentos y Permisos (en adelante A.R.Pe.). Ese señalamiento es incorrecto, pero sirve para dirigirnos a un punto que debe ser esclarecido: que esa ley no aplica a los proyectos de construcción de la A.A.A. A.R.Pe. ha eximido a la A.A.A. de tener que solicitar un permiso para la construcción de sus obras. La Resolución Núm. JPE-14, emitida por A.R.Pe. el 28 de octubre de 1966, exime a la A.A.A. de tener que someter solicitudes de permiso de construcción para la creación de acueductos rurales. A.R.Pe. extendió el alcance de esa resolución el 30 de agosto de 1973, en una resolución que amplió la exención de los permisos a la construcción de plantas de filtración, estaciones de bomba y líneas de transmisión. Mediante su Resolución de 2 de marzo de 1983, A.R.Pe. aclaró que había extendido un permiso para que la A.A.A. no tuviera que presentar planos de construcción o solicitudes para proyectos de segregación.[13] La A.A.A. ha dependido tradicionalmente de esas resoluciones

---

[13] Véase, también, la Resolución de 29 de octubre de 1993.

para proceder con la construcción de sus proyectos sin tener que someter primero ante A.R.PE. una solicitud del permiso de construcción. La razón para esta exención nos parece obvia. Los proyectos de la A.A.A. son de un rango tan esencial al interés público, que A.R.PE. ha facilitado y aligerado el proceso de su construcción.[14] De manera que la A.A.A. no requiere un permiso de construcción de A.R.PE. para la colocar los referidos tubos.

## VI

Un último riesgo mencionado por el Tribunal de Circuito de Apelaciones en su resolución merece nuestra atención particular. El riesgo señalado es la probabilidad de pérdida económica que resultaría si las agencias pertinentes denegaran eventualmente sus permisos, o de que el S.A.N. resulte ineficaz en su función. Como ya mencionamos, esos riesgos, un tanto remotos, no nos convencen de que debemos dejar en vigor la paralización de la construcción del S.A.N.

La paralización del proyecto del S.A.N. está causando graves daños, no sólo a la A.A.A. sino al pueblo de Puerto Rico. Al expedir el auto, el Tribunal de Circuito de Apelaciones debió examinar el agravio automático que la paralización de este proyecto le causaría al erario y a la capacidad de nuestro Gobierno de proveer un servicio público esencial. Un hecho que surge de los escritos presentados por la A.A.A. y la Junta de Planificación, y que fue admitido por el tribunal a quo en su resolución, es que cada día que la construcción del S.A.N. permanece detenida, el erario pierde ciento diez mil dólares ($110,000). A la fecha de hoy, calculamos que el dictamen infundado de ese tribunal le ha costado dos millones trescientos diez mil dólares ($2,310,000) al Gobierno de Puerto Rico. En la vista oral se expuso que la A.A.A. ya ha comprometido setenta millones de dólares ($70,000,000) a este proyecto. Se calcula que el

---

[14] Véase Resolución de ARPE de 2 de marzo de 1983, pág. 1.

costo de la cancelación del S.A.N. a esta etapa sería de cien millones seiscientos mil dólares ($100,600,000). La paralización también puede afectar alrededor de ochenta y cinco mil quinientos (85,500) empleos.[15] Varios otros proyectos podrían ser colateralmente afectados, como lo son los proyectos de construcción de alrededor de cincuenta y ocho mil (58,000) viviendas en las áreas que serían suplidas de agua por el S.A.N.[16] Estos son costos reales e inevitables que no están sujetos al azar de las probabilidades. En comparación a estas pérdidas, el costo aducido por el Tribunal de Circuito de Apelaciones en su resolución es, en verdad, minúsculo, sobre todo cuando las probabilidades de detener permanentemente este proyecto son mínimas.

Finalizado nuestro análisis, concluimos que el beneficio público que proveerá este proyecto sopesa sobre las alegaciones infundadas y preocupaciones mínimamente probables que afectaron el juicio del tribunal a quo.

## VII

Nos resta examinar la determinación del Tribunal de Circuito de Apelaciones de expedir el auto solicitado sin eliminar el efecto paralizador y oneroso de su acción.

Ante la solicitud de expedición de este tipo de auto, es práctica razonable que el tribunal evalúe la naturaleza del caso para determinar, dentro de su discreción, qué pasos tomar. El caso que nos ocupa merece que se catalogue en una clasificación particular, la cual incumbe intereses públicos de la más alta trascendencia. Por las razones expuestas, la construcción del S.A.N. es un proyecto que intenta solucionar la grave incapacidad de la infraestructura actual para suplir agua a la costa norte de nuestra isla. No se requiere una evaluación sofisticada para notar que el

---

[15] Véase la Moción en cumplimiento de orden de la Junta de Planificación de 12 de marzo de 1997, pág. 14, y Anejo, pág. 26.

[16] Íd., pág. 15; Moción en Cumplimiento de Orden presentada por la A.A.A. de 12 de marzo de 1997, pág. 9.

impacto que este caso puede tener sobre el bienestar de nuestro pueblo requería que el tribunal a quo tomara las medidas cautelares pertinentes en situaciones de esta naturaleza, para evitar daños irreparables y, sobre todo, responder al interés público.

El Tribunal de Circuito de Apelaciones debió utilizar su prerrogativa de ordenar la elevación de los autos ventilados ante el foro administrativo y las transcripciones de las vistas públicas antes de expedir el auto de revisión.([17]) De esa forma el tribunal a quo pudo haber tratado de comprender mejor lo acontecido sin tener que paralizar la construcción del S.A.N. Entendemos que esa es la práctica que debe seguirse ante casos de tanta importancia para el bien público.

Aun si el Tribunal de Circuito de Apelaciones entendía que era necesario expedir el auto de revisión, eso no requería la paralización de este importante proyecto. La Regla 61(B)(1) del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A, dispone:

> B. *Efectos de la expedición del auto.*
> (1) La expedición del auto de revisión suspenderá la implantación de una regla o reglamento, orden, resolución o determinación de una agencia o funcionario o la adjudicación de la subasta impugnada si no se hubiere otorgado el contrato antes, *salvo orden en contrario emitida por el Tribunal.* (Énfasis suplido.)

De esta manera, el reglamento de ese tribunal provee que una vez se expida el auto de revisión, se evaluarán los

---

([17]) Nótese que resalta de la resolución emitida por el Tribunal de Circuito de Apelaciones la admitida ignorancia en la que éste se encontraba sobre las alegaciones del recurso instado. El tribunal reconoce esta situación al mencionar en su resolución que "no contamos con información precisa que nos permita hacer una determinación razonable sobre los costos de cancelación del proyecto". Resolución de 28 de febrero de 1997 del Tribunal de Circuito de Apelaciones, pág. 20. Eso es, el Tribunal de Circuito de Apelaciones paralizó uno de los proyectos infraestructurales más importantes de nuestra historia sin haber determinado primero la violación de alguna disposición de ley o probabilidad de daño ambiental. Ante esa situación entendemos que el tribunal a quo debió adquirir más información y fundamentos sobre las alegaciones instadas *antes* de expedir el auto de revisión administrativa.

intereses en conflicto para determinar si se deja sin efecto la paralización de la determinación de la agencia recurrida. Entendemos que la citada Regla 61(B)(1) le impone al tribunal la responsabilidad de enfocar su criterio sobre los hechos particulares del recurso.([18])

Expresamos en *P.R. Telephone Co. v. Tribunal Superior*, 103 D.P.R. 200 (1975),([19]) que una orden para paralizar una obra goza de las características de una acción de *injunction*. Por esa razón, y siendo el proyecto en cuestión tan necesario para la infraestructura de nuestra isla, el Tribunal de Circuito de Apelaciones debió evaluar las alegaciones de las partes *vis-à-vis* los criterios evaluativos para conceder un interdicto.

---

([18]) Imponerle una interpretación alterna a esta regla resultaría en el precario fin de que el Tribunal de Circuito de Apelaciones paralice las resoluciones administrativas sin tomar en consideración las consecuencias. Al expedir un auto de revisión, el tribunal nunca debe imponer automáticamente la paralización de funciones, decisiones o proyectos del Gobierno que, como el de autos, sean de una naturaleza que requiera su progreso hasta la determinación final del foro revisor. Dado que el interés de que se continúe con la construcción del S.A.N. al no percibir violaciones de ley o reglamentos en su obra ni dudas fundadas sobre la viabilidad de la terminación del proyecto, entendemos que el Tribunal de Circuito de Apelaciones abusó en su discreción.

Presumiendo que la Regla 61(B)(1) del Reglamento del Tribunal de Circuito de Apelaciones, 4 L.P.R.A. Ap. XXII-A, debe ser interpretada como favoreciendo la paralización del dictamen administrativo que ha de ser revisado, entendemos que el interés público del S.A.N. y la carencia de fundamentos para sostener las preocupaciones que invadieron el psique de ese foro, lo que procedía es que éste emitiera la orden aludida en la regla, para mediante ésta disponer que el proyecto siguiera su curso mientras se ventila la revisión.

([19]) En *P.R. Telephone Co. v. Tribunal Superior*, 103 D.P.R. 200 (1975), el antiguo Tribunal Superior decretó la suspensión de la adjudicación de una subasta, mediante la cual la Puerto Rico Telephone Company contrató con I.T.T. para la compra e instalación de ciertos equipos. Ante controversias sobre la interpretación de varias cláusulas del contrato entre estas compañías, la Puerto Rico Telephone Company presentó una demanda y ITTCM (una subsidiaria de I.T.T. y la fabricadora del equipo) interpuso una moción para que se remitieran las controversias a arbitraje (como alegadamente se requería en el contrato) y solicitar *injunction* para paralizar la adjudicación de una subasta para adquirir el equipo. El tribunal expidió el *injunction pendente lite* hasta poder determinar si la interpretación del contrato estaba sujeta a arbitraje. La Puerto Rico Telephone Company acudió ante nos. En vista de este marco fáctico y los criterios dispuestos, encontramos que no procedía el *injunction* solicitado por ITTCM, ya que ésta contaba con remedios de ley adecuados; no se le exponía a perjuicios irreparables; y la no adjudicación de la subasta sólo demoraría "el programa de expansión y mejoramiento del sistema telefónico de Puerto Rico". Íd., pág. 202.

Según expusimos en *P.R. Telephone Co. v. Tribunal Superior*, supra, pág. 202, los requisitos para que se otorgue un *injunction* son:

[1] la naturaleza de los daños que pueden ocasionárseles a las partes de concederse o denegarse el *injunction*;
[2] su irreparabilidad o la existencia de un remedio adecuado en ley;
[3] la probabilidad de que la parte promovente prevalezca eventualmente al resolverse el litigio en su fondo [revisión];
[4] la probabilidad de que la causa se torne en académica de no concederse el *injunction* y,
[5] *sobre todo, el posible impacto sobre el interés público del remedio que se solicita.* (Énfasis suplido.) Véanse, también: 32 L.P.R.A. sec. 3523; *Universidad del Turabo v. L.A.I.*, 126 D.P.R. 497 (1990).

En *P.R. Telephone Co. v. Tribunal Superior*, supra, fuimos claros al requerirle a la parte promovente del *injunction* el cumplimiento con el peso de la prueba para demostrar, a base de estos factores, que éste se debía decretar. Así debió haber hecho el Tribunal de Circuito de Apelaciones, pero éste se limitó a considerar sólo el prospecto de que la continuación de la construcción del proyecto tornara académica la controversia sobre su legalidad. Del Tribunal de Circuito de Apelaciones aplicar los requisitos esbozados al caso de autos, hubiese llegado a la inevitable conclusión de que no se justificaba la paralización de la construcción. Abusó de su discreción el Tribunal de Circuito de Apelaciones al no hacer este ejercicio justiciero y al actuar prácticamente a ciegas.

Aunque los daños que pueden ocasionársele al ambiente por definición requieren nuestra considerada atención, existe un remedio en ley que hace innecesario el remedio extraordinario. El remedio en ley aludido se encuentra en estos momentos ventilándose ante el Tribunal de Circuito de Apelaciones, al éste haber expedido el auto de revisión. La probabilidad de que la continuación de la construcción del S.A.N. torne el caso en académico es mínima; del expediente se desprende que se espera que el S.A.N. no se termine hasta 1998, y que éste no entre en operación hasta el

2000. Dada la naturaleza del S.A.N., encontramos razonable esperar que la Junta de Planificación y la A.A.A. prevalezcan eventualmente en este caso. El factor más importante que se debe considerar es el impacto que la paralización podría tener sobre el interés público. Cualquier posible ilegalidad en el trámite, si alguna, podría subsanarse mediante medidas subsiguientes que sean tomadas por las agencias concernidas a la luz de la decisión que en su día recaiga en el caso. Definitivamente, del tribunal a quo haber aplicado las doctrinas de *equity* sobre *injunction* al caso de autos, hubiese procedido a expedir una orden para dejar sin efecto la paralización.

## VIII

Ante la incapacidad de Misión Industrial de demostrar que la construcción del S.A.N. se ha llevado a cabo en violación a las leyes o los permisos pertinentes, nos parece obvio que no existen fundamentos para paralizar la obra. Sin embargo, la opinión que hoy emite el tribunal paraliza la construcción de la mayoría de los componentes del S.A.N., permitiendo sólo que se proceda con la instalación del sistema de tubería. Los méritos de este recurso no presentan justificación para esa limitación; por lo que nos vemos obligados a disentir vigorosamente.

En su opinión, la mayoría describe el proyecto del S.A.N de la siguiente forma:

> *El proyecto está compuesto de siete elementos principales. Su primer componente es una laguna de retención de aguas crudas* (sin tratar) cerca de la confluencia del Río Grande de Arecibo y del Río Tanamá. *El segundo componente es una estación de bombeo de aguas crudas* hacia la planta al este sureste de la mencionada laguna. *El tercer elemento es la tubería de conducción de aguas crudas* que va desde la estación de bombeo hasta la planta de filtración propuesta. *El cuarto elemento es la Planta de Filtración* en el Barrio Miraflores de Arecibo con una capacidad de producción inicial de 100 MGD. *Como quinto elemento está la tubería de agua potable* desde Arecibo hasta la zona este de Bayamón con un total de doce (12) puntos de conexión de servicio para los municipios a servirse ya mencion-

ados. El lugar seleccionado para la planta es un punto alto que permite llevar las aguas por gravedad, sin bombeo, desde Arecibo hasta Bayamón. *El sexto componente serán dos tanques de almacenaje* de 10 MGD cada uno y serán instalados al oeste de la ciudad de Bayamón. *Dos líneas de trasmición [sic] eléctricas serán el último componente del sistema.* Una de las líneas va a suplir la estación de bombas cerca del Río Grande de Arecibo y la otra la Planta de Tratamiento a ubicarse en el Barrio Miraflores. Resolución de la Junta de 5 de julio de 1996, Apéndice Caso Núm. CC-97-114, pág. 41. (Énfasis suplido.) Opinión mayoritaria, pág. 675.

Como explicamos antes, el Tribunal de Circuito de Apelaciones carece de fundamentos para decretar la paralización de estos componentes. Misión Industrial se ha concentrado en alegar la ilegalidad de la construcción por razón de la falta de un permiso de franquicia de agua. Ese permiso y el de la toma de agua aún se encuentran ante el D.R.N.A. y pueden ser revisados una vez que esa agencia emita su determinación final sobre ellos, por lo que la construcción de los siete (7) componentes del sistema —es decir, la infraestructura del proyecto, mientras no comience la extracción de agua— representa riesgos mínimos al ambiente, que se han tomado en consideración en la D.I.A. y en los otros permisos ya concedidos. Inclusive, no se ha demostrado que la remoción de agua para el S.A.N. causaría un daño ecológico, y preliminarmente sus riesgos fueron considerados y evaluados como aceptables.[20] La D.I.A., que fue preparada por la A.A.A. y certificada como válida por la J.C.A., no ha sido impugnada.

Ante estos hechos, Misión Industrial no ha probado que la A.A.A. carece de un permiso necesario para la construcción del S.A.N. Entendemos que no existe ni un "asomo" de irregularidad, pero nos parece indiscutible que, de existir sólo un "asomo", éste no justificaría la paralización de un proyecto como el S.A.N. No obstante, la mayoría entiende

---

[20] Véase Resolución emitida por la Junta de Planificación el 5 de julio de 1996; la Resolución emitida por la J.C.A. el 20 de mayo de 1996, y la misiva de la Agencia de Protección Ambiental de Estados Unidos, dirigida al Cuerpo de Ingenieros del Ejército de Estados Unidos, de 27 de marzo de 1996.

que procede la paralización de aquellas partes del S.A.N. que alegadamente queden afectadas por omisiones. No existen las omisiones presentadas por Misión Industrial y la D.I.A., la propia decisión de la Junta de Planificación que aprueba la consulta de ubicación y varios de los permisos concedidos en efecto han requerido que se tomen las medidas que permiten que la construcción se realice produciendo un mínimo daño, por lo que es caprichosa la paralización casi total del proyecto, permitiéndose sólo la colocación de las tuberías.

Las tuberías sólo constituyen dos (2) de las fases de la construcción del S.A.N.: las tuberías para la conducción de aguas crudas y la tubería que conduce el agua potable. Se podrá proceder con la colocación de estas tuberías, pero quedan paralizados: la construcción de la laguna de retención de aguas crudas; la estación de bombeo para estas aguas; la planta de filtración; los tanques de almacenaje, y las líneas de transmisión eléctricas. Como reconoce la mayoría, todos los componentes son esenciales para la construcción del S.A.N. El Tribunal hoy actúa de forma arbitraria y contra los mejores intereses públicos al sostener la paralización de todos estos componentes de la construcción del S.A.N. Recordemos que estas tuberías no son para que por ellas pase aire; sin todos los componentes el S.A.N. es inútil e incapaz de cumplir con la necesidad de los puertorriqueños.

En un intento de justificar la paralización parcial del S.A.N., la mayoría menciona que durante la vista oral los representantes de la A.A.A. y la Junta de Planificación entendieron que ese remedio es aceptable. Eso es totalmente incorrecto. En la vista estos representantes, al responder a una pregunta del Tribunal, expresaron únicamente en referencia a la colocación de la tubería que podría ser aceptable no colocarla por el momento sobre lechos y ríos. Esas partes en ningún momento de la vista comentaron, ni se les preguntó, sobre la paralización de los otros componentes que son necesarios para la creación del S.A.N.; que son, por cierto, los que sin fundamento paraliza la mayoría hoy.

## IX

Cada avance en el progreso de nuestro desarrollo debe ser evaluado ante el efecto que éste pueda tener sobre el ambiente natural de nuestro terruño, ya que éste es, por cierto, junto con nuestra gente, nuestro recurso primordial. Por un lado, con el S.A.N. se ambiciona cumplir con la necesidad de agua potable de quince (15) municipios de la costa norte de Puerto Rico. Al paralizar la construcción del S.A.N., el Tribunal a quo le impone al Estado el riesgo, muy grave e inaceptable, de no poder llevar el agua potable a los hogares y a las empresas de estos municipios. Además, con sus medidas a medias, el Tribunal de Circuito de Apelaciones, y ahora este Tribunal, le imponen un costo exorbitante al erario; este costo podría llegar hasta tener el efecto de paralizar la construcción del S.A.N. indefinidamente.

Por otro lado, Misión Industrial y las otras partes que suplicaron la paralización del S.A.N. no han establecido de manera prima facie que la A.A.A. incumplió con los requisitos legales y administrativos al comenzar la construcción de esta obra ni, tampoco, daños irreparables al ambiente como consecuencia del proyecto.

Completado el ejercicio analítico y valorativo, concluimos que las preocupaciones del Tribunal de Circuito de Apelaciones, sobre la certificación del D.I.A. y sobre los permisos aún pendientes ante el D.R.N.A., no tienen justificación. Al dictaminar sobre el recurso y la moción presentada, el Tribunal a quo debió examinar con mayor minuciosidad estas preocupaciones, para así darse cuenta de que ellas son infundadas e improbables. Por las razones expuestas, entendemos que la paralización de este proyecto constituye una medida desproporcionada, onerosa y contraproducente para el bienestar de Puerto Rico. Procede la revocación de la Resolución de 28 de febrero de 1997 emitida por el Tribunal de Circuito de Apelaciones, en cuanto a la paralización de la construcción del proyecto del

S.A.N. hasta tanto dicho tribunal emita su decisión en el caso ante su consideración. Por no ser ese el alcance de la opinión mayoritaria que hoy emite este Tribunal, disentimos.

Mientras unos tienen la visión de un Puerto Rico que necesita de soluciones rápidas y eficaces a sus problemas, otros prefieren que sigamos "arrastrando los pies" con la mentalidad del estancamiento y la inacción bajo cualquier pretexto.